GEORGE S. CANELLOS
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281-1022
(212) 336-0174 (Stoelting)

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

APR 2 0 2010

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                  *Plaintiff,*

          v.

McGINN, SMITH & CO., INC.,
McGINN, SMITH ADVISORS, LLC,
McGINN, SMITH CAPITAL HOLDINGS CORP.,
FIRST ADVISORY INCOME NOTES, LLC,
FIRST EXCELSIOR INCOME NOTES, LLC,
FIRST INDEPENDENT INCOME NOTES, LLC,
THIRD ALBANY INCOME NOTES, LLC,
TIMOTHY M. MCGINN, AND
DAVID L. SMITH,

                  *Defendants, and*

LYNN A. SMITH,

                  *Relief Defendant.*

:
:
:
:
:
: 1. 10 cv. 457 GDS/RFT
:
:
:
: **COMPLAINT**
:
:
: **JURY TRIAL DEMANDED**
:
:
:
:
:
:
:
:

---

Plaintiff Securities and Exchange Commission (the "Commission") for its complaint

against McGinn, Smith & Co., Inc. ("MS & Co."), McGinn, Smith Advisors, LLC ("MS

Advisors"), McGinn, Smith Capital Holdings Corp. ("MS Capital"), First Advisory Income

Notes, LLC ("FAIN"), First Excelsior Income Notes, LLC ("FEIN"), First Independent Income

Notes, LLC ("FIIN"), Third Albany Income Notes, LLC ("TAIN") (FIIN, FEIN, FAIN and

TAIN are referred to collectively herein as the "Four Funds"), Timothy M. McGinn ("McGinn"),

and David L. Smith ("Smith"), Defendants, and Lynn A. Smith, Relief Defendant, alleges as follows:

## SUMMARY OF ALLEGATIONS

1.  The Commission brings this action to stop an ongoing fraud orchestrated by defendants McGinn, Smith and entities they control.  Since 2003, McGinn and Smith have used MS & Co., a registered broker-dealer and investment adviser, MS Advisors, an investment advisor, and MS Capital, as well as dozens of affiliated entities they own or control (collectively, "the McGinn Smith Entities"), to raise over $136 million in more than 20 unregistered debt offerings.  The debt offerings, including the Four Funds and numerous trust entities (the "Trusts"), have been sold to more than 900 investors. The offering fraud already has caused significant investor losses, and this emergency action is intended to stop the fraud and preserve the status quo for the benefit of the victims.

2.  McGinn, Smith, MS & Co., MS Advisors and MS Capital deceived investors in the Four Funds.  They told investors that their hard-earned money would be invested and that the profits would depend on the spread between the cost of the investment and the rate of return. Instead, the Defendants secretly funneled investor money to entities they owned or controlled, even though this was not permitted by offering materials.  Defendants concealed from investors the truth about the Four Funds, including the fact that investor money was being routed to in-house entities controlled by Smith and McGinn and to other non-public and illiquid investments, and that these actions were having a disastrous impact on the investors.

3.  In addition to the Four Funds, Smith and McGinn directed a series of smaller-scale offerings, primarily through various Trusts.  The Trusts also were used as vehicles to funnel investor funds to various companies controlled by Smith and McGinn, contrary to the terms of

2

the Private Placement Memoranda (PPMs). Investor money raised in offerings for the Trusts was routinely diverted to other McGinn Smith entities as liquidity needs of the enterprise dictated. The Defendants also used offering proceeds to make unauthorized investments in and unsecured loans to speculative, financially troubled McGinn Smith Entities, to make MS & Co.'s payroll, to pay commission and transaction fees to McGinn Smith Entities, to make interest payments to investors in other entities, to support McGinn's and Smith's lifestyle, and to procure strippers for a "sexually themed" cruise.

4.      The Defendants' misrepresentations and omissions have had a devastating impact on the investors. In 2009, Smith and McGinn received e-mails telling them the investors were wondering "if they've bought into a Ponzi Scheme," and a MS&Co. broker reported to McGinn and Smith that there are "many people who refer to our deals as a Ponzi Scheme."

5.      As of September 2009, it appears that investors in the four Funds were owed at least $84 million, that the Four Funds had less than $500,000 in cash on hand, and that their remaining assets were worth only a small fraction of the amount owed to investors. Similarly, the Trusts have a negative equity of approximately $18 million, and have never had the ability to pay the interest rates promoted to investors and also pay back principal. Nonetheless, McGinn and Smith have continued to raise money from investors, using similar misrepresentations, as recently as December 2009. During the first few months of 2010, contrary to representations to investors, McGinn and Smith have continued to drain what little cash remains through payment of "fees" to themselves.

6.      In order to halt the ongoing fraud, maintain the status quo and preserve any assets for injured investors, the Commission seeks emergency relief, including an asset freeze; a receiver over the McGinn Smith Entities; expedited discovery; and verified accountings.

3

## VIOLATIONS

By virtue of the conduct alleged herein:

7.     MS & Co., MS Advisors, MS Capital, McGinn and Smith, directly or indirectly, singly or in concert, have engaged, are engaging, and unless restrained and enjoined will continue to engage in acts, practices, schemes and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder[17 C.F.R.§ 240.10b-5];

8.     MS & Co., MS Advisors, McGinn and Smith directly or indirectly, singly or in concert, have engaged, are engaging, and unless restrained and enjoined will continue to engage in acts, practices, schemes and courses of business that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the"Advisers Act") [15 U.S.C. §§ 80b-6(1)(2) and (6)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8];

9.     FAIN, FEIN, FIIN and TAIN have violated, are violating, and, unless restrained and enjoined, will continue to violate Section 7(a) of the Investment Company Act of 1940 ("Company Act") [15 U.S.C. § 80a-7];

10.     MS & Co., MS Capital,  FAIN, FEIN, FIIN, and TAIN, McGinn and Smith directly or indirectly, singly or in concert, have violated, are violating, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act[15 U.S.C. § 77e];

11.     MS & Co. violated, is violating and, unless restrained and enjoined, will continue to violate Section 15(c) (1) of the Exchange Act [15 U.S.C. § 78(o)(1)] and Rule 10b-3 [17 C.F.R. § 240.10b-3], and McGinn and Smith have aided and abetted such violation; and

4

12.    Lynn Smith, as relief defendant, has received and retained ill gotten gains from defendants' fraud.

## JURISDICTION AND VENUE

13.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], Section 209(d) of the Advisers Act, [15 U.S.C. §80b-9(d)] and Section 42(d) of the Company Act [15 U.S.C. §80a-41(d)] seeking a final judgment: (i) restraining and permanently enjoining the defendants from engaging in the acts, practices and courses of business respectfully alleged against them herein; (ii) ordering defendants to disgorge any ill-gotten gains and to pay prejudgment interest thereon, jointly and severally; (iii) prohibiting McGinn from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)]; and (iv) imposing civil money penalties on all defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and Section 42(e) of the Company Act [15 U.S.C. § 80a-41(e)].

