GEORGE S. CANELLOS
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, NY 10281-1022
(212) 336-0174 (Stoelting)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____
                                                :
SECURITIES AND EXCHANGE COMMISSION,             :
                                                :
                              *Plaintiff,*      :
                                                :
              *v.*                              :   10 Civ. 457 (GLS/DRH)
                                                :
McGINN, SMITH & CO., INC.,                       :
McGINN, SMITH ADVISORS, LLC,                     :   **SECOND AMENDED**
McGINN, SMITH CAPITAL HOLDINGS CORP.,            :   **COMPLAINT**
FIRST ADVISORY INCOME NOTES, LLC,                :
FIRST EXCELSIOR INCOME NOTES, LLC,               :
FIRST INDEPENDENT INCOME NOTES, LLC,             :   **JURY TRIAL DEMANDED**
THIRD ALBANY INCOME NOTES, LLC,                  :
TIMOTHY M. MCGINN, DAVID L. SMITH,               :
LYNN A. SMITH, GEOFFREY R. SMITH,                :
Individually and as Trustee of the David L. and :
Lynn A. Smith Irrevocable Trust U/A 8/04/04,     :
LAUREN T. SMITH, and NANCY MCGINN,               :
                                                :
                              *Defendants,*      :
                                                :
LYNN A. SMITH, and                               :
NANCY MCGINN,                                     :
                                                :
                      *Relief Defendants, and*   :
                                                :
GEOFFREY R. SMITH, Trustee of the                :
David L. and Lynn A. Smith Irrevocable           :
Trust U/A 8/04/04,                               :
                              *Intervenor.*      :
_____:

Plaintiff Securities and Exchange Commission (the "Commission") for its second amended complaint against McGinn, Smith & Co., Inc. ("MS & Co."), McGinn, Smith Advisors, LLC ("MS Advisors"), McGinn, Smith Capital Holdings Corp. ("MS Capital"), First Advisory Income Notes, LLC ("FAIN"), First Excelsior Income Notes, LLC ("FEIN"), First Independent Income Notes, LLC ("FIIN"), Third Albany Income Notes, LLC ("TAIN") (FIIN, FEIN, FAIN and TAIN are referred to collectively herein as the "Four Funds"), Timothy M. McGinn ("McGinn"), David L. Smith ("Smith"), Lynn A. Smith ("L. Smith"), Geoffrey R. Smith ("G. Smith"), Individually and as Trustee of the David L. and Lynn A. Smith Irrevocable Trust U/A 8/04/04 (the "Smith Trust"), Lauren T. Smith ("L.T. Smith"), and Nancy McGinn ("N. McGinn"), Defendants, and L. Smith and N. McGinn, Relief Defendants, alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from a fraud orchestrated by defendants McGinn, Smith and entities they control.  From at least 2003 through April 2010, McGinn and Smith used MS & Co., a registered broker-dealer and investment adviser, MS Advisors, an investment adviser, and MS Capital, as well as dozens of affiliated entities they own or control (collectively, "the McGinn Smith Entities"), to raise over $136 million in more than 20 unregistered debt offerings. The debt offerings, including the Four Funds and numerous trust entities (the "Trusts"), have been sold to more than 900 investors. The offering fraud already has caused significant investor losses, and this emergency action is intended to stop the fraud and preserve the status quo for the benefit of the victims.

2.      McGinn, Smith, MS & Co., MS Advisors and MS Capital deceived investors in the Four Funds.  They told investors that their money would be invested and that the McGinn Smith Entities' profits would depend on the spread between the cost of the investment and the

rate of return.  Instead, the Defendants secretly funneled investor money to entities they owned or controlled, even though this was not permitted by offering materials.  Defendants concealed from investors the truth about the Four Funds, including the fact that investor money was being routed to in-house entities controlled by Smith and McGinn and to other non-public and illiquid investments, and that these actions were having a disastrous impact on the investors.

3.     In addition to the Four Funds, Smith and McGinn directed a series of smaller-scale offerings, primarily through various Trusts.  The Trusts also were used as vehicles to funnel investor funds to various companies controlled by Smith and McGinn, contrary to the terms of the Private Placement Memoranda (PPMs).  Investor money raised in offerings for the Trusts was routinely diverted to other McGinn Smith Entities as liquidity needs of the enterprise dictated.  The Defendants also used offering proceeds to make unauthorized investments in and unsecured loans to speculative, financially troubled McGinn Smith Entities, to make MS & Co.'s payroll, to pay commission and transaction fees to McGinn Smith Entities, to make interest payments to investors in other entities, to support McGinn's and Smith's lifestyles, and to procure strippers for a "sexually themed" cruise.

4.     During the period of the fraud, Smith and McGinn transferred substantial assets, including houses, cash and stock, with an intent to shield those assets from creditors.

5.     The fraud has had a devastating impact on the investors.  In 2009, Smith and McGinn received e-mails telling them the investors were wondering "if they've bought into a Ponzi Scheme," and a MS&Co. broker reported to McGinn and Smith that there are "many people who refer to our deals as a Ponzi Scheme."

6.     As of September 2009, it appears that investors in the Four Funds were owed at least $84 million, that the Four Funds had less than $500,000 in cash on hand, and that their

remaining assets were worth only a small fraction of the amount owed to investors.   Similarly, the Trusts have a negative equity of approximately $18 million, and have never had the ability to pay the interest rates promoted to investors and also pay back principal.   Nonetheless, McGinn and Smith continued to raise money from investors, using similar misrepresentations.   During the first few months of 2010, contrary to representations to investors, McGinn and Smith continued to drain what little cash remained through payment of "fees" to themselves.

## PROCEDURAL HISTORY

7.      On April 20, 2010, in order to halt the ongoing fraud, maintain the status quo and preserve assets for injured investors, the Commission filed a Complaint and Order to Show Cause seeking emergency relief.   At 2:00 p.m. on April 20, 2010, the Court granted the Commission's application for emergency relief and entered an Order freezing assets of the defendants and the relief defendant, L. Smith, including a brokerage account in the name of the Smith Trust; appointing a Receiver over the McGinn Smith Entities; and requiring the defendants and the relief defendant to produce verified accountings.   The Order to Show Cause also provided for expedited discovery and scheduled a hearing on the Commission's motion for a preliminary injunction.

8.      On May 28, 2010, the Smith Trust filed a motion to intervene for the limited purpose of asking the Court to lift the temporary restraining order and asset freeze as it related to the Smith Trust's brokerage account.   On June 1, 2010, the Smith Trust's motion to intervene was granted.

9.      Smith and McGinn consented to the preliminary injunction freezing their assets, and the Receiver consented as to the remaining defendants.   The Smith Trust and L. Smith, however, opposed entry of the preliminary injunction.

10.     On June 9, 10 and 11, 2010, following six weeks of discovery focusing on the Smith Trust and the Smiths' assets, the Court conducted a hearing on the Commission's motion for a preliminary injunction, and the motions of L. Smith and the Smith Trust to lift the asset freeze over their assets.  During the hearing, the Court heard testimony from, among others, L. Smith, G. Smith, and David Wojeski, who had been named as Trustee when the original Trustee, Thomas Urbelis, resigned shortly after the Complaint was filed.  Urbelis also testified at the hearing by way of deposition.  L. Smith, G. Smith, Wojeski and Urbelis testified at the June 2010 hearing that the Smith Trust was nothing more than a simple family trust created by David and Lynn Smith for the sole purpose of benefitting their two children.

11.     On July 7, 2010, the Court issued a memorandum-decision and order ("MDO I") that granted in part the Commission's motion for a preliminary injunction, and denied L. Smith's motion.  As to the Smith Trust, the Court found that the Commission had not demonstrated that David Smith controlled the Trust or was the beneficial owner of the Trust; therefore, MDO I vacated the asset freeze as to the Trust.

12.     On July 22, 2010, the Court entered the Preliminary Injunction Order.

13.     On August 3, 2010, the Commission filed an Amended Complaint, motion for reconsideration of MDO I, and an application for emergency relief requesting that the Court, among other relief, again freeze the assets of the Smith Trust, based upon a previously undisclosed "Private Annuity Agreement" between David and Lynn Smith and the Smith Trust that gave the Smiths an interest in the assets of the Smith Trust.

14.     On November 22, 2010, the Court issued a memorandum-decision and order ("MDO II") granting the Commission's motion for reconsideration of MDO I, and further finding that the Commission demonstrated a substantial likelihood of success of proving that

David and Lynn Smith created the Smith Trust and Annuity Agreement to avoid gift and capital gains taxes; and that David Smith maintained control of the Smith Trust to insure that the annuity payments back to the Smiths would be made.  MDO II also found evidence of fraud, misrepresentation, and misconduct by those associated with the Trust in failing to disclose the Annuity Agreement.  Accordingly, the Commission's motion for a preliminary injunction as to the Smith Trust was granted.

15.     On December 1, 2010, following the submission of an emergency motion by the Commission, the Court issued a memorandum-decision and order finding that in September and October 2010, McGinn engaged in a fraudulent securities offering through an entity named Security Alarm Credit, LLC, and that this offering included misrepresentations and omissions of material facts.  The Court enjoined the offering; enjoined McGinn from proceeding with any offering without prior Court approval; and found McGinn in contempt of the Preliminary Injunction Order.