14.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], Sections 42 and 44 of the Company Act [15 U.S.C. §§ 80a-41 and 80a-43] and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14]..

15.    Venue lies in the Northern District of New York, pursuant to Section 22 (a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section

44 of the Company Act [15 U.S.C. § 80a-43] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. The Defendants, directly or indirectly, singly or in concert, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Certain of these transactions, acts, practices, and courses of business occurred in the Northern District of New York. For example, the main offices of MS & Co., MS Advisors, MS Capital, the Four Funds, and the various Trusts were located in Albany, New York and all of the Defendants, including McGinn and Smith, transacted business at those offices.

## DEFENDANTS

16.     **Timothy M. McGinn,** age 62, is a resident of Schenectady, New York. He is the chairman, secretary, and co-owner of MS & Co. as well as treasurer and indirect co-owner of MS Advisors. From 2003 to 2006, McGinn served as Chief Executive Officer of Integrated Alarm Services Group, Inc. ("IASG"), a publicly traded company. He left IASG and returned to MS & Co. in the fall of 2006.

17.     **David L. Smith,** age 65, is a resident of Saratoga Springs, New York. He is the president of MS & Co. and the managing member of MS Advisors. Until 2007, Smith also was the chief compliance officer of MS & Co. Smith owns about 50% of MS & Co. and about 50% of MS Advisors.

18.     **McGinn, Smith & Co., Inc. ("MS & Co."),** a registered broker-dealer and New York corporation founded in 1981 by Smith and McGinn, has its principal place of business at 99 Pine Street, Albany, NY. It is currently owned by Smith (50%), McGinn (30%), another partner ("Partner 3") (about15%) and a fourth partner ("Partner 4") (about 5%). In April 2009, MS & Co. registered with the Commission as an investment adviser, and replaced MS Advisors

as the adviser to the Funds.  Throughout 2009, MS & Co. had about 53 employees, including

about 35 registered representatives, and branch offices in Clifton Park, Manhattan and Boca

Raton.  On December 24, 2009, MS & Co. filed a partial BD-W and has been winding down

much of its broker-dealer business.  On March 9, 2010, it also withdrew its investment adviser

registration.

19.    **McGinn Smith Advisors, LLC ("MS Advisors")** is a New York corporation with

its principal place of business at 99 Pine Street, Albany, New York. MS Advisors is a wholly-

owned subsidiary of McGinn, Smith Holdings LLC, which is owned 50% by Smith, 30% by

McGinn and 20% by MS Partners.   MS Advisors was registered as an investment advisor with

the Commission from January 3, 2006 to April 24, 2009.  It was the investment adviser to all of

the Funds until April 2009, when it was replaced by MS & Co.

20.    **McGinn, Smith Capital Holdings Corp. ("MS Capital")** is a New York

corporation with its principal place of business at 99 Pine Street, Albany, New York. It is owned

by MS Holdings LLC (52%), McGinn (24%) and Smith (24%).  It is the indenture trustee for the

Funds and the trustee for all the Trusts created between 2006 and 2009.  Smith is president and

McGinn is chairman of the board.

21.    **First Independent Income Notes LLC ("FIIN");  First Equity Income Notes**
**LLC ("FEIN"); First Albany Income Notes LLC ("FAIN") and Third Albany Income**
**Notes LLC ("TAIN")** are New York corporations and unregistered investment companies with

their principal places of business at 99 Pine Street, Albany, New York.  They are wholly-owned

by MS Advisors.

## RELIEF DEFENDANT

22.   **Lynn A. Smith,** age 64, is the wife of David Smith and a resident of Saratoga Springs, New York.

## FACTS

23.   McGinn and Smith founded MS & Co. in 1980 and the firm registered as a broker-dealer in 1981. McGinn sold 40% of his interest in MS & Co to Partner 3 in 2003 when he became the chief executive officer of IASG, but he returned to MS & Co. in 2006. Since then, he and Smith have actively controlled virtually every aspect of the McGinn Smith Entities' operations.

### The Four Funds

24.   Between September 2003 and October 2005, MS Advisors formed FAIN, FEIN, FIIN and TAIN. MS Advisors held 100% of the membership interest in each Fund and was their sole managing member. MS Advisors also served as investment adviser to the Four Funds. Smith was responsible for the majority of the investment decisions for the Funds. Among other functions, McGinn served as signatory on behalf of various McGinn Smith Entities that received loans from the Funds.

25.   MS & Co. acted as the placement agent for debt offerings by the Four Funds, raising a total of approximately $90 million. MS Capital served as Trustee and Servicing Agent for each of the Four Funds. The Funds each had between 150 and 300 investors.

26.   Each Fund invested more than 40% of its assets in securities. MS & Co. was required to, but did not, register each of the Funds as investment companies.

27.   The terms of the offerings by the Four Funds, as disclosed in their "Confidential Private Placement Memoranda ("PPMs"), are summarized below:

| OFFERING | DATE OF PPM | AGGREGATE PRINCIPAL AMOUNT | TYPES OF NOTES SOLD |
|---|---|---|---|
| FIIN | Sept. 15, 2003 | $20 million | 5% Secured Senior Notes due 2004<br>7.5% Secured Senior Subordinated Notes due 2008<br>10.25% Secured Junior Notes due 2008 |
| FEIN | Jan. 16, 2004 | $20 million | 5% Secured Senior Notes due 2005<br>7.5% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2009 |
| TAIN | Nov. 1, 2004 | $30 million | 5.75% Secured Senior Notes due 2005<br>7.75% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2009 |
| FAIN | Oct. 1, 2005 | $20 million | 6% Secured Senior Notes due 2005<br>7.75% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2010 |

28.    Each note holder was entitled to quarterly interest payments. The Secured Senior Subordinated and Secured Junior Note holders' rights to payments were subordinated to the rights of the Senior Secured Note holders.