## **VIOLATIONS**

By virtue of the conduct alleged herein:

16.     MS & Co., MS Advisors, MS Capital, McGinn and Smith, directly or indirectly, singly or in concert, have engaged and, unless restrained and enjoined will continue to engage in acts, practices, schemes and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder[17 C.F.R.§ 240.10b-5];

17.     MS & Co., MS Advisors, McGinn and Smith directly or indirectly, singly or in concert, have engaged and, unless restrained and enjoined, will continue to engage in acts,

practices, schemes and courses of business that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1)(2) and (6)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8];

18.     FAIN, FEIN, FIIN and TAIN have violated and, unless restrained and enjoined, will continue to violate Section 7(a) of the Investment Company Act of 1940 ("Company Act") [15 U.S.C. § 80a-7];

19.     MS & Co., MS Capital,  FAIN, FEIN, FIIN, and TAIN, McGinn and Smith directly or indirectly, singly or in concert, have violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e];

20.     MS & Co. violated and, unless restrained and enjoined, will continue to violate Section 15(c) (1) of the Exchange Act [15 U.S.C. § 78(o)(1)] and Rule 10b-3 [17 C.F.R. § 240.10b-3], and McGinn and Smith have aided and abetted such violation;

21.     The fraudulent conveyance defendants – Smith, L. Smith, G. Smith, L.T. Smith, the Smith Trust, McGinn and N. McGinn – conveyed certain property with actual intent to hinder, delay or defraud either present or future creditors, or received such property, in violation of N.Y. Debtor & Creditor Law ("NYDCL") Section 276.

22.     L. Smith and N. McGinn, as relief defendants, have received and retained ill-gotten gains from defendants' fraud.

## JURISDICTION AND VENUE

23.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], Section 209(d) of the Advisers Act, [15 U.S.C. §80b-9(d)] and Section

42(d) of the Company Act [15 U.S.C. §80a-41(d)].  The fraudulent conveyance claim is brought under Section 276 of the NYDCL.

24.     The Commission seeks final judgments:  (i) restraining and permanently enjoining McGinn, Smith, MS & Co., MS Advisors, MS Capital, and the Four Funds from engaging in the acts, practices and courses of business respectively alleged against them herein; (ii) ordering McGinn, Smith, MS & Co., MS Advisors, MS Capital, the Four Funds, L. Smith and N. McGinn to disgorge any ill-gotten gains and to pay prejudgment interest thereon, jointly and severally; (iii) prohibiting McGinn from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)];  and (iv) imposing civil money penalties on certain defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)],  Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and Section 42(e) of the Company Act [15 U.S.C. § 80a-41(e)].

25.     As to the fraudulent conveyance claim, the Commission seeks to have the fraudulent conveyances voided pursuant to Sections 276 and 278 of the NYDCL and to recover the property fraudulently conveyed or its equivalent value (and for attorneys' fees pursuant to Section 276-a of the NYDCL).

26.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], Sections 42 and 44 of the Company Act [15 U.S.C. §§ 80a-41 and 80a-43] and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

This Court has jurisdiction over the fraudulent conveyance claim pursuant to 28 U.S.C. § 1345 and the Court's ancillary and/or supplemental jurisdiction.

27.     Venue lies in the Northern District of New York, pursuant to Section 22 (a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa],  Section 44 of the Company Act [15 U.S.C. § 80a-43] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  The Defendants directly or indirectly, singly or in concert, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Certain of these transactions, acts, practices, and courses of business occurred in the Northern District of New York.  For example, the main offices of MS & Co., MS Advisors, MS Capital, the Four Funds, and the various Trusts were located in Albany, New York and McGinn and Smith transacted business at those offices.

## DEFENDANTS AND RELIEF DEFENDANTS

28.     **Timothy M. McGinn,** age 62, is a resident of Schenectady, New York.  He is the chairman, secretary, and co-owner of MS & Co. as well as treasurer and indirect co-owner of MS Advisors.  From 2003 to 2006, McGinn served as Chief Executive Officer of Integrated Alarm Services Group, Inc. ("IASG"), a publicly traded company.   He left IASG and returned to MS & Co. in the fall of 2006.

29.     **David L. Smith,** age 65, is a resident of Saratoga Springs, New York.  He is the president of MS & Co. and the managing member of MS Advisors.  Until 2007, Smith also was the chief compliance officer of MS & Co.  Smith owns about 50% of MS & Co. and about 50% of MS Advisors.

30.     **McGinn, Smith & Co., Inc. ("MS & Co."),** a registered broker-dealer and New York corporation founded in 1981 by Smith and McGinn, has its principal place of business at

99 Pine Street, Albany, NY.  It is currently owned by Smith (50%), McGinn (30%), another partner ("Partner 3") (about15%) and a fourth partner ("Partner 4") (about 5%).  In April 2009, MS & Co. registered with the Commission as an investment adviser, and replaced MS Advisors as the adviser to the Funds.  Throughout 2009, MS & Co. had about 53 employees, including about 35 registered representatives, and branch offices in Clifton Park, Manhattan and Boca Raton.  On December 24, 2009, MS & Co. filed a partial BD-W in connection with winding down much of its broker-dealer business.  On March 9, 2010, it also withdrew its investment adviser registration.

31.     **McGinn Smith Advisors, LLC ("MS Advisors")** is a New York corporation with its principal place of business at 99 Pine Street, Albany, New York. MS Advisors is a wholly-owned subsidiary of McGinn, Smith Holdings LLC, which is owned 50% by Smith, 30% by McGinn and 20% by MS Partners.   MS Advisors was registered as an investment advisor with the Commission from January 3, 2006 to April 24, 2009.  It was the investment adviser to all of the Funds until April 2009, when it was replaced by MS & Co.

32.     **McGinn, Smith Capital Holdings Corp. ("MS Capital")** is a New York corporation with its principal place of business at 99 Pine Street, Albany, New York. It is owned by MS Holdings LLC (52%), McGinn (24%) and Smith (24%).  It is the indenture trustee for the Funds and the trustee for all the Trusts created between 2006 and 2009.  Smith is president and McGinn is chairman of the board.

33.     **First Independent Income Notes LLC ("FIIN");  First Equity Income Notes LLC ("FEIN"); First Albany Income Notes LLC ("FAIN") and Third Albany Income Notes LLC ("TAIN")** are New York corporations and unregistered investment companies with

their principal places of business at 99 Pine Street, Albany, New York.  They are wholly-owned by MS Advisors.

34.      **Geoffrey R. Smith**, age 30, a resident of New York, New York, is the son of Smith and L. Smith, and a beneficiary of the Smith Trust.  G. Smith is also the Trustee of the Smith Trust.  G. Smith became Trustee when he was substituted for the prior trustee, David M. Wojeski, on February 14, 2011.  Wojeski was named as Trustee when the original Trustee, Thomas Urbelis, resigned on April 22, 2010.

35.      **Lauren T. Smith**, age 28, a resident of Aspen, Colorado, is the daughter of Smith and L. Smith, and a beneficiary of the Smith Trust.

36.      **Lynn A. Smith,** age 64, is the wife of Smith and a resident of Saratoga Springs, New York.

37.      **Nancy McGinn,** age 50, is the wife of McGinn and a resident of Schenectady, New York.

## FACTS

38.      McGinn and Smith founded MS & Co. in 1980 and the firm registered as a broker-dealer in 1981.  McGinn sold 40% of his interest in MS & Co. to Partner 3 in 2003 when he became the chief executive officer of IASG, but he returned to MS & Co. in 2006.  Since then, he and Smith have actively controlled virtually every aspect of the McGinn Smith Entities' operations.

## The Four Funds

39.      Between September 2003 and October 2005, MS Advisors formed FAIN, FEIN, FIIN and TAIN.  MS Advisors held 100% of the membership interest in each Fund and was their sole managing member.  MS Advisors also served as investment adviser to the Four Funds.

11

Smith was responsible for the majority of the investment decisions for the Funds.  Among other functions, McGinn served as signatory on behalf of various McGinn Smith Entities that received loans from the Funds.

40.     MS & Co. acted as the placement agent for debt offerings by the Four Funds, raising a total of approximately $90 million.  MS Capital served as Trustee and Servicing Agent for each of the Four Funds.  The Funds each had between 150 and 300 investors.

41.     Each Fund invested more than 40% of its assets in securities.  MS & Co. was required to, but did not, register each of the Funds as investment companies.

42.     The terms of the offerings by the Four Funds, as disclosed in their "Confidential Private Placement Memoranda ("PPMs"), are summarized below:

| OFFERING | DATE OF PPM | AGGREGATE PRINCIPAL AMOUNT | TYPES OF NOTES SOLD |
|---|---|---|---|
| FIIN | Sept. 15, 2003 | $20 million | 5% Secured Senior Notes due 2004<br>7.5% Secured Senior Subordinated Notes due 2008<br>10.25% Secured Junior Notes due 2008 |
| FEIN | Jan. 16, 2004 | $20 million | 5% Secured Senior Notes due 2005<br>7.5% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2009 |
| TAIN | Nov. 1, 2004 | $30 million | 5.75% Secured Senior Notes due 2005<br>7.75% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2009 |
| FAIN | Oct. 1, 2005 | $20 million | 6% Secured Senior Notes due 2005<br>7.75% Secured Senior Subordinated Notes due 2007<br>10.25% Secured Junior Notes due 2010 |

43.     Each note holder was entitled to quarterly interest payments. The Secured Senior Subordinated and Secured Junior Note holders' rights to payments were subordinated to the rights of the Senior Secured Note holders.

44.     The PPMs contained essentially identical disclosures, terms and conditions.  They were prepared at Smith's direction and were reviewed by him for accuracy prior to commencement of each offering.  Each PPM disclosed that the issuer was:

> formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio. . . .

45.     Although the PPMs include broad disclosures about the risks of investing in the Four Funds, the disclosures regarding potential affiliated transactions, aside from payment of fees and commissions to affiliates, was limited to the following language:

> [The Fund] may acquire Investments from our managing member or an affiliate of our managing member that has purchased the Investments. If the Investment is purchased from our managing member or any affiliate, we will not pay above the price paid by our managing member or such affiliate for the Investment, other than to reimburse our managing member or such affiliate for its costs and any discounts that it may have received by virtue of a special arrangement or relationship.  In other words, if we purchase an Investment from our managing member or any of its affiliates, we will pay the same price for the Investment that we would have paid if we had purchased the Investment directly. We may also purchase securities from issuers in offerings for which McGinn, Smith & Co., is acting as underwriter or placement agent and for which McGinn, Smith & Co. will receive a commission.