29.    The PPMs contained essentially identical disclosures, terms and conditions. They were prepared at Smith's direction and were reviewed by him for accuracy prior to commencement of each offering. Each PPM disclosed that the issuer was:

> formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio. . . .

30.    Although the PPMs include broad disclosures about the risks of investing in the Four Funds, the disclosures regarding potential affiliated transactions, aside from payment of fees and commissions to affiliates, was limited to the following language:

> [The Fund] may acquire Investments from our managing member or an affiliate of our managing member that has purchased the Investments. If the Investment is

9

purchased from our managing member or any affiliate, we will not pay above the
price paid by our managing member or such affiliate for the Investment, other
than to reimburse our managing member or such affiliate for its costs and any
discounts that it may have received by virtue of a special arrangement or
relationship. In other words, if we purchase an Investment from our managing
member or any of its affiliates, we will pay the same price for the Investment that
we would have paid if we had purchased the Investment directly. We may also
purchase securities from issuers in offerings for which McGinn, Smith & Co., is
acting as underwriter or placement agent and for which McGinn, Smith & Co.
will receive a commission.

31.    The PPMs did not disclose that the Funds would make any loans to, transfers, or

investments in, affiliated entities.

32.    The Funds increasingly made unauthorized loans and transfers to and investments

in affiliated McGinn Smith Entities. By September 2009, approximately one-half of all Funds

assets had been loaned to or invested in affiliated, often cash poor and financially desperate

McGinn Smith Entities. The PPMs suggested that the Funds were created to identify and invest

in a wide spectrum of public and private investments that would "add value to our portfolio." In

fact, the Funds served the more limited purpose of loaning or investing the majority of their

Funds in financially troubled McGinn Smith Entities. Only about $3.6 million of the

approximately $106 million raised by the Four Funds was invested in liquid, publicly traded

companies.

33.    The PPMs did not disclose that most of the McGinn Smith Entities were illiquid,

had little or no revenues, or were in poor financial condition when they received the proceeds

from the Four Fund offerings. The investments appear to have been preceded by little due

diligence (none of which was done by persons independent of MS & Co.). The investments were

generally dictated by liquidity needs of the McGinn Smith Entities.

34.    For example, between 2005 and 2007, MS Advisors caused three of the Funds to

loan nearly $8 million to alseT IP, a start-up entity partly owned and managed by Partner 3. At

10

least $700,000 of those loans was immediately transferred to Partner 3 as salary. AlseT never made a penny, and never repaid any of the loans. By December 2007, an internal MS & Co. email shows that the chief financial officer placed the value of the Funds' loans to alseT at zero. Nonetheless, MS Advisors caused two of the Funds to "loan" alseT an additional $250,000 in February 2008, so that alseT could make additional payments to certain individuals.

35.    By no later than 2006, as the Defendants knew or recklessly disregarded that the Four Funds could not redeem investor notes when they became due. For example, on December 21, 2006, an MS & Co. employee sent an email to Smith telling him that a TAIN investor wanted to redeem $100,000 in TAIN notes due December 15, 2006 and purchase $100,000 in one of the Trusts (TDM 9.25%). Smith replied that the broker "needs to replace the $100,000 before doing the trade." He continued: "I am running on fumes with all of these redemptions and cannot afford any more."

36.    By the end of 2007, each of the Funds had already paid out millions more than the Funds had received in income from investments. As of September 30, 2009, since inception the Funds had revenues of only $12.9 million and spent a total of $37 million, for a combined total loss from operations of $24 million.

37.    By the end of 2007, the Funds' assets were worth a fraction of the amount owed to investors. According to an analysis in December 2007 by MS & Co.'s then-chief financial officer, the combined "book value" of the Funds was then only $69,384,870 compared to total notes payable of $86,046,000. Moreover, the CFO calculated that the "net realizable" amount in the Funds combined as only $37,160,299 , nearly $48.9 million less than the amount owed to investors. Nonetheless, the Funds continued to raise money from investors without disclosing these facts.

11

**Additional Misrepresentations and Omissions**

38.     On January 13, 2005, Smith wrote to a prospective investor that the purpose of TAIN

"is to make investments, primarily in the form of secured loans, to private and public entities for

purposes that include acquisition, equipment purchases, receivable financing and general corporate

growth." At the time Smith wrote this letter, TAIN had made three investments. Only one of those

three investments was secured, a loan for only $830,000 out of a total of $13.1 million in

outstanding investments.

39.     Smith steered another investor away from investing in blue chip stocks like General

Electric as too risky, and told him that the Fund private placements were safer investments.

40.     On July 6, 2004, an MS & Co. broker told a prospective investor that:

> The [FEIN] Notes represent a basket of asset backed securities with substantial
> cash flow, a history of performance and limited liquidity in the marketplace. The
> portfolio includes securities from both the public and private sector. Asset classes
> consist of bonds, notes, preferred stock, leases, mortgages, limited partnerships,
> and securitized cash flow instruments. Our most active market of ideas comes
> from small private placements ($25 - $50 million) offered by investment banks
> primarily to institutional investors. We take comfort in these ideas due to the fact
> that these offerings are usually proceeded [sic] with substantial due diligence,
> scrutinized by product and industry professionals, and underwritten by top-tier
> investment banking firms with an ongoing capability to assist with additional
> capital if necessary. . . . I feel this investment is a great way for you to earn an
> attractive yield while minimizing risk.

41.     In fact, the "basket" of securities in which FEIN invested consisted mostly of

promissory notes from MS & Co. affiliates that did not have "substantial cash flow" or "a history

of performance." There is no evidence that any of the investments in FEIN resulted from "small

private placements . . . offered by investment banks primarily to institutional investors". There is

no evidence of any "due diligence," "scrutin[y] by product and industry professionals," or

underwriting by "top-tier investment banking firms" for any of the investments made by the Four

Funds at any time.