46.      The PPMs did not disclose that the Four Funds would make any loans to, transfers, or investments in, affiliated entities.

47.     The Four Funds increasingly made unauthorized loans and transfers to and investments in affiliated McGinn Smith Entities.  By September 2009, approximately one-half of all of the Four Funds' assets had been loaned to or invested in affiliated, often cash poor and

financially desperate McGinn Smith Entities.  The PPMs suggested that the Four Funds were created to identify and invest in a wide spectrum of public and private investments that would "add value to our portfolio."  In fact, the Four Funds served the more limited purpose of loaning or investing the majority of their funds in financially troubled McGinn Smith Entities.  Only about $3.6 million of the approximately $106 million raised by the Four Funds was invested in liquid, publicly traded companies.

48.     The PPMs did not disclose that most of the McGinn Smith Entities were illiquid, had little or no revenues, or were in poor financial condition when they received the proceeds from the Four Fund offerings.  The investments appear to have been preceded by little due diligence (none of which was done by persons independent of MS & Co.).  The investments were generally dictated by liquidity needs of the McGinn Smith Entities.

49.     For example, between 2005 and 2007, MS Advisors caused three of the Four Funds to loan nearly $8 million to alseT IP, a start-up entity partly owned and managed by Partner 3.  At least $700,000 of those loans was immediately transferred to Partner 3 as salary.  AlseT never made a penny, and never repaid any of the loans.  By December 2007, an internal MS & Co. email shows that the chief financial officer placed the value of the Four Funds' loans to alseT at zero.  Nonetheless, MS Advisors caused two of the Four Funds to "loan" alseT an additional $250,000 in February 2008, so that alseT could make additional payments to certain individuals.

50.     By no later than 2006, McGinn, Smith, MS & Co., MS Advisors, MS Capital and the Four Funds knew or recklessly disregarded that the Four Funds could not redeem investor notes when they became due.  For example, on December 21, 2006, an MS & Co. employee sent an email to Smith telling him that a TAIN investor wanted to redeem $100,000 in TAIN notes

due December 15, 2006 and purchase $100,000 in one of the Trusts (TDM 9.25%). Smith replied that the broker "needs to replace the $100,000 before doing the trade." He continued: "I am running on fumes with all of these redemptions and cannot afford any more."

51.     By the end of 2007, each of the Four Funds had already paid out millions more than the Four Funds had received in income from investments. As of September 30, 2009, since inception the Four Funds had revenues of only $12.9 million and spent a total of $37 million, for a combined total loss from operations of $24 million.

52.     By the end of 2007, the Four Funds' assets were worth a fraction of the amount owed to investors. According to an analysis in December 2007 by MS & Co.'s then-chief financial officer, the combined "book value" of the Four Funds was then only $69,384,870 compared to total notes payable of $86,046,000. Moreover, the CFO calculated that the "net realizable" amount in the Four Funds combined as only $37,160,299, nearly $48.9 million less than the amount owed to investors. Nonetheless, the Four Funds continued to raise money from investors without disclosing these facts.

### Additional Misrepresentations and Omissions

53.     On January 13, 2005, Smith wrote to a prospective investor that the purpose of TAIN "is to make investments, primarily in the form of secured loans, to private and public entities for purposes that include acquisition, equipment purchases, receivable financing and general corporate growth." At the time Smith wrote this letter, TAIN had made three investments. Only one of those three investments was secured, a loan for only $830,000 out of a total of $13.1 million in outstanding investments.

54.     Smith steered another investor away from investing in blue chip stocks like General Electric as too risky, and told him that the Four Funds' private placements were safer investments.

55.     On July 6, 2004, an MS & Co. broker told a prospective investor that:

The [FEIN] Notes represent a basket of asset backed securities with substantial cash flow, a history of performance and limited liquidity in the marketplace.  The portfolio includes securities from both the public and private sector.  Asset classes consist of bonds, notes, preferred stock, leases, mortgages, limited partnerships, and securitized cash flow instruments.  Our most active market of ideas comes from small private placements ($25 - $50 million) offered by investment banks primarily to institutional investors.  We take comfort in these ideas due to the fact that these offerings are usually proceeded [sic] with substantial due diligence, scrutinized by product and industry professionals, and underwritten by top-tier investment banking firms with an ongoing capability to assist with additional capital if necessary. . . .  I feel this investment is a great way for you to earn an attractive yield while minimizing risk.

56.     In fact, the "basket" of securities in which FEIN invested consisted mostly of promissory notes from MS & Co. affiliates that did not have "substantial cash flow" or "a history of performance."  There is no evidence that any of the investments in FEIN resulted from "small private placements . . . offered by investment banks primarily to institutional investors."  There is no evidence of any "due diligence," "scrutin[y] by product and industry professionals," or underwriting by "top-tier investment banking firms" for any of the investments made by the Four Funds at any time.

57.     In addition, MS & Co. did not provide other investors with the relevant PPMs prior to their investments.

58.     In order to maintain sufficient monies in the Four Funds to continue to make interest payments, MS & Co. encouraged investors to rollover their notes when they became due.  As a result, McGinn, Smith, and MS & Co., and other entities were able to use what was, in effect, principal, to continue to make periodic interest payments.

**Four Funds Restructuring**

59.     By as early as 2007, McGinn and Smith generally refused to honor investors'
requests for the return of principal at the maturity of the notes, unless the customer's broker was
able to find a new investor to replace the outgoing investor.

60.     In January 2008, Smith sent a letter to certain investors in the Four Funds stating
that the Four Funds had run into difficulty, which he falsely and misleadingly blamed as
"primarily on liquidity" caused by the subprime crisis.  In April 2008, Smith sent a second letter
informing Four Fund investors that the problems cited in the January letter have "become more
acute" and that, because two investments had eliminated their dividends or ceased distributions,
the Four Funds were "forced" to eliminate the interest payments to Secured Junior Notes holders
for the quarter.  The letter also noted that MS Advisors had been advised by counsel that
"distributions at this time quite probably reflect a return of capital and not interest, and therefore
distributions at this time might be considered an invasion of principal due to the Senior and
Senior Subordinated Note holders.  This is a result of not knowing how and where to price our
investments in these very illiquid markets."

61.     In October 2008, Smith sent a letter to all Four Funds' note holders that falsely
and misleadingly blamed the financial condition of the Four Funds on, among other things, the
"current condition of the financial credit markets" and "financial crisis."  It further stated that
"the lack of liquidity in the credit markets . . . is the major issue that impacts your investment in
the [Funds]."

62.     These statements by Smith were false or misleading.  The letters did not mention
that affiliates of MS & Co., many of which were insolvent, owed the Four Funds tens of millions
of dollars.  These letters also omitted the material information that the value of the Four Funds'

assets was only 50 % or less of the amount owed investors, and falsely suggested that note holders had a reasonable prospect of eventually receiving their principal, pursuant to the restructuring plans.

63.     The purported restructuring plan extended the maturity dates of the notes, some until 2023, and unilaterally reduced interest payments for all the note tranches.  Since the 2008 restructuring, MS Advisors has made only reduced interest payments to the Secured Senior Note holders.

64.     Smith also misrepresented that MS & Co. and the McGinn Smith Entities would be making their own "sacrifices" and would "forfeit" all annual fees and commissions as part of the note restructuring to "improve liquidity."  In fact, MS & Co. received approximately $700,000 in fees in 2009 and $275,000 in fees in 2010, after this letter was sent.

65.     Notwithstanding the insolvency of the Four Funds, MS & Co. continued to sell and rollover investors' notes in these Four Funds, including junior notes.  Internal MS & Co. documents show new and rollover investments, including investments by customers of Smith, of at least $736,500 in 2008 and $130,500 in 2009.  The firm apparently used these new investments in part to permit certain preferred investors to cash out.

66.     Despite the dire condition of the Four Funds, Smith and McGinn and MS Advisors continued to divert the remaining moneys in the Four Funds to other financially troubled McGinn Smith Entities, such as Cruise Charter Ventures LLC ("CCV") and TDM Luxury Cruise Trust 07 ("TDM Luxury").

67.     The PPMs also stated that the notes were being offered only to "accredited investors."  By MS & Co.'s own records, however, the Four Funds each had many unaccredited investors.  According to MS & Co.'s records, as of March 20, 2006, FAIN had 30 unaccredited

investors; FEIN had 46 unaccredited investors; FIIN had 31 unaccredited investors; and TAIN
had 75 unaccredited investors.

## THE TRUST OFFERINGS

68.     Between 2006 and 2009, MS & Co. acted as placement agent for: four Firstline Jr.
and Sr. Trusts 07 offerings ("Firstline Trusts"), TDM Cable Trust 06 ("TDM Cable 06"),TDM
Luxury Cruise Trust 07 ("TDM Cruise"), TDM Verifier Trust 07 ("Verifier 07"), TDM Verifier
Trust 08 ("Verifier 08"); Cruise Charter Venture Trust 08 ("CCV Trust"), Fortress Trust 08
("Fortress Trust"), Integrated Excellence Jr. and Sr. Trusts 08, TDM Cable Trust 08; TDM
Verifier Trust 09;  TDMM Benchmark Trust 09 ("Benchmark 09"), TDMM Cable Jr. and Sr.
Trusts 09 ("TDMM Cable 09"), TDM Verifier Trust 07R;  and  TDM Verifier Trust 08R and
other offerings, including affiliate McGinn Smith Transaction Funding Corp. ("MSTF").