42.     In addition, MS & Co. did not provide other investors with the relevant PPM prior to their investments.

43.     In order to maintain sufficient monies in the Funds to continue to make interest payments, MS and Co. encouraged investors to rollover their notes when they became due.  As a result, Defendants were able to use what was, in effect, principal, to continue to make periodic interest payments.

### Four Funds Restructuring

44.     By as early as 2007, McGinn and Smith generally refused to honor investors' requests for the return of principal at the maturity of the notes, unless the customer's broker was able to find a new investor to replace the outgoing investor.

45.     In January 2008, Smith sent a letter to certain Fund investors stating that the Funds had run into difficulty, which he falsely and misleadingly blamed as "primarily on liquidity" caused by the subprime crisis.  In April 2008, Smith sent a second letter informing Fund investors that the problems cited in the January letter have "become more acute" and that, because two investments had eliminated their dividends or ceased distributions, the Funds were "forced" to eliminate the interest payments to Secured Junior Notes holders for the quarter.  The letter also noted that MS Advisors had been advised by counsel that "distributions at this time quite probably reflect a return of capital and not interest, and therefore distributions at this time might be considered an invasion of principal due to the Senior and Senior Subordinated Note holders.  This is a result of not knowing how and where to price our investments in these very illiquid markets."

46.     In October 2008, Smith sent a letter to all Four Funds' note holders that falsely and misleadingly blamed the financial condition of the Funds on, among other things, the "current

condition of the financial credit markets" and "financial crisis." It further stated that "the lack of liquidity in the credit markets . . . is the major issue that impacts your investment in the [Funds]."

47. These statements by Smith were false or misleading. The letters did not mention that affiliates of MS & Co., many of which were insolvent, owed the Funds tens of millions of dollars. These letters also omitted the material information that the value of the Funds' assets was only 50 % or less of the amount owed investors, and falsely suggested that note holders had a reasonable prospect of eventually receiving their principal, pursuant to the restructuring plans.

48. The purported restructuring plan extended the maturity dates of the notes, some until 2023, and unilaterally reduced interest payments for all the note tranches. Since the 2008 restructuring, MS Advisors has made only reduced interest payments to the Secured Senior Note holders.

49. Smith also misrepresented that MS & Co. and the McGinn Smith Entities would be making their own "sacrifices" and would "forfeit" all annual fees and commissions as part of the note restructuring to "improve liquidity." In fact, MS & Co. received approximately $700,000 in fees in 2009 and $275,000 in fees in 2010, after this letter was sent.

50. Notwithstanding the insolvency of the Funds, MS & Co. continued to sell and rollover investors' notes in these Funds, including junior notes. Internal MS & Co. documents show new and rollover investments, including investments by customers of Smith, of at least $736,500 in 2008 and $130,500 in 2009. The firm apparently used these new investments in part to permit certain preferred investors to cash out.

51. Despite the dire condition of the Funds, Smith and McGinn and MS Advisors continued to divert the remaining moneys in the Funds to other financially troubled McGinn

14

Smith Entities, such as Cruise Charter Ventures LLC ("CCV") and TDM Luxury Cruise Trust 07 ("TDM Luxury").

52.     The PPMs also stated that the notes were being offered only to "accredited investors." By MS & Co.'s own records, however, the Four Funds each had many unaccredited investors. According to MS & Co.'s records, as of March 20, 2006, FAIN had 30 unaccredited investors; FEIN had 46 unaccredited investors; FIIN had 31 unaccredited investors; and TAIN had 75 unaccredited investors.

## THE TRUST OFFERINGS

53.     Between 2006 and 2009, MS & Co. acted as placement agent for: four Firstline Jr. and Sr. Trusts 07 offerings ("Firstline Trusts"), TDM Cable Trust 06 ("TDM Cable 06"),TDM Luxury Cruise Trust 07 ("TDM Cruise"), TDM Verifier Trust 07 ("Verifier 07"), TDM Verifier Trust 08 ("Verifier 08"); Cruise Charter Venture Trust 08 ("CCV Trust"), Fortress Trust 08 ("Fortress Trust"), Integrated Excellence Jr. and Sr. Trusts 08, TDM Cable Trust 08; TDM Verifier Trust 09; TDMM Benchmark Trust 09 ("Benchmark 09"), TDMM Cable Jr. and Sr. Trusts 09 ("TDMM Cable 09"), TDM Verifier Trust 07R; and TDM Verifier Trust 08R and other offerings, including affiliate McGinn Smith Transaction Funding Corp. ("MSTF").

54.     The Trusts issued one or more tranches of notes and promoted interest rates ranging from 7.75 % to13% *per annum*. Maturity dates varied from approximately 15 months to five years from the date of the offering.

55.     Many of the Trusts were created to loan the offering proceeds, minus placement agent fees, to another McGinn Smith Entity ("the Conduit Entity"), which would then use those funds, minus substantial additional fees, to purchase specific contracts or receivables from a third entity, such as contracts for burglar alarm services or "triple play" (broadband, cable and telephone)

services, or luxury cruise charters. The Trusts were generally left with only a promissory note and a "security" interest in the assets to be purchased by the Conduit Entity.

56.     The Declaration of Trust typically defined "Permitted Investments" to mean a "promissory note ("the Note") evidencing a loan from the Trust to [the particular Conduit Entity]. In addition, to the extent not employed for the loan from the Trust to [the Conduit Entity], the Declaration permitted temporary investments limited to (1) certificates of deposit; (2) regularly traded short term AAA rated debt obligations; or (3) U.S. Treasury obligations.

### The PPMs Misled Investors As to The True Purpose of the Trusts

57.     The true purpose of the Trusts was to structure a series of transactions that would allow various McGinn Smith Entities to siphon off millions of dollars in transaction fees and commissions and to serve the interest of McGinn Smith Entities, not the Trust investors. MS & Co. extracted enormous fees from these Trust deals, which were not clearly disclosed in the PPMs. The Trusts typically paid placement agent fees to MS & Co. of 5% to 9.5%. When the Trusts transferred funds to the Conduit Entity, that entity paid large fees to MS & Co. that were variously characterized as, among other things, "trust administration fees," "acquisition costs," "investment banking fees," "legal fees," and "due diligence fees." Those fees were sometimes as much as 20% or more of the gross proceeds of the offering.