69.     The Trusts issued one or more tranches of notes and promoted interest rates ranging
from 7.75 % to13% per annum.  Maturity dates varied from approximately 15 months to five years
from the date of the offering.

70.     Many of the Trusts were created to loan the offering proceeds, minus placement
agent fees, to another McGinn Smith Entity ("the Conduit Entity"), which would then use those
funds, minus substantial additional fees, to purchase specific contracts or receivables from a third
entity, such as contracts for burglar alarm services or "triple play" (broadband, cable and telephone)
services, or luxury cruise charters.  The Trusts were generally left with only a promissory note and a
"security" interest in the assets to be purchased by the Conduit Entity.

71.     The Declaration of Trust typically defined "Permitted Investments" to mean a
"promissory note" evidencing a loan from the Trust to the particular Conduit Entity.  In addition, to
the extent not employed for the loan from the Trust to the Conduit Entity, the Declaration permitted

temporary investments limited to (1) certificates of deposit; (2) regularly traded short term AAA rated debt obligations; or (3) U.S. Treasury obligations.

### The PPMs Misled Investors as to the True Purpose of the Trusts

72.     The true purpose of the Trusts was to structure a series of transactions that would allow various McGinn Smith Entities to siphon off millions of dollars in transaction fees and commissions and to serve the interest of McGinn Smith Entities, not the Trust investors.  MS & Co. extracted enormous fees from these Trust deals, which were not clearly disclosed in the PPMs. The Trusts typically paid placement agent fees to MS & Co. of 5% to 9.5%.  When the Trusts transferred funds to the Conduit Entity, that entity paid large fees to MS & Co. that were variously characterized as, among other things, "trust administration fees," "acquisition costs," "investment banking fees," "legal fees," and "due diligence fees."  Those fees were sometimes as much as 20% or more of the gross proceeds of the offering.

73.     Although many of these fees were disclosed in the Trust PPMs, the PPMs failed to disclose that certain of these fees, commissions or transaction costs overstated the true market value of the services performed, were unnecessary or were paid for services not performed or not performed with the customary degree of professional care and due diligence.

74.     The PPMs also failed to disclose that, contrary to the terms of the Trust PPMs, large portions of the proceeds would be diverted to financially struggling McGinn Smith Entities, commingled with the offering proceeds of other Trusts, used to pay interest and principal to investors in other Trusts and to keep the financially failing McGinn Smith fraud scheme afloat.

75.     While the Trust PPMs often disclosed that there "was a high degree of risk" associated with the investment, the PPMs failed to disclose that it was virtually certain that the Trusts would not be able to meet their obligations to pay the promised interest payments or to

repay principal, given the large percentage of proceeds siphoned off in commissions and transaction fees by McGinn Smith Entities before any investments were made, combined with unauthorized loans to affiliated entities.

76.     McGinn and Smith have fraudulently maintained the illusion of success by funding interest payments with principal raised in other Trust offerings, at the expense of these investors. The following examples demonstrate how the Trusts have been used to benefit the McGinn Smith Entities, at the expense of Trust investors.

### Benchmark 09 Trust PPM Misrepresented How Proceeds Would Be Used

77.     On about July 27, 2009, MS & Co. launched an offering for the Benchmark 09 Trust.  The PPM states that approximately $1,950,000 of the $3 million raised would be loaned to TDMM Cable Funding, which would use the loan proceeds to purchase the operating assets and "triple play" contracts of Benchmark LLC.  TDMM Cable Funding would then purportedly use the earnings from this investment in Benchmark LLC to repay principal and interest due on the loan from the Benchmark 09 Trust.

78.     According to the PPM, MS & Co.'s fees and expenses would total $1,050,000, or 34% of the offering proceeds.

79.     Contrary to the representations in the PPM, the net proceeds of the offering were used for many unauthorized purposes.  For example, notwithstanding the PPM's representation that money loaned by the Trust to TDMM Cable Funding would be used to acquire the assets of Benchmark LLC, McGinn directed that some of the money in the TDMM Cable Funding account be diverted to affiliated entities, including TDM Cable 06 and TDM Verifier 07 and TDMM Cable Sr Trust.  Those funds were presumably used to pay "interest" to the various Trusts investors.

80.     The Benchmark 09 Trust promised investors 10.5% interest on the notes, with a maturity date of five years.  Given that defendants took 34% of the proceeds to themselves in fees and diverted additional monies to affiliated entities in unauthorized transfers, their representation that investors would be repaid out of the investment in Benchmark LLC was false, and McGinn, Smith, MS & Co. and MS Capital knew, or recklessly disregarded, that this representation was false.  Nevertheless, McGinn continued to personally raise money for this offering as recently as December 10, 2009.

## The TDMM Cable Trust 09

81.     On January 19, 2009, MS & Co. launched an offering of $1,550,000 of 9.00% three-year notes in TDMM Cable Senior Trust 09 ("Senior 09 Tranche") and an offering of $1,325,000 of 11% 54-month notes in TDMM Cable Junior Trust 09 ("Junior 09 Tranche," collectively "TDMM Cable 09").  The Senior and Junior offerings sold out.

82.     The PPM stated that after MS & Co. took a placement agent fee of 5% of the amount raised for Senior 09 Tranche and 8% of the amount raised for Junior 09 Tranche, the balance, about $2.7 million, would be loaned to TDM Cable Funding, which would use the proceeds to acquire all the operating assets and customer contracts of Broadband Solutions LLC and HipNET LLC (both of which purportedly provided "triple play" service to communities in Florida). The PPMs also state that TDM Cable Funding would pay MS & Co. an additional $400,000 for "acquisition negotiations, legal and due diligence activities"-- making MS & Co.'s total fee $583,500 or 20.3% of the gross proceeds of the offering.

83.     Not satisfied with the disclosed fees, MS & Co. used a total of at least 54% of the funds raised to: (i) make payments to McGinn, McGinn's son, Smith, relief defendant L. Smith, MS Partner 4 and an Albany politician; (ii) to cover MS & Co.'s payroll between January and

April 2009; and (iii) to pay investors in other Trust entities.  The following is a summary of McGinn's misuse use of TDMM Cable 09 investor funds:

84.     During January 2009, MS & Co. raised the first $554,000 from investors for the Senior 09 Tranche.  On January 30, 2009, McGinn transferred $475,000 from the Trust to TDM Cable Funding, and transferred $413,000 from the TDM Cable Funding to MS & Co., where it was immediately used to cover the firm's payroll.

85.     In February 2009, McGinn again transferred large sums of money from the TDMM Cable Senior Trust account to TDM Cable Funding and then to MS & Co to make MS & Co.'s mid-February and end of February payroll. The following months, McGinn again transferred substantial amounts from the TDMM Cable 09 Trust accounts to MS & Co. to cover the March 31 and April 30 payrolls.

86.     McGinn also transferred a total of at least $99,000 to McGinn's personal account; more than $21,000 to McGinn's son (apparently a lawyer who worked for MS & Co.); more than $105,000 to a MS & Co. affiliate called Mr. Cranberry; $18,750 to an Albany politician's law firm; at least $70,000 to MSTF; $26,500 to Verifier 07; $10,000 to Firstline Trust; $25,000 to a senior MS & Co. officer $24,000 to Smith; and more than $335,000 to Smith's wife, relief defendant L. Smith.

87.     The transfers described above total $1,646,040 -- nearly three times the fees to which MS & Co. Entities were entitled pursuant to the PPMs, and more than half of the gross offering proceeds.

**The Verifier 08 Trust**

88.     In December 2007, MS & Co. launched an offering for the TDM Verifier 08

Trust.  Verifier 08 offered up to $3.85 million in 18-month notes and 36-month notes, with

returns of 8.5% and 10%, respectively.  The offering sold out.

89.     The PPM represented that the net proceeds of the Trust, $3,484,500, (after

subtraction of MS and Co. 9.5% fee of $365,750) were to be "advanced" by the Trust to McGinn

Smith Funding LLC ("MS Funding") for the purpose of purchasing $3,000,000 face value of

"guaranteed payment units" issued by Verifier Capital LLC, a company that "provides capital to

security alarm dealers by purchasing some or all of their security alarm monitoring accounts."  A

senior managing director of MS & Co. was the Chairman and 12.5% owner of Verifier Capital

LLC.

90.     The Trust has had to borrow money from other McGinn Smith Entities to make its

scheduled interest payments.

91.     Verifier 08 investors were deceived about the success of the Verifier 08 Trust

with the first quarterly "interest" payment, which was actually a return of investor capital.

92.     Thereafter, in order to make quarterly interest payments to Verifier 08 investors,

the Verifier 08 Trust repeatedly borrowed funds from other McGinn Smith Entities.

Furthermore, despite having income insufficient to make interest payments to investors, the Trust

made numerous unauthorized loans to other McGinn Smith Entities.

**The CCV Trust**

93.     McGinn, MS Capital and MS & Co. also deceived investors into unwittingly

investing in a sexually-oriented charter cruise venture created by McGinn.  In February 2008,

MS & Co. launched a $3,250,000 note offering for an entity 50% owned by an MS & Co.

affiliate called CCV.   The PPM stated that CCV "is engaged in the business of procuring whole ship charters and selling the berths to various affinity groups."   The PPM stated that the net proceeds of the offering would be used to charter a ship and to "underwrite the marketing, sales and administrative expenses associated with selling [the] berths for the cruise."

94.     The PPM did not disclose that CCV operated under the name YOLO (You Only Live Once) Cruises, that the affinity group was sexually oriented, that strippers and go-go dancers would be procured to entertain passengers, that investor money would be used to buy insurance for these individuals and that YOLO was run by a woman with whom McGinn was romantically involved.