58.     Although many of these fees were disclosed in the Trust PPMs, the PPMs failed to disclose that certain of these fees, commissions or transaction costs overstated the true market value of the services performed, were unnecessary or were paid for services not performed or not performed with the customary degree of professional care and due diligence.

59.     The PPMs also failed to disclose that, contrary to the terms of the Trust PPMs, large portions of the proceeds would be diverted to financially struggling McGinn Smith Entities,

commingled with the offering proceeds of other Trusts, used to pay interest and principal to investors in other Trusts and to keep the financially failing McGinn Smith fraud scheme afloat.

60.     While the Trust PPMs often disclosed that there "was a high degree of risk" associated with the  investment, the PPMs failed to disclose that it was virtually certain that the Trusts would not be able to meet their obligations to pay the promised interest payments or to repay principal, given the large percentage of proceeds siphoned off in commissions and transaction fees by McGinn Smith Entities before any investments were made, combined with unauthorized loans to affiliated entities.

61.     McGinn and Smith have fraudulently maintained the illusion of success by funding interest payments with principal raised in other Trust offerings, at the expense of these investors. The following examples demonstrate how the Trusts have been used to benefit the McGinn Smith Entities, at the expense of Trust investors.

### Benchmark 09 Trust PPM Misrepresented How Proceeds Would Be Used

62.     On about July 27, 2009, MS & Co. launched an offering for the Benchmark 09 Trust.  The PPM states that approximately $1,950,000 of the $3 million raised would be loaned to TDMM Cable Funding, which would use the loan proceeds to purchase the operating assets and "triple play" contracts of Benchmark LLC.  TDMM Cable Funding would then purportedly use the earnings from this investment in Benchmark LLC to repay principal and interest due on the loan from the Benchmark 09 Trust.

63.     According to the PPM, MS & Co.'s fees and expenses would total $1,050,000, or 34% of the offering proceeds.

64.     Contrary to the representations in the PPM, the net proceeds of the offering were used for many unauthorized purposes.  For example, notwithstanding the PPM's representation

that money loaned by the Trust to TDMM Cable Funding would be used to acquire the assets of

Benchmark LLC, McGinn directed that some of the money in the TDMM Cable Funding

account be diverted to affiliated entities, including TDM Cable 06 and TDM Verifier 07 and

TDMM Cable Sr Trust.  Those funds were presumably used to pay "interest" to the various

Trusts investors.

65.    The Benchmark 09 Trust promised investors 10.5% interest on the notes, with a

maturity date of five years.  Given that defendants took 34% of the proceeds to themselves in fees

and diverted additional monies to affiliated entities in unauthorized transfers, their representation

that investors would be repaid out of the investment in Benchmark LLC was false, and McGinn,

Smith, MS & Co. and MS Capital knew, or recklessly disregarded, that this representation was

false.  Nevertheless, McGinn continued to personally raise money for this offering as recently as

December 10, 2009.

### The TDMM Cable Trust 09

66.    On January 19, 2009, MS & Co. launched an offering of $1,550,000 of 9.00%

three-year notes in TDMM Cable Senior Trust 09 ("Senior 09 Tranche") and an offering of

$1,325,000 of 11% 54-month notes in TDMM Cable Junior Trust 09 ("Junior 09 Tranche,"

collectively "TDMM Cable 09").  The Senior and Junior offerings sold out.

67.    The PPM stated that after MS & Co. took a placement agent fee of 5% of the

amount raised for Senior 09 Tranche and 8% of the amount raised for Junior 09 Tranche, the

balance, about $2.7 million, would be loaned to TDM Cable Funding, which would use the

proceeds to acquire all the operating assets and customer contracts of Broadband Solutions LLC

and HipNET LLC (both of which purportedly provided "triple play" service to communities in

Florida). The PPMs also state that TDM Cable Funding would pay MS & Co. an additional

$400,000 for "acquisition negotiations, legal and due diligence activities"-- making MS & Co.'s total fee $583,500 or 20.3% of the gross proceeds of the offering.

68.    Not satisfied with the disclosed fees, MS & Co. used a total of at least 54% of the funds raised to: (i) make payments to McGinn, McGinn's son, Smith, relief defendant Lynn Smith, MS Partner 4 and an Albany politician; (ii) to cover MS & Co.'s payroll between January and April 2009; and (iii) to pay investors in other Trust entities.  The following is a summary of McGinn's misuse use of TDMM Cable 09 investor funds:

69.    During January 2009, MS & Co. raised the first $554,000 from investors for the Senior 09 Tranche.  On January 30, 2009, McGinn transferred $475,000 from the Trust to TDM Cable Funding, and transferred $413,000 from the TDM Cable Funding to MS & Co., where it was immediately used to cover the firm's payroll.

70.    In February 2009, McGinn again transferred large sums of money from the TDMM Cable Senior Trust account to TDM Cable Funding and then to MS & Co to make MS & Co.'s mid-February and end of February payroll. The following months, McGinn again transferred substantial amounts from the TDMM Cable 09 Trust accounts to MS & Co. to cover the March 31 and April 30 payrolls.

71.    McGinn also transferred a total of at least $99,000 to McGinn's personal account; more than $21,000 to McGinn's son (apparently a lawyer who worked for MS & Co.); more than $105,000 to a MS & Co. affiliate called Mr. Cranberry; $18,750 to an Albany politician's law firm; at least $70,000 to MSTF; $26,500 to Verifier 07; $10,000 to Firstline Trust; $25,000 to a senior MS & Co. officer $24,000 to Smith; and more than $335,000 to Smith's wife, relief defendant Lynn Smith.

72.   The transfers described above total $1,646,040 -- nearly three times the fees to which MS & Co. Entities were entitled pursuant to the PPMs, and more than half of the gross offering proceeds.