95.     The PPM failed to disclose that instead of marketing charters to an unlimited variety of "affinity groups" as represented, the charters would only be marketed to a narrow niche of potential customers interested in cruises "involving sexually themed activities among and between consenting adults" (as belatedly disclosed in a PPM for a later offering) and that the charters would involve legally and morally questionable activities that investors might not want to be associated with.

96.     McGinn was the managing member of CCV.  He was involved in its day-to-day operations and was keenly interested in the activities aboard the cruise.  McGinn "borrowed" from other Trusts and Funds to fund CCV.

97.     Even though CCV lost $1.5 million during its first 17 months of operation, McGinn and Smith nonetheless enriched themselves.  CCV transferred at least $50,000 to Smith, $75,000 to McGinn, and paid at least $245,000 to MS & Co. in "advisory fees."  CCV also paid McGinn's son (an attorney and MS & Co. employee) $7,240 for "consulting."  Between July 2008 and November 2009, CCV also transferred to McGinn more than $156,000, purportedly to

25

pay credit card charges related to meals, travel and other expenses; and in June 2009, CCV transferred more than $32,000 to White Glove Cruises, a Florida company managed by McGinn.

98.     The CCV Trust also promised investors a 13% rate of interest on their notes, even though the Trust was to earn its investment return by loaning the money to CCV, which was obligated to pay back interest to the CCV Trust of only 10%.

### The CCV Trust (2nd PPM)

99.     In 2009, MS & Co. conducted a second CCV offering of $400,000 raised from just three investors.  The PPM falsely and misleadingly stated that CCV's loss for the period February 1, 2008 through June 2009 was $870,000.  In fact, MS & Co.'s internal books and records show a loss of nearly $1.5 million during that period.

### The Firstline Trusts

100.    Firstline Trusts raised a total of $7 million in 2007.  According to the Firstline Trust 07 Junior PPM, dated October 19, 2007, the Firstline Trusts were created to acquire a tranche of financing secured by contracts owned or originated by Firstline Security, Inc., a security alarm company.  In January 2008, Firstline Security filed for bankruptcy.  Nonetheless, MS & Co. continued to sell notes in this offering without disclosing the bankruptcy filing to investors.

101.    A December 7, 2009 email to McGinn reveals that Firstline loaned another McGinn Smith affiliated entity, known as Mr. Cranberry, more than $2.27 million.  Mr. Cranberry does not appear to be involved in the security alarm business.

### MS & Co. Did Not Disclose that the Proceeds Would Be Commingled

102.    A common feature of most of the Trust offerings was that the proceeds -- rather than being directly invested -- were "loaned" to an intermediate entity, most often TDM Cable

Funding (*see, e.g.* Verifier 07 (for the purchase of alarm contract receivables); TDM Luxury (luxury cabin cruise receivables); and TDM Cable 06 and TDMM Cable 09 Junior and Senior (triple play receivables)).  However, instead of using the proceeds for the stated purpose, Smith and McGinn diverted the proceeds as needed to meet the cash needs of other McGinn Smith Entities.

103.    As alleged above, on several occasions, McGinn transferred funds raised in the TDMM Cable 09 offerings to TDM Cable Funding, and then transferred those funds to MS & Co. for payroll.

### McGinn and Smith Have Taken Large Personal
### "Loans" from Various McGinn Smith Entities

104.    McGinn, Smith and another senior MS & Co. employee frequently received substantial "loans" from the McGinn Smith Entities.  Between October 2006 and October 2009, TDM Cable Funding "loaned" McGinn $830,341, Smith $694,000, and the senior MS & Co. employee $563,000, for a total of nearly $2.1 million.  None of these loans has been repaid, and it does not appear that any interest has ever been paid.

105.    McGinn and Smith each took a $200,000 loan from the Firstline Trust.  Firstline Securities filed for bankruptcy a few months after the four Firstline offerings raised about $7 million.   Although Firstline Trust investors are owed $5.9 million, McGinn and Smith have not repaid the loans.

106.    McGinn also authorized the following additional personal loans, none of which were evidenced by loan documentation: (i) from NEI, a McGinn Smith Entity, to Smith totaling $360,000, to the senior MS & Co. employee totaling $285,000 and to McGinn totaling $340,000; and (ii) from TDMM Cable Funding to Smith totaling $74,000, to the senior MS & Co. employee totaling $25,000 and to McGinn totaling $82,500.

**McGinn and Smith Submitted Backdated Documents to FINRA**

107.    While under investigation by FINRA, McGinn, Smith and MS & Co. submitted

numerous backdated promissory notes after FINRA requested loan documentation during its

exam.

**The Misuse of Funds and Deception Became More Desperate**

108.    The audited financial statements for MS & Co. for 2008 state that the firm had a

loss of more than $1.8 million, and includes a "going concern" clause. Virtually every day in

2009, McGinn obtained from his accounting staff a summary of the cash available in the bank

accounts controlled by MS & Co., and a report of the immediate "funding needs."   The

documentary evidence reveals a constant movement of money among dozens of MS & Co.

affiliates and scores of bank accounts, designed to use any cash available to satisfy the most

pressing funding needs – primarily the firm's payroll, and payments to the personal accounts of

McGinn and Smith, along with interest payments and redemption requests by investors

threatening to complain to authorities.

109.    Internal MS & Co. emails in 2009, including many by McGinn and Smith, reveal

a constant need to raise millions of dollars, a growing desperation to make payroll, meet interest

payments and assuage investors complaining of a Ponzi scheme, in order to keep their house of

cards from collapsing.  For example, on February 24, 2009, Smith emailed McGinn regarding an

upcoming payroll.  He stated: "We have been living on the edge for some time and Tim's deals

have kept us alive by fronting our profit.  However, the $200,000 + that we are losing every

month is just too difficult to keep pace with." On February 25, 2009, another MS & Co. Partner 3

emailed Smith: "In our many conversations over the last year, I came to understand the depths to

which the firm has sunk relative to its revenue."   The liquidity problems were so severe that one

outside broker was forced to invest $10,000 of his own money so one of his elderly customers could be redeemed.

110.    Notwithstanding these financial woes, McGinn and Smith continued to solicit investors for the Four Funds and the Trusts throughout 2009 and into 2010, using the original Fund and Trust PPMs.  In Smith's testimony provided to FINRA on February 12, 2010, Smith stated that MS & Co. continues to raise funds from new investors.

### MS & Co. Has Paid for Luxuries for Smith and McGinn

111.    From at least January 2004, MS & Co. made monthly payments on two cars for Smith (a Lexus and a Mercedes) totaling more than $89,000, including payments of about $17,000 in each of 2007 and 2008.  MS & Co. made monthly payments on McGinn's behalf to exclusive country clubs, including the Schuyler Meadows Club, the Fort Orange Club and the Pine Tree Golf Club.  In 2007 and 2008 alone, those payments totaled more than $22,000.

### Transfers to L. Smith and N. McGinn Without Consideration

112.    L. Smith received more than $1.8 million from Smith and the McGinn Smith Entities during the period of the fraud.  For example, L. Smith received $375,000 in December 2007; $325,000 in June and July 2009; $100,000 in March 2010; and $185,000 in October 2006 and May 2007.  L. Smith received many other payments from McGinn Smith Entities.

113.    L. Smith provided no consideration for these transfers.

114.    L. Smith maintained a brokerage account at MS & Co. which in 2010 was transferred to NFS/RMR Capital Management (the "Stock Account").  Smith exercised beneficial ownership and unfettered control over the Stock Account for at least fifteen years.  L. Smith allowed Smith, McGinn and the McGinn Smith Entities to draw upon the Stock Account for business and personal needs without restrictions, and the Stock Account served as a de facto

financing arm for Smith and McGinn and the McGinn Smith Entities during the period of the fraud.  L. Smith allowed Smith to use the Stock Account as a personal line of credit to further his personal and professional interests.  Internal e-mails during the period of the fraud show McGinn Smith employees freely transferring money into and out of the Stock Account, which contained ill-gotten gains.

115.    In the early 1990's, the Stock Account acquired 40,000 shares of a predecessor to Charter One Financial, Inc. ("Charter One") at a cost of $10 per share.   By the end of August 1999, the Stock Account had 110,735 shares of Charter One worth $24.75 per share, or $2,740,691.  Each September from 1999 to 2002, Charter One issued a 5% stock dividend resulting in a total of an additional 21,269 shares added to the Stock Account.  The Charter One stock also continued to appreciate during this time.  During the period from August 1999 to September 2002, the Smiths sold a total of 24,530 shares of Charter One stock from the Stock Account for a gross profit of approximately $800,000, and transferred an additional 2,574 shares of Charter One stock out of the Stock Account.  By the end of September 2002, the Stock Account had 105,000 shares of Charter One stock worth over $3 million.

116.    Smith and L. Smith used the Charter One stock to further their business interests.  On October 14, 2002, the 105,000 shares of Charter One stock were journaled out of the Stock Account, and were deposited into an account for KC Acquisition Corp, a McGinn Smith Entity.

117.    The 105,000 shares of Charter One remained out of the Stock Account from October 14, 2002 to July 29, 2003, when the shares were journaled back into the Stock Account from the KC Acquisition Corp. account.  Smith, as the treasurer of KC Acquisition Corp., signed the letter authorizing the transfer of shares back to L. Smith.

118.   Smith also deposited significant personal assets into the Stock Account, including cash of $38,430, the proceeds of a trust amounting to $326,304, and a note receivable totaling $410,000.

119.   In an e-mail dated January 14, 2009 from Smith to McGinn, Smith stated that "Lynn and I have to shift money around between us."

120.   In 2009, when an investigation by the Financial Industry Regulatory Authority (FINRA) into MS & Co. commenced, and as Smith and McGinn learned that they and their firm were named as Respondents in a number of FINRA arbitrations filed by investors, Smith and L. Smith began moving assets that had been jointly held into solely L. Smith's name.