### The Verifier 08 Trust

73.   In December 2007, MS & Co. launched an offering for the TDM Verifier 08 Trust. Verifier 08 offered up to $3.85 million in 18-month notes and 36-month notes, with returns of 8.5% and 10%, respectively.  The offering sold out.

74.   The PPM represented that the net proceeds of the Trust, $3,484,500, (after subtraction of MS and Co. 9.5% fee of $365,750) were to be "advanced" by the Trust to McGinn Smith Funding LLC ("MS Funding") for the purpose of purchasing $3,000,000 face value of "guaranteed payment units" issued by Verifier Capital LLC, a company that "provides capital to security alarm dealers by purchasing some or all of their security alarm monitoring accounts."  A senior managing director of MS & Co. was the Chairman and 12.5% owner of Verifier Capital LLC.

75.   The Trust has had to borrow money from other McGinn Smith Entities to make its scheduled interest payments.

76.   Verifier 08 investors were deceived about the success of the Verifier 08 Trust with the first quarterly "interest" payment, which was actually a return of investor capital.

77.   Thereafter, in order to make quarterly interest payments to Verifier 08 investors, the Verifier 08 Trust repeatedly borrowed funds from other MS Entities.  Furthermore, despite having income insufficient to make interest payments to investors, the Trust made numerous unauthorized loans to other MS Entities.

**The CCV Trust**

78.    McGinn, MS Capital and MS & Co. also deceived investors into unwittingly

investing in a sexually-oriented charter cruise venture created by McGinn.  In February 2008,

MS & Co. launched a $3,250,000 note offering for an entity 50% owned by an MS & Co.

affiliate called CCV.  The PPM stated that CCV "is engaged in the business of procuring whole

ship charters and selling the berths to various affinity groups."  The PPM stated that the net

proceeds of the offering would be used to charter a ship and to "underwrite the marketing, sales

and administrative expenses associated with selling [the] berths for the cruise."

79.    The PPM did not disclose that CCV operated under the name YOLO (You Only

Live Once) Cruises, that the affinity group was sexually oriented, that strippers and go-go

dancers would be procured to entertain passengers, that investor money would be used to buy

insurance for these individuals and that YOLO was run by a woman with whom McGinn was

romantically involved.

80.    The PPM failed to disclose that instead of marketing charters to an unlimited

variety of "affinity groups" as represented, the charters would only be marketed to a narrow

niche of potential customers interested in cruises "involving sexually themed activities among

and between consenting adults" (as belatedly disclosed in a PPM for a later offering) and that the

charters would involve legally and morally questionable activities that investors might not want

to be associated with.

81.    McGinn was the managing member of CCV.  He was involved in its day-to-day

operations and was keenly interested in the activities aboard the cruise.  McGinn "borrowed"

from other Trusts and Funds to fund CCV.

21

82.    Even though CCV lost $1.5 million during its first 17 months of operation, McGinn and Smith nonetheless enriched themselves.  CCV transferred at least $50,000 to Smith, $75,000 to McGinn, and paid at least $245,000 to MS & Co. in "advisory fees."  CCV also paid McGinn's son (an attorney and MS & Co. employee) $7,240 for "consulting."  Between July 2008 and November 2009, CCV also transferred to McGinn more than $156,000, purportedly to pay credit card charges related to meals, travel and other expenses; and in June 2009, CCV transferred more than $32,000 to White Glove Cruises, a Florida company managed by McGinn.

83.    The CCV Trust also promised investors a 13% rate of interest on their notes, even though the Trust was to earn its investment return by loaning the money to CCV, which was obligated to pay back interest to the CCV Trust of only 10%.

### The CCV Trust (2nd PPM).

84.    In 2009, MS & Co. conducted a second CCV offering of $400,000 raised from just three investors.  The PPM falsely and misleadingly stated that CCV's loss for the period February 1, 2008 through June 2009 was $870,000.  In fact, MS & Co.'s internal books and records show a loss of nearly $1.5 million during that period.

### The Firstline Trusts

85.    Firstline Trusts raised a total of $7 million in 2007.  According to the Firstline Trust 07 Junior PPM, dated October 19, 2007, the Firstline Trusts were created to acquire a tranche of financing secured by contracts owned or originated by Firstline Security, Inc., a security alarm company.  In January 2008, Firstline Security filed for bankruptcy.  Nonetheless, MS & Co. continued to sell notes in this offering without disclosing the bankruptcy filing to investors.

86.     A December 7, 2009 email to McGinn reveals that Firstline loaned another

McGinn Smith affiliated entity, known as Mr. Cranberry, more than $2.27 million.  Mr.

Cranberry does not appear to be involved in the security alarm business.

### MS & Co. Did Not Disclose that the Proceeds Would Be Commingled.

87.     A common feature of most of the Trust offerings was that the proceeds -- rather

than being directly invested -- were "loaned" to an intermediate entity, most often TDM Cable

Funding (*see, e.g.* Verifier 07 (for the purchase of alarm contract receivables); TDM Luxury

(luxury cabin cruise receivables); and TDM Cable 06 and TDMM Cable 09 Junior and Senior

(triple play receivables).  However, instead of using the proceeds for the stated purpose, Smith

and McGinn diverted the proceeds as needed to meet the cash needs of other McGinn Smith

Entities.

88.     As alleged above, on several occasions, McGinn transferred funds raised in the

TDMM Cable 09 offerings to TDM Cable Funding, and then transferred those funds to MS &

Co. for payroll.

### McGinn and Smith Have Taken Large Personal "Loans" from Various McGinn Smith Entities

89.     McGinn, Smith and another senior MS & Co. employee frequently received

substantial "loans" from the McGinn Smith  Entities.  Between October 2006 and October 2009,

TDM Cable Funding "loaned" McGinn $830,341, Smith $694,000, and the senior MS & Co.

employee $563,000, for a total of nearly $2.1 million.  None of these loans has been repaid, and

it does not appear that any interest has ever been paid.

90.     McGinn and Smith each took a $200,000 loan from the Firstline Trust.  Firstline

Securities filed for bankruptcy a few months after the four Firstline offerings raised about $7

million.    Although Firstline Trust investors are owed $5.9 million, McGinn and Smith have not repaid the loans.