121.   In mid-2009, L. Smith opened up a checking account in her name for the first time and began depositing assets into this account which had previously been deposited into a joint account, including Smith's paychecks.  These transfers were without consideration.

122.   At the same time, a house in Vero Beach, Florida was transferred to L. Smith after being previously held in joint ownership.  This transfer was without consideration.

123.   From 2003 through March 2010, McGinn made numerous cash transfers from McGinn's account to an account in the name of N. McGinn.  These transfers were without consideration.

**Fraudulent Transfer to the Smith Trust**

124.   Smith and L. Smith created the Smith Trust pursuant to a Declaration of Trust dated August 4, 2004.  Smith and L. Smith are the grantors of the Smith Trust.  The named beneficiaries are their children, LT. Smith and G. Smith, who are 28 and 30 years old, respectively.

125.    The Smith Trust had no assets when it was created.  On August 31, 2004, Smith and L. Smith entered into the Annuity Agreement with the Smith Trust.  Under the agreement, Smith and L. Smith agreed to sell 100,000 shares of Charter One stock to the Smith Trust in exchange for annuity payments from the Smith Trust of $489,932 per year from September 26, 2015 until the last to die of Smith and L. Smith.  The agreement states that the payment amount of $489,932 is derived from an annuity interest rate of 4.6% per annum.  Both Smith and L. Smith signed the agreement with the Smith Trust.

126.    A separate one-page document entitled "Private Annuity" dated September 7, 2004 set forth a joint life expectancy for Smith and L. Smith of 31 years.  The Smiths therefore have a joint life expectancy of 20 years from the date the payment obligations are scheduled to begin in September 2015.  The annual payment of $489,932, if paid out over the 20-year joint life expectancy, would therefore entitle Smith and/or L. Smith to receive payments of approximately $10 million from the Smith Trust.

127.    On May 4, 2004, Charter One publicly announced that it was being acquired in an all-cash deal by Citizens Financial Group, which paid $44.50 per share.  Smith and L. Smith knew, therefore, that their Charter One stock would be converted to cash as a result of the buy-out.  The deal was completed on August 31, 2004.

128.    On September 1, 2004, 100,000 shares of Charter One stock was transferred from the Stock Account to the Smith Trust account.  At the time of this transfer, the fair market value of the Charter One stock was approximately $4.45 million.

129.    On the same day that the 100,000 shares were transferred from the Stock Account to the Smith Trust account on September 1, 2004, the cash merger occurred, resulting in the Smith Trust account being credited with $4,450,000 in cash.

130.    G. Smith and L.T. Smith, the named beneficiaries, never received a distribution from the Smith Trust from its creation until April 15, 2010, when G. Smith requested a distribution of $95,000, which he testified was to give to his parents to pay their personal taxes. The funds were transferred directly from the Smith Trust to L. Smith's checking account.

131.    When they transferred the Charter One stock to the Smith Trust account, Smith and L. Smith had the intent to hinder, delay or defraud present or future creditors. Their intent is shown by the following evidence:

132.    First, at the time of the transfer, the FIIN and FEIN fraudulent offerings were well underway. The FIIN offering dated September 15, 2003 and the FEIN offering dated January 16, 2004 each raised $20 million from investors, for a total of $40 million. The private placement memoranda for both offerings did not permit investments in affiliates but Smith from the beginning invested with affiliates. Accordingly, as of December 31, 2003, 11% of the investments were with affiliates, and this grew to 32% by December 31, 2004. Smith therefore knew that he would likely become liable to the defrauded investors and/or to the Commission as a result of his ongoing violations of the federal securities laws.

133.    In addition, at the time of the transfer to the Smith Trust, the liabilities of FIIN and FEIN far exceeded their assets; as a result, Smith knew that he would be unable to meet the payment obligations of these Funds to investors.

134.    Second, at the time of the transfer, Smith was aware of the consequences of committing fraud and that his actions would result in significant financial loss. In a lengthy, undated, handwritten "personal confession" to McGinn, Smith wrote that:

> The business has become addicted to the cash flow from the trust business, and without that we will have a difficult time surviving. . . . The default of the trusts will drastically reduce revenues, cause us to lose brokers and at least their confidence in us, bring on crushing litigation and devastating

publicity and I am convinced prosecution by regulators or worse. . . . I am
overwhelmed by the thought of the financial losses, the humiliation, the
perceived betrayal of trust. . . . I, unlike you, feel that we are vulnerable to
criminal prosecution. . . .

[W]e are now in possession of indisputable empirical evidence that the
new investments have no chance of ever being repaid in full. . . . For us
not to allow for these deficits by setting up adequate reserves is, in my
judgment, bordering on fraud, certainly, by not disclosing in the
prospectus our poor history of collections, we are not providing the
prospective investors an accurate picture of his risk.  We both know why
we don't make that disclosure – because such disclosure would cause our
salesman to cease selling and investors to cease buying.  Thus, we are
misleading both our own employees and customers. . . . This is wrong.  I
strongly believe that in civil or criminal litigation we would lose badly on
this point. . . .

[B]oth you and I are violating the high standards of integrity and ethics
that have been the historical standard for us.  That bothers me very very
much.  But what terrifies me is the possibility of being indicted for such
conduct, and worse, the prospect of conviction.  I cannot emphasize
enough how strongly I feel about this point.

135.   <u>Third</u>, in December 2003, Smith, L. Smith, McGinn, MS & Co. and other entities

controlled by Smith and McGinn had been named as defendants in a securities fraud suit filed in

the United States District Court for the Southern District of New York arising from the June

2003 initial public offering of IASG, *Meyers v. Integrated Alarm Services Group, Inc., et al*, 03-

cv-09748 (S.D.N.Y.).   A focus of the factual allegations in this complaint was two $3 million

loans by L. Smith to certain entities to facilitate a public offering of a company affiliated with

Smith and McGinn.  The Stock Account was used to make these loans.  The complaint asserted

23 causes of action and sought $3 million in damages for each claim.  Upon information and

belief, the case was settled in the spring of 2004 by the payment of $200,000 to the plaintiff.

136.   <u>Fourth</u>, as early as May 4, 2004, when the impending buy-out of Charter One was

announced, Smith and L. Smith knew that the value of their stock holdings would increase

substantially and would become cash as of the closing of the merger, which would result in

approximately $4.5 million in cash in the Stock Account.  The Smiths waited until the day of the buy-out before selling the stock to the Trust account pursuant to the Annuity Agreement.  On that day, through a merger, the 100,000 shares of stock was converted into approximately $4.5 million in cash.  The creation of the Smith Trust and the transfer of the stock through the Annuity Agreement therefore served to shelter this large sum of cash.

137.    Fifth, in 2003 and early 2004 the Broker-Dealer Inspection Program ("BDIP") of the SEC conducted an examination of MS & Co.  In a letter to Smith from the BDIP dated February 26, 2004, Smith was put on notice of various "deficiencies and/or violations of law."

138.    Finally, Smith and L. Smith concealed the existence of the Annuity Agreement when questions arose in 2010 in this matter regarding their assets, the Smith Trust, and the circumstances surrounding the transfer of the Charter One stock to the Smith Trust.

### Additional Fraudulent Transfers

139.    Smith and McGinn made other fraudulent transfers with an intent to hinder, delay or defraud creditors, as follows:

140.    Pursuant to a deed dated October 19, 2009, McGinn transferred title to a house, located at 26 Port Huron Drive, Niskayuna, New York, to N. McGinn, for consideration of "less than $100.00."

141.    In 2009, Smith and L. Smith transferred title to a house in Vero Beach, Florida, which had been jointly held, to L. Smith.

142.    In 2009, Smith and L. Smith caused a joint checking account at Bank of America to be transferred to L. Smith.

143.    In July 2010, funds that had been fraudulently conveyed to the Smith Trust were transferred to G. Smith and L.T. Smith and others.

**Fraudulent Transfers from the Smith Trust to G. Smith, L.T. Smith and L. Smith**

144.    On April 20, 2010, Plaintiff moved for a preliminary injunction which, *inter alia*, sought to freeze the assets of the Smith Trust.

145.    To persuade the Court to unfreeze $3.5 million in assets held by the Smith Trust, the then-trustee (David Wojeski), prior trustee (Thomas Urbelis), counsel for the Smith Trust (Jill Dunn), L. Smith and G. Smith misrepresented the nature and purpose of the Smith Trust and concealed the existence of the Annuity Agreement.

146.    Wojeski, Urbelis, L. Smith, Dunn and G. Smith characterized the Smith Trust as a trust created solely to benefit G. Smith and L.T. Smith without disclosing that the Trust was created to pay a substantial annuity in the future to Smith and L. Smith.  In fact, the Smith Trust was created as a vehicle to protect and preserve the assets of the Smiths from present and future creditors.

147.    Following a hearing, on July 7, 2010, prior to the disclosure of the Annuity Agreement, the Court in MDO I vacated the asset freeze as to the Smith Trust.

148.    Approximately $944,848 was disbursed from the Smith Trust bank account from July 7, 2010 through August 3, 2010, when the Smith Trust was re-frozen.  Those disbursements include the following:

149.    L. Smith directly received $449,878 directly from the Smith Trust in exchange for title to property on Great Sacandaga Lake (the "Lake Property") that had been held in L. Smith's name, and indirectly received $150,000 through Geoffrey and Lauren Smith (down payment for Lake Property).

150.    G. Smith received $296,500, including $75,000 that he gave to L. Smith as a down payment on the purchase by the Smith Trust of the Lake Property, and $200,000, a

purported "investment" by the Smith Trust in a company G. Smith created, Capacity One Management LLC.

151.    L.T. Smith received $83,500, including $75,000 that she gave to L. Smith as a down payment on the purchase of the Lake Property.