91.    McGinn also authorized the following additional personal loans, none of which were evidenced by loan documentation: (i) from NEI, a McGinn Smith Entity, to Smith totaling $360,000, to the senior MS & Co. employee totaling $285,000 and to McGinn totaling $340,000; and (ii) from TDMM Cable Funding to Smith totaling $74,000, to the senior MS & Co. employee totaling $25,000 and to McGinn totaling $82,500.

### McGinn and Smith Submitted Backdated Documents to FINRA

92.    While under investigation by FINRA, McGinn, Smith and MS & Co. submitted numerous backdated promissory notes after FINRA requested loan documentation during its exam.

### MS & Co. Has Paid for Luxuries for Smith and McGinn and Transferred Funds to Smith's Wife

93.    From at least January 2004 through at least December 2008, MS & Co. made monthly payments on two cars for Smith (a Lexus and a Mercedes) totaling about $89,000, including payments of about $17,000 in each of 2007 and 2008.  MS & Co. made monthly payments on McGinn's behalf to exclusive country clubs, including the Schuyler Meadows Club, the Fort Orange Club and the Pine Tree Golf Club.  In 2007 and 2008 alone, those payments totaled more than $22,000.

94.    MS Capital transferred $335,000 to accounts in the name of Smith's wife, relief defendant Lynn Smith.  Lynn Smith received many other payments from McGinn Smith Entities. On May 4, 2009, for example, Smith directed that a $100,000 check be issued to his wife's account at National Financial Services.  Smith also testified that his salary was generally paid to his wife, Lynn.

## The Misuse of Funds and Deception Has Become More Desperate

95.     The audited financial statements for MS & Co. for 2008 state that the firm had a

loss of more than $1.8 million, and includes a "going concern" clause. Virtually every day in

2009, McGinn obtained from his accounting staff a summary of the cash available in the bank

accounts controlled by MS & Co., and a report of the immediate "funding needs."   The

documentary evidence reveals a constant movement of money among dozens of MS & Co.

affiliates and scores of bank accounts, designed to use any cash available to satisfy the most

pressing funding needs – primarily the firm's payroll, and payments to the personal accounts of

McGinn and Smith, along with interest payments and redemption requests by investors

threatening to complain to authorities.

96.     Internal MS & Co. emails in 2009, including many by McGinn and Smith, reveal a

constant need to raise millions of dollars, a growing desperation to make payroll, meet interest

payments and assuage investors complaining of a Ponzi scheme, in order to keep their house of

cards from collapsing.  For example, on February 24, 2009, Smith emailed McGinn regarding an

upcoming payroll.  He stated: "We have been living on the edge for some time and Tim's deals

have kept us alive by fronting our profit.  However, the $200,000 + that we are losing every

month is just too difficult to keep pace with." On February 25, 2009, another MS & Co. Partner 3

emailed Smith: "In our many conversations over the last year, I came to understand the depths to

which the firm has sunk relative to its revenue."  The liquidity problems were so severe that one

outside broker was forced to invest $10,000 of his own money so one of his elderly customers

could be redeemed.

97.     Notwithstanding these financial woes, McGinn and Smith continued to solicit

investors for the Four Funds and the Trusts throughout 2009 and into 2010, using the original

Fund and Trust PPMs.  In Smith's testimony provided to FINRA on February 12, 2010, Smith stated that MS & Co. continues to raise funds from new investors.  Smith stated that TDM Benchmark Trust.

### FIRST CLAIM FOR RELIEF
**Violations of Section 17(a) of the Securities Act**
(Against MS & Co., MS Advisors, MS Capital, McGinn, Smith)
(Antifraud violations)

113.    Paragraphs 1 through 112 are realleged and incorporated by reference as if set forth fully herein.

114.    The Fund and Trust certificates and notes are securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1) and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

115.    From at least 2005 through the present, the Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, in connection with the offer or sale of securities, knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or c) have engaged, are engaging or are about to engage in transactions, practices or courses of business which have operated, operate or will operate as a fraud and deceit upon investors.

116.    By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, are violating , and unless restrained and enjoined will again Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
(Antifraud Violations)
Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against MS & Co., MS Advisors, MS Capital, McGinn, Smith)

117.    Paragraphs 1 through 116 are realleged and incorporated by reference as if set forth fully herein.

118.    From at least 2005 through the present, the Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, in connection with the offer or sale of securities, knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or c) have engaged, are engaging or are about to engage in transactions, practices or courses of business which have operated, operate or will operate as a fraud and deceit upon investors.

119.    By reason of the activities herein described, the Defendants, singly or in concert, directly or indirectly, have violated, are violating, and unless restrained and enjoined will again violate Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

**THIRD CLAIM FOR RELIEF**
Violations, and Aiding and Abetting Violations, of
Section 15(c)(1) Of The Exchange Act, 15 U.S.C. §78o(c)(1), And
Rule 10b-3, 17 C.F.R. §240.10b-3
(Against MS & Co. and aiding and abetting by McGinn and Smith)
(Violations of Antifraud Provisions by Brokers)

120.     Paragraphs 1 through 119 are realleged and incorporated by reference as if set forth fully herein.

121.     MS & Co. engaged and is engaging in the business of effecting transactions in securities for the accounts of others, and therefore was and is a broker within the meaning of Section 3(a)(4) of the Exchange Act, 15 U.S.C. §78c(a)(4).

122.     MS & Co., while a broker, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, has effected and is effecting transactions in, and has induced and attempted to induce and are attempting to induce the purchase or sale of, securities by means of manipulative, deceptive, or other fraudulent devices or contrivances, including:  (a) acts, practices, and courses of business that operated or would have operated as a fraud or deceit upon any person, including persons to whom MS & Co. offered and/or sold securities; and (b) making untrue statements of material fact and omissions to state a material fact necessary, in order to make the statements made, in light of the circumstances under which they were made, not misleading with knowledge or reasonable grounds to believe that such statements are untrue or misleading.

123.     As part of and in furtherance of this violative conduct, MS & Co. offered and/or sold securities by making the material misrepresentations and omissions set forth herein.