152.    Jill Dunn, counsel for the Smith Trust, received $101,096.

153.    Wojeski, the trustee of the Smith Trust from May 2010 through January 2011, received $13,874, including $5,775.50 reimbursement for fees paid to title company and $8,098.50 for trustee fees.

154.    On August 3, 2010, the Court again froze the Smith Trust assets after Plaintiff filed a motion upon discovery of the Annuity Agreement which had been concealed by individuals affiliated with the Smith Trust.

155.    Between July 7 to August 3, 2010, when it transferred approximately $944,848 to G. Smith, L.T. Smith, L. Smith and others, the Smith Trust had the intent to hinder, delay or defraud present or future creditors.  The Trust, through its Trustees, the beneficiaries, and others knew that the order in MDO I vacating the freeze as to the Smith Trust was obtained through fraud and misrepresentation.  Their intent is shown by the following evidence:

156.    First, the individuals affiliated with the Smith Trust, including the Trustees, the beneficiaries and L. Smith, knew but concealed the existence of the smoking-gun Annuity Agreement and concealed the fact that the Smith Trust was obligated to pay a substantial annuity to Smith and L. Smith.

157.    Second, the prior trustee, Thomas Urbelis, was a party to the Annuity Agreement, had a copy of that agreement in his possession, knew that the Smith Trust was required to pay millions of dollars to the Smiths beginning in 2015, and knew that the Charter

One stock was sold to the Smith Trust in exchange for the annuity, not donated. Yet he failed to disclose any of these facts during his deposition in response to questions requiring disclosure and failed to produce the Annuity Agreement in response to a document request.

158.   Third, Jill Dunn, counsel for the Smith Trust, knew that the Smith Trust was a "private annuity trust" and knew that there was a separate agreement creating the private annuity. Yet she filed a memorandum of law and declarations from Wojeski and L. Smith that she knew or recklessly disregarded were false, elicited testimony that was tailored to conceal the truth by implying that the "transfer" of stock was a gift, not a sale, and falsely stated to the Court that L. Smith had relinquished any and all interest whatsoever in the assets of the Smith Trust.

159.   Finally, Wojeski, trustee at the time of the 2010 transfers, had a fiduciary duty to identify any obligation of the Trust, such as the Annuity Agreement. Wojeski, moreover, was required to conduct due diligence because he gave sworn oral and written testimony to the Court as the Trustee and legal representative of the Smith Trust. Wojeski nevertheless knew or recklessly disregarded that the Charter One stock was not donated but sold to the Trust in exchange for annuity payments and knew or recklessly disregarded that the Trust was contractually obligated to pay most or all of its assets back to Smith and L. Smith. Wojeski also testified that Smith and L. Smith had no interest in the Smith Trust, described the transfer of stock as a gift rather than as a purchase and sale, and failed to disclose that the Smith Trust was contractually obligated to pay its assets back to Smith and L. Smith.

160.   Between July 7 to August 3, 2010, when L. Smith received $449,878.00 directly from the Smith Trust and $150,000 indirectly through her children, L. Smith had the intent to hinder, delay or defraud present or future creditors because she knew that the Court's July 7,

2010 order unfreezing the Trust Assets was obtained through fraud and misrepresentation.  Her intent is shown by the following evidence:

161.    L. Smith was the donor of the Smith Trust and a party to the Annuity Agreement and thus knew that she and Smith had a right to receive millions in annuity payments from the Smith Trust.  Yet L. Smith failed to disclose the Annuity Agreement in response to a document demand, submitted a false statement of assets and two false affidavits in May 2010 disclaiming her interest in the Smith Trust, and testified falsely during her deposition and in the preliminary injunction hearing.

162.    Between July 7 and August 3, 2010, when G. Smith and L.T. Smith received over $350,000.00 from the Smith Trust, they had the intent to hinder, delay or defraud present or future creditors because they knew that MDO I, which vacated the freeze as to the Trust, was obtained through fraud and misrepresentation.  Their intent is shown by the following evidence which constitute "badges of fraud" with regard to the fraudulent conveyance claim:

163.    First, G. Smith and L.T. Smith were told of the existence of the Smith Trust shortly after it was created in 2004; therefore, they knew or should have known that the true intent of the Trust was to pay a substantial annuity in the future to Smith and L. Smith pursuant to the Annuity Agreement.

164.    Second, on or about Thanksgiving 2004, Smith discussed the Smith Trust with G. Smith and provided him with the trust agreement.

165.    Third, on or shortly after Thanksgiving 2004, G. Smith had informed L.T. Smith that they were the named beneficiaries of the Smith Trust containing approximately $4,000,000.00 set up by their parents.

166.    Fourth, the conduct of G. Smith and L.T. Smith from 2004 through 2010 demonstrates their knowledge that the Trust was created not for their benefit but rather to hide the assets of their parents, David and Lynn Smith.  For example, G. Smith and L.T. Smith never requested or received any distribution from the Smith Trust from its creation in 2004 through April 14, 2010, even though G. Smith had been working to start his own company since at least October 2009 and L.T. Smith was unemployed for a year during the 2008-2010 time period.

167.    Fifth, from 2004 to 2010, G. Smith and L.T. Smith periodically received financial support directly from Smith and L. Smith rather than taking any distributions from the Smith Trust.  Smith and L. Smith also paid the Smith Trust's taxes directly from their accounts rather than allowing the Smith Trust to pay its own tax liabilities. Upon information and belief, Smith and L. Smith undertook these actions to preserve the Trust assets and their interest in annuity payments.

168.    Sixth, G. Smith and L.T. Smith knew or should have known that Smith made the investment decisions for the Smith Trust and received all of the trust account statements.

169.    Seventh, the only distribution of Smith Trust assets to its stated beneficiaries before July 7, 2010 occurred on April 15, 2010, when G. Smith requested a distribution of $95,000, which he gave to Smith and L. Smith to pay their personal taxes.  The funds were transferred directly from the Smith Trust to L. Smith's checking account.

170.    Eighth, the close family relationship between Smith, L. Smith, G. Smith and L.T. Smith, and Urbelis, who was a close family friend, is another of the badges of fraud.

171.    Ninth, G. Smith and L.T. Smith knew that Smith faced substantial liability to creditors as a result of this action brought by the SEC, various FINRA arbitrations, and other

complaints by investors, and that the Court had frozen assets held by Smith or jointly held by Smith and L. Smith.

172.    <u>Tenth</u>, G. Smith and L.T. Smith knew that the Smith Trust had been subject to the asset freeze in this matter and that substantial effort was undertaken in order to release the assets of the Smith Trust from the asset freeze.

173.    <u>Eleventh</u>, with knowledge of falsity or reckless disregard of the truth, G. Smith testified at the preliminary injunction hearing that from 2004 onward he believed that the trust assets were owned by him and L.T. Smith equally, while failing to mention his parents' interest in annuity payments from the Smith Trust.

174.    <u>Twelfth</u>, when the Smith Trust assets were released from the asset freeze, almost $600,000 of the total amount distributed was provided to L. Smith, purportedly in exchange for the Lake Property.  This transaction provided cash to L. Smith in exchange for the only other significant asset owned by Smith or L. Smith that was not subject to the asset freeze.  L. Smith appears to have paid $115,000 from these funds to her counsel.

175.    <u>Finally</u>, upon information and belief, no independent appraisal or valuation of the Lake Property was completed before it was sold to the Smith Trust, and Smith, L. Smith, G. Smith and L.T. Smith have continued to share possession, benefit and use of the Lake Property.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
(Against MS & Co., MS Advisors, MS Capital, McGinn, and Smith)
(Antifraud violations)

176.    Paragraphs 1 through 175 are realleged and incorporated by reference as if set forth fully herein.

177.    The Fund and Trust certificates and notes are securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1) and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

178.    From at least 2005 through the present, MS & Co., MS Advisors, MS Capital, McGinn, and Smith, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, in connection with the offer or sale of securities, knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or c) have engaged, are engaging or are about to engage in transactions, practices or courses of business which have operated, operate or will operate as a fraud and deceit upon investors.

179.    By reason of the foregoing, MS & Co., MS Advisors, MS Capital, McGinn, and Smith, directly or indirectly, singly or in concert, have violated, are violating , and unless restrained and enjoined will again Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
(Against MS & Co., MS Advisors, MS Capital, McGinn, and Smith)
(Antifraud Violations)

180.    Paragraphs 1 through 175 are realleged and incorporated by reference as if set forth fully herein.

181.    From at least 2005 through the present, the MS & Co., MS Advisors, MS Capital, McGinn, and Smith, directly or indirectly, singly or in concert, by use of the means or

instruments of transportation or communication in, or the means or instrumentalities of, interstate

commerce or by the use of the mails, in connection with the offer or sale of securities, knowingly

or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices

to defraud; b) have obtained, are obtaining or are about to obtain money and property by means

of untrue statements of material fact or omissions to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading; and/or c) have engaged, are engaging or are about to engage in transactions,

practices or courses of business which have operated, operate or will operate as a fraud and

deceit upon investors.

182.    By reason of the activities herein described, the MS & Co., MS Advisors, MS

Capital, McGinn, and Smith, singly or in concert, directly or indirectly, have violated, are

violating, and unless restrained and enjoined will again violate Section 10(b) of the Exchange

Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

**THIRD CLAIM FOR RELIEF**
**Violations, and Aiding and Abetting Violations, of**
**Section 15(c)(1) Of The Exchange Act, 15 U.S.C. §78o(c)(1), and**
**Rule 10b-3, 17 C.F.R. §240.10b-3**
(Against MS & Co. and aiding and abetting by McGinn and Smith)
(Violations of Antifraud Provisions by Brokers)

183.    Paragraphs 1 through 175 are realleged and incorporated by reference as if set

forth fully herein.