124.     MS & Co. knew, was reckless in not knowing, or had reasonable grounds to believe that said representations or omissions were false or misleading.

125.     By reason of the foregoing, MS & Co. has violated, is violating, and unless

restrained and enjoined, will again violate Section 15(c)(1) of the Exchange Act, 15 U.S.C.

§78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

126.    To the extent McGinn and Smith were associated with MS & Co., and not acting

brokers unassociated with a registered broker-dealer, McGinn and Smith each aided and abetted,

and, unless restrained and enjoined, will again aid and abet, MS & Co's violations of Section

15(c)(1) of the Exchange Act, 15 U.S.C. §78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

### FOURTH CLAIM FOR RELIEF
(MS & Co., MS Advisors, McGinn and Smith)
Violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8

127.    Paragraphs 1 through 126 are realleged and incorporated and incorporated by reference as

if set forth fully herein.

128.    From at least 2005 through the present, MS & Co. and MS Advisors, by use of the means

or instrumentalities of interstate commerce or of the mails, and while engaged in the business of

advising others for compensation as to the advisability of investing in, purchasing, or selling securities:

(a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon clients or prospective clients.

129.    By reason of the foregoing, MS & Co. and MS Advisors, singly or in concert, directly or

indirectly, violated Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and

(2)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

130.    McGinn and Smith, knowingly or recklessly provided substantial assistance to MS & Co.

and MS Advisors and thereby directly or indirectly, singly or in concert, by use of the means or

instrumentalities of interstate commerce, or of the mails, aided and abetted MS & Co. and MS Advisors'

violations of Sections 206(1), 206(2) and 206(4)-2 of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)] and Rule 206(4)-2 thereunder [17 C.F.R. §275.206(4)-8].

**FIFTH CLAIM FOR RELIEF**
Violations of Section 7(a) of the Investment Company Act
(FAIN, FEIN, FIIN and TAIN)

131.    Paragraphs 1 through 130 are realleged and incorporated and incorporated by reference as if set forth fully herein.

132.    FAIN, FEIN, FIIN and TAIN issued securities, in the form of notes, in what amounted to a public offering, and held themselves out as funds formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, and any other investments that may add value to our portfolio.

133.    Accordingly, FAIN, FEIN, FIIN and TAIN were investment companies under Section 3(a)(1) of the Company Act [15 U.S.C. § 80a-3(a)(1)], and were required to register as investment companies with the Commission under Section 7(a) of the Company Act [15 U.S.C. § 80a-7(a)].  FAIN, FEIN, FIIN and TAIN were never so registered and, while acting as investment companies, FAIN, FEIN, FIIN and TAIN offered, purchased and sold, redeemed or retired securities by the use of the mails and the means and instrumentalities of interstate commerce and engaged in business in interstate commerce.

134.    By reason of the foregoing, FAIN, FEIN, FIIN and TAIN violated Section 7(a) of the Company Act [15 U.S.C. § 80a-7(a)].

## SIXTH CLAIM FOR RELIEF
Violations of Section 5(a) and 5(c) of the Securities Act
(MS & Co., MS Capital, the Four Funds, McGinn and Smith )

135.    Paragraphs 1 through 134 are realleged and incorporated and incorporated by reference as if set forth fully herein.

136.    The notes and certificates that MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

137.    The FAIN, FEIN, FIIN and TAIN offerings were not limited to 35 or fewer non-accredited purchasers, and MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith could not reasonably have believed that the offering was so limited.  Further, not all of the non-accredited purchasers satisfied the sophistication requirement of Rule 506(b)(2)(ii) of Regulation D [17 C.F.R. § 230.506(b)(2)(ii)], and MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith could not reasonably have believed that all such purchasers met the requirement at the time they invested.

138.    MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith Investments singly or in concert, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or have carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

139.    By reason of the foregoing MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith singly or in concert, directly or indirectly, have violated, are violating, and unless enjoined will again violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SEVENTH CLAIM FOR RELIEF
(Relief Defendant)

140.    Paragraphs 1 through 139 are realleged and incorporated and incorporated by reference as if set forth fully herein.

141.    Relief Defendant Lynn A. Smith was a recipient, without consideration, of proceeds of the fraudulent and illegal sales of securities alleged above.  The Relief Defendant profited from such receipt or from the  fraudulent and illegal sales of securities alleged above by obtaining illegal proceeds under circumstances in which it is not just, equitable, or conscionable for her to retain the illegal proceeds.  Consequently, Lynn Smith has been named as a Relief Defendant for the amount of proceeds by which she has been unjustly enriched as a result of the fraudulent scheme or illegal sales transactions.

142.    By reason of the foregoing, Lynn Smith should disgorge her ill-gotten gains, plus prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Enter a Final Judgment finding that the Defendants each violated the securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Enter an Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining the Defendants and their agents, servants, employees and attorneys and

all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder, or alternatively, from aiding and abetting such future violations, as respectively alleged against them herein.

## III.

An Order freezing the assets of the Defendants, the Relief Defendant, and all McGinn Smith Entities pending further Order of the Court.

## IV.

An Order appointing temporary and preliminary receivers over the Defendants and all McGinn Smith Entities.

## IV.

An Order directing the Defendants, the Relief Defendant and all McGinn Smith Entities to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees in writing or as otherwise ordered by the Court, a verified written accounting, signed by each of them under penalty of perjury.

## V.

An Order permitting expedited discovery.

## VI.

An Order permanently restraining and enjoining the Defendants, the Relief Defendant, the McGinn Smith Entities and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

## VII.

A Final Judgment directing the Defendants and the Relief Defendant to disgorge their ill-gotten gains, plus prejudgment interest.

## VIII.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

A Final Judgment permanently prohibiting McGinn from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)];

## X.

Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
      April 20, 2010

s/ David Stoelting
Attorney Bar Number: 516163
Attorney for Plaintiff
Securities and Exchange Commission
3 World Financial Center, Room 400
New York, NY 10281
Telephone: (212) 336-0174
Fax: (212) 336-1324
E-mail: stoeltingd@sec.gov

Of Counsel:
Andrew Calamari
Michael Paley
Kevin McGrath
Lara Mehreban
Linda Arnold

35