184.    MS & Co. engaged and is engaging in the business of effecting transactions in

securities for the accounts of others, and therefore was and is a broker within the meaning of

Section 3(a)(4) of the Exchange Act, 15 U.S.C. §78c(a)(4).

185.    MS & Co., while a broker, directly or indirectly, by use of the mails or the means

or instrumentalities of interstate commerce, has effected and is effecting transactions in, and has

induced and attempted to induce and are attempting to induce the purchase or sale of, securities by means of manipulative, deceptive, or other fraudulent devices or contrivances, including: (a) acts, practices, and courses of business that operated or would have operated as a fraud or deceit upon any person, including persons to whom MS & Co. offered and/or sold securities; and (b) making untrue statements of material fact and omissions to state a material fact necessary, in order to make the statements made, in light of the circumstances under which they were made, not misleading with knowledge or reasonable grounds to believe that such statements are untrue or misleading.

186.   As part of and in furtherance of this violative conduct, MS & Co. offered and/or sold securities by making the material misrepresentations and omissions set forth herein.

187.   MS & Co. knew, was reckless in not knowing, or had reasonable grounds to believe that said representations or omissions were false or misleading.

188.   By reason of the foregoing, MS & Co. has violated, is violating, and unless restrained and enjoined, will again violate Section 15(c)(1) of the Exchange Act, 15 U.S.C. §78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

189.   To the extent McGinn and Smith were associated with MS & Co., and not acting brokers unassociated with a registered broker-dealer, McGinn and Smith each aided and abetted, and, unless restrained and enjoined, will again aid and abet, MS & Co's violations of Section 15(c)(1) of the Exchange Act, 15 U.S.C. §78o(c)(1), and Rule 10b-3, 17 C.F.R. §240.10b-3.

**FOURTH CLAIM FOR RELIEF**
**Violations of Sections 206(1), 206(2) and 206(4)**
**of the Advisers Act and Rule 206(4)-8**
(MS & Co., MS Advisors, McGinn and Smith)

190.   Paragraphs 1 through 175 are realleged and incorporated and incorporated by reference as if set forth fully herein.

191.    From at least 2005 through the present, MS & Co. and MS Advisors, by use of the means or instrumentalities of interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

192.    By reason of the foregoing, MS & Co. and MS Advisors, singly or in concert, directly or indirectly, violated Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

193.    McGinn and Smith, knowingly or recklessly provided substantial assistance to MS & Co. and MS Advisors and thereby directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, aided and abetted MS & Co. and MS Advisors' violations of Sections 206(1), 206(2) and 206(4)-2 of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)] and Rule 206(4)-2 thereunder [17 C.F.R. §275.206(4)-8].

### FIFTH CLAIM FOR RELIEF
**Violations of Section 7(a) of the Investment Company Act**
(FAIN, FEIN, FIIN and TAIN)

194.    Paragraphs 1 through 175 are realleged and incorporated and incorporated by reference as if set forth fully herein.

195.    FAIN, FEIN, FIIN and TAIN issued securities, in the form of notes, in what amounted to a public offering, and held themselves out as funds formed to identify and acquire various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, and any other investments that may add value to our portfolio.

196.     Accordingly, FAIN, FEIN, FIIN and TAIN were investment companies under Section 3(a)(1) of the Company Act [15 U.S.C. § 80a-3(a)(1)], and were required to register as investment companies with the Commission under Section 7(a) of the Company Act [15 U.S.C. § 80a-7(a)].  FAIN, FEIN, FIIN and TAIN were never so registered and, while acting as investment companies, FAIN, FEIN, FIIN and TAIN offered, purchased and sold, redeemed or retired securities by the use of the mails and the means and instrumentalities of interstate commerce and engaged in business in interstate commerce.

197.     By reason of the foregoing, FAIN, FEIN, FIIN and TAIN violated Section 7(a) of the Company Act [15 U.S.C. § 80a-7(a)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 5(a) and 5(c) of the Securities Act**
(MS & Co., MS Capital, the Four Funds, McGinn and Smith)

198.     Paragraphs 1 through 175 are realleged and incorporated and incorporated by reference as if set forth fully herein.

199.     The notes and certificates that MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

200.     The FAIN, FEIN, FIIN and TAIN offerings were not limited to 35 or fewer non-accredited purchasers, and MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith could not reasonably have believed that the offering was so limited.  Further, not all of the non-accredited purchasers satisfied the sophistication requirement of Rule 506(b)(2)(ii) of Regulation D [17 C.F.R. § 230.506(b)(2)(ii)], and MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith could not reasonably have believed that all such purchasers met the requirement at the time they invested.

201.    MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith Investments singly or in concert, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise, or have carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

202.    By reason of the foregoing MS & Co., MS Capital, FAIN, FEIN, FIIN, TAIN, McGinn and Smith singly or in concert, directly or indirectly, have violated, are violating, and unless enjoined will again violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### SEVENTH CLAIM FOR RELIEF
(Relief Defendants)

203.    Paragraphs 1 through 175 are realleged and incorporated and incorporated by reference as if set forth fully herein.

204.    Relief Defendants L. Smith and N. McGinn were recipients, without consideration, of proceeds of the fraudulent and illegal sales of securities alleged above.  The Relief Defendants profited from such receipt or from the  fraudulent and illegal sales of securities alleged above by obtaining illegal proceeds under circumstances in which it is not just, equitable, or conscionable for them to retain the illegal proceeds.  Consequently, L. Smith and N. McGinn have each been named as a Relief Defendant for the amount of proceeds by which each has been unjustly enriched as a result of the fraudulent scheme or illegal sales transactions.

205. By reason of the foregoing, L. Smith and N. McGinn should disgorge their ill-gotten gains, plus prejudgment interest.


## EIGHTH CLAIM FOR RELIEF
### Violations of Section 276 of New York Debtor and Creditor Law
(David Smith, Lynn Smith, Tim McGinn, Nancy McGinn,
the Smith Trust, Geoffrey Smith, and Lauren Smith)

206. Paragraphs 1 through 175 are realleged and incorporated and incorporated by reference as if set forth fully herein.

207. McGinn, Smith and L. Smith made transfers with the actual intent to hinder, delay or defraud either present or future creditors, including the following:

    (a)    100,000 shares of Charter One stock from the Stock Account to the Smith Trust in 2004;

    (b)    the Niskayuna house from McGinn to N. McGinn in 2009; and

    (c)    the Vero Beach house from joint ownership to L. Smith in 2009.

208. The Smith Trust, N. McGinn and L. Smith received fraudulently conveyed assets.

209. G. Smith and L.T. Smith received funds after July 7, 2010 that had been fraudulently conveyed to the Smith Trust.

210. The Smith Trust made transfers with the actual intent to hinder, delay or defraud either present or future creditors, including the following:

    (a)    $150,000 to L. Smith indirectly through G. Smith and L.T. Smith for the Lake Property;

    (b)    $449,878.00 to L. Smith in exchange for the Lake Property;

(c)     $296,500 to G. Smith, including $75,000 that he gave to L. Smith as a down payment for the Lake Property and $200,000 for a company he created;

(d)     $83,500 to L.T. Smith, including $75,000 that she gave to L. Smith as a down payment for the Lake Property.

211.    Consequently, all fraudulent conveyances should be voided and set aside, and the property, or its equivalent value, recovered under Section 278 of New York Debtor and Creditor Law.

## PRAYER FOR RELIEF

**WHEREFORE**, the Court having entered the Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief on April 20, 2010 (Dkt. 5); the Preliminary Injunction Order on July 22, 2010 (Dkt. 96); the Order to Show Cause on August 3, 2010 (Dkt. 104); and subsequent Orders concerning preliminary relief on November 22, 2010 (Dkt. 194), December 1, 2010 (Dkt. 207); December 22, 2010 (Dkt. 233) and February 1, 2011 (Dkt. 263);

**WHEREFORE**, the Commission respectfully requests that the Court grant the following additional relief:

### I.

A Final Judgment finding that McGinn, Smith, MS & Co., MS Advisors, MS Capital, and the Four Funds each violated the securities laws and rules promulgated thereunder as alleged against them herein;

**II.**

A Final Judgment permanently restraining and enjoining McGinn, Smith, MS & Co., MS Advisors, MS Capital, and the Four Funds and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of each of the securities laws and rules promulgated thereunder, or alternatively, from aiding and abetting such future violations, as respectively alleged against them herein.

**III.**

An Order directing the return of all assets transferred from the Smith Trust after July 7, 2010.

**IV.**

A Final Judgment directing McGinn, Smith, MS & Co., MS Advisors, MS Capital, the Four Funds, L. Smith, and N. McGinn to disgorge their ill-gotten gains, plus prejudgment interest.

**V.**

A Final Judgment directing McGinn, Smith, MS & Co., MS Advisors, MS Capital, and the Four Funds to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

A Final Judgment permanently prohibiting McGinn from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act

[15 U.S.C. §78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

[15 U.S.C. §78o(d)];

## VII.

A Final Judgment directing McGinn, Smith, N. McGinn, L. Smith, the Smith Trust, G.

Smith and L.T. Smith to return all assets fraudulently conveyed, or their equivalent value, and to

pay attorneys' fees pursuant to NYDCL §§ 276, 276-a and 278.

## VIII.

Granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        June 8, 2011

                                     **s/ David Stoelting**
                                     Attorney Bar Number: 516163
                                     Attorney for Plaintiff
                                     Securities and Exchange Commission
                                     3 World Financial Center, Room 400
                                     New York, NY 10281
                                     Telephone: (212) 336-0174
                                     Fax: (212) 336-1324
                                     E-mail: stoeltingd@sec.gov

Of Counsel:
Andrew Calamari
Michael Paley
Kevin McGrath
Lara Mehraban
Haimavathi V. Marlier
Joshua Newville