**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SECURITIES AND EXCHANGE**
**COMMISSION,**

|  |  |
|---|---|
| **Plaintiff,** | **1:10-cv-457** |
|  | **(GLS/CFH)** |
| **v.** |  |

**MCGINN, SMITH & CO., INC.**
**et al.,**

                        **Defendants,**

**LYNN A. SMITH,** and **NANCY**
**MCGINN,**

                    **Relief**
                    **Defendants,**
                    and

**GEOFFREY R. SMITH,** Trustee of
the David L. and Lynn A. Smith
Irrevocable Trust U/A 8/04/04, and
**U.S. ATTORNEY'S OFFICE FOR**
**ND/NY,**

                    **Intervenors.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** |  |
| U.S Securities and Exchange | DAVID P. STOELTING |
| Commission | HAIMAVATHI V. MARLIER |
| 3 World Financial Center | JACK KAUFMAN |
| New York, NY 10281 | JOSHUA M. NEWVILLE |

KEVIN P. MCGRATH
LARA S. MEHRABAN

**FOR THE DEFENDANTS/RELIEF
DEFENDANTS AND INTERVENORS:**
*McGinn, Smith & Co.*; *Inc.*, *McGinn,
Smith Advisors, LLC*; *McGinn, Smith
Capital Holdings Corp.*; *First Advisory
Income Notes, LLC*; *First Excelsior
Income Notes, LLC*; *First Independent
Income Notes, LLC*; *and Third Albany
Income Notes, LLC*
Phillips, Lytle LLP                          WILLIAM J. BROWN, ESQ.
One Canalside
125 Main Street
Buffalo, NY 14203

*Timothy M. McGinn*
Office of E. Stewart Jones, Jr.              E. STEWART JONES, JR., ESQ.
28 Second Street
Jones Building
Troy, NY 12180

*David L. Smith*
Dreyer, Boyajian Law Firm                    WILLIAM J. DREYER, ESQ.
75 Columbia Street                           BENJAMIN W. HILL, ESQ.
Albany, NY 12210

*Lynn A. Smith*
Featherstonhaugh, Wiley Law Firm             JAMES D.
99 Pine Street                               FEATHERSTONHAUGH, ESQ.
Suite 207
Albany, NY 12207

*Geoffrey R. Smith, Individually and as
Trustee of the David L. and Lynn A.
Smith Irrevocable Trust U/A 8/04/04*,

2

*and Lauren T. Smith*
Linnan, Fallon Law Firm                    JAMES D. LINNAN, ESQ.
61 Columbia Street
Suite 300
Albany, NY 12210-2736

*Nancy McGinn*
Pro Se
426-8th Ave.
Troy, NY 12182

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff the United States Securities and Exchange Commission

(SEC) commenced this civil enforcement action against defendants David

Smith and Timothy McGinn, along with various entities owned and

controlled by McGinn and Smith: McGinn, Smith & Co, Inc. (MS & Co.),

McGinn, Smith Advisors, LLC ("MS Advisors"), McGinn, Smith Capital

Holdings Corp. ("MS Capital"), First Advisory Income Notes, LLC (FAIN),

First Excelsior Income Notes, LLC (FEIN), First Independent Income

Notes, LLC (FIIN), and Third Albany Income Notes, LLC (TAIN),[1]

---

[1] FAIN, FEIN, FIIN, and TAIN are collectively referred to as the "Four Funds."

(collectively, the "MS Entities"), alleging violations of §§ 5(a),[2] 5(c),[3] and 17(a)[4] of the Securities Act of 1933 ("Securities Act"), § 10b of the Securities Exchange Act of 1934 ("Exchange Act"),[5] and Rule 10b-5 thereunder,[6] § 15(c)(1) of the Exchange Act,[7] and Rule 10b-3 thereunder,[8] and §§ 206(1), (2), and (4) of the Investment Advisors Act of 1940,[9] and Rule 206(4)-8 thereunder.[10]  (*See generally* 2d Am. Compl., Dkt. No. 334.) The SEC additionally asserts claims of fraudulent conveyance in violation of § 276 of the New York Debtor and Creditor Law against McGinn, Smith, defendants Lynn A. Smith[11] ("L. Smith"), Geoffrey R. Smith ("G. Smith"), individually and as Trustee of the David L. and Lynn A. Smith Irrevocable

---

[2] *See* 15 U.S.C. § 77e(a).

[3] *See* 15 U.S.C. § 77e(c).

[4] *See* 15 U.S.C. § 77q(a).

[5] *See* 15 U.S.C. § 78a.

[6] *See* 17 C.F.R. § 240.10b-5.

[7] *See* 15 U.S.C. § 78o(c)(1).

[8] *See* 17 C.F.R. § 240.10b-3.

[9] *See* 15 U.S.C. § 80b-6(1), (2), and (4).

[10] *See* 17 C.F.R. § 275.206(4)-8.

[11] L. Smith is Smith's wife.  (2d. Am. Compl. ¶ 36.)

4

Trust U/A 8/04/04 (the "Smith Trust"), Lauren T. Smith ("L.T. Smith"),[12] and *pro se* defendant Nancy McGinn[13] ("N. McGinn").  (*Id.* ¶¶ 206-11.)  L. Smith and N. McGinn are also named as relief defendants for allegedly receiving and retaining ill-gotten gains.[14]  (*Id.* ¶¶ 203-05.)

Pending is the SEC's motion for summary judgment.[15]  (Dkt. No. 708.)  In its motion, the SEC seeks sanctions in the form of disgorgement of profits, an injunction prohibiting McGinn and Smith from committing future securities laws violations, an order barring McGinn from serving as an officer or director, and civil monetary penalties.  (Dkt. No. 708, Attach. 1 at 14-31.)  Further, the SEC seeks to include in a disgorgement order assets held solely in L. Smith and N. McGinn's names, along with assets held by the Smith Trust.  (*Id.* at 18-29.)

---

[12] L.T. Smith and G. Smith are the children of L. Smith and Smith.  (2d Am. Compl. ¶¶ 34, 35.)

[13] N. McGinn is McGinn's wife.  (2d Am. Compl. ¶ 37.)

[14] The SEC also alleges violations of § 7(a) of the Investment Company Act of 1940,  15 U.S.C. § 80a-7, but only as against the Four Funds.  (2d Am. Compl. ¶¶ 194-97.)  Because the SEC has not moved for summary judgment against the Four Funds, (Dkt. No. 708 at 2), the court does not consider that claim here.

[15] The court notes that L. Smith's motion for summary judgment, (Dkt. No. 696), and G. Smith, L.T. Smith, and the Smith Trust's motion for summary judgment, (Dkt. No. 704), are also pending.  The court will address those motions, along with the SEC's request to include L. Smith, N. McGinn, and the Smith Trust's assets in the disgorgement order, in a forthcoming decision.

In this Memorandum-Decision and Order, the court addresses only the following: (1) whether McGinn and Smith violated the securities laws; and (2) whether the SEC is entitled to the sanctions its seeks against McGinn and Smith.  The court reserves judgment with respect to the assets held solely by L. Smith, N. McGinn, and the Smith Trust, and will consider the issues related to those assets in a later decision.  For the reasons that follow, the SEC's motion is granted in part and denied in part.

## II. **Background**[16]

_____

[16] At the outset, a few points mut be noted.  First, in his response to the SEC's statement of material facts, (Dkt. No. 785), Smith failed to comply with this District's Local Rules.  Local Rule 7.1(a)(3) provides that, in a response to a statement of material facts, "[t]he non-movant's response shall mirror the movant's [s]tatement of [m]aterial [f]acts by admitting and/or denying each of the movant's assertions . . . .  Each denial shall set forth a specific citation to the record where the factual issue arises."  Where the opposing party does not specifically controvert facts, "[t]he [c]ourt shall deem admitted any properly supported facts." N.D.N.Y. L.R. 7.1(a)(3).  Here, rather than deny certain facts and provide a specific citation to the record in support of that denial, Smith simply "object[s]" to numerous facts set forth by the SEC.  (_See, e.g._, Dkt. No. 785 ¶¶ 20-23, 35, 47, 57, 59, 61, 63, 68, 75-84, 91-92.)  This is plainly improper, and the court, therefore, admits those facts asserted by the SEC that are supported by the record and not specifically or properly controverted by Smith.  Second, despite the passage of the due date, (Dkt. No. 776), McGinn and N. McGinn neither filed a response to the SEC's motion, nor notified the court of their intent to forego opposition to the motion, as is required by this District's Local Rules.  _See_ N.D.N.Y. L.R. 7.1(b)(3).  In an abundance of caution, and particularly in light of N. McGinn's _pro se_ status, the court ordered McGinn and N. McGinn to either respond to the SEC's motion or notify the court of his or her intent not to oppose the motion.  (Dkt. No. 806.)  McGinn and N. McGinn blatantly ignored that order.  As a result, in accordance with L.R. 7.1(a)(3), the court deems admitted any properly supported facts asserted against McGinn and N. McGinn.  Further, in this District, where, as here, "a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have 'consented' to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3)."  _Pedroso v. Syracuse Cmty. Health Ctr._, No. 5:11-CV-1268, 2014 WL 3956570, at *6 (N.D.N.Y. Aug. 13, 2014).  Therefore, as against McGinn and N. McGinn, the SEC "need only show that [its] argument[s] possess facial merit, which has appropriately been characterized as a 'modest' burden."  _Id._ Accordingly, unless

6

Before delving into the salient facts and winding procedural history, it is worth establishing a big-picture framework for this case.  Generally, the SEC alleges that McGinn and Smith, individually and through the various entities that they owned and controlled, orchestrated an elaborate Ponzi scheme,[17] which spanned over several years, involved dozens of debt offerings, and bamboozled hundreds of investors out of millions of dollars. (*See generally* 2d Am. Compl.)  More specifically, the SEC alleges that, between 2003 and 2010, McGinn and Smith raised over $136 million in over twenty unregistered debt offerings, including the Four Funds—FAIN, FEIN, FIIN, and TAIN—and various trust offerings, by representing that investor money would be "invested," when instead it was "funneled" into various entities owned or controlled by McGinn and Smith.  (*Id.* ¶¶ 1-3.) The money was then used to fund unauthorized investments and unsecured loans, make interest payments to investors in other entities and offerings, support McGinn and Smith's "lifestyles," and cover the payroll at MS & Co.  (*Id.*)

---

otherwise noted, the facts are not in dispute.

[17] "'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008).

On April 20, 2010, in order to halt what it viewed as an ongoing fraud, the SEC filed a complaint and order to show cause, seeking emergency relief.  (Dkt. Nos. 1, 4.)  On the same day, the court granted the SEC's application, and temporarily froze assets of McGinn, Smith, and the MS Entities, along with certain assets of L. Smith and N. McGinn. (Dkt. No. 5.)  As relevant to the pending motions, the following assets remain frozen: (1) all assets held by McGinn, Smith, and the MS Entities, (Dkt. No. 61; Dkt. No. 86 at 42), (2) assets held in L. Smith's name, including a checking account, (Dkt. No. 86 at 42), a brokerage account, (*id.*), and proceeds from the sale of a vacation home in Vero Beach, Florida, (*id.*; Dkt. No. 263,); (3) assets held by the Smith Trust, (Dkt. No. 194 at 23); and (4) assets held by N. McGinn, including proceeds from the sale of the McGinns' property in Niskayuna, New York, (Dkt. No. 233; Dkt. No. 276; Dkt. No. 426).

It should also be noted at the outset that, in addition to the case at bar, a parallel criminal case was brought against McGinn and Smith ("MS Criminal Case").  *See United States v. Timothy M. McGinn and David L. Smith*, 1:12-cr-28.  This civil action was stayed pending the outcome of the MS Criminal Case.  (Dkt. No. 474.)  After a four-week jury trial before

8

District Judge David N. Hurd, McGinn and Smith were found guilty of conspiracy to commit mail and wire fraud, mail fraud, wire fraud, securities fraud, and filing false tax returns.  (Pl.'s Statement of Material Facts (SMF) ¶ 50, Dkt. No. 711; Dkt. No. 712, Attachs. 5, 6.)  Once the stay was lifted in this case, (Dkt. No. 589), the court set a briefing schedule for the now pending dispositive motions.  (Dkt. Nos. 672, 695.)

## A.    Facts[18]

The scheme to defraud alleged by the SEC revolves primarily around three different types of offerings: (1) the Four Funds, (2) approximately twenty separate trust offerings (the "Trust Offerings"),[19] and offerings through McGinn Smith Transaction Funding Corporation (MSTF). (2d Am. Compl. ¶¶ 39-67, 68-103; Pl.'s SMF ¶¶ 9-14.)  Below, the Four Funds and Trust Offerings are discussed separately, while facts relevant

---

[18] Because, as discussed further below, the SEC primarily argues that it is entitled to summary judgment based on collateral estoppel—an argument with which the court agrees—this section highlights the major relevant facts, but does not plunge too far into the minutiae.

[19] The Trust Offerings included the following: TDM Cable Trust 06, TDM Verifier Trust 07, Firstline Senior Trust 07, Firstline Trust 07, TDM Luxury Cruise Trust 07, Firstline Senior Trust 07 Series B, TDM Verifier Trust 08, Cruise Charter Ventures Trust 08, Integrated Excellence Sr. Trust 08, Integrated Excellence Jr. Trust 08, Fortress Trust 08, TDM Cable Trust 06, TDM Verifier Trust 09, TDMM Cable Jr Trust 09, TDMM Cable Sr. Trust 09, TDM Verifier Trust 07R, TDM Verifier Trust 08R, TDMM Benchmark Trust 09, TDM Verifier Trust 11. (Pl.'s SMF ¶ 12.)

to the MSTF offering are interspersed throughout.

    *1. The Four Funds*

    The Four Funds were single purpose, New York limited liability companies formed between September 2003 and October 2005.  (Pl.'s SMF ¶ 9.)  The private placement memoranda (PPM) for each of the Four Funds were substantively identical, and each offered $20 million worth of notes, with the exception of TAIN, which offered $30 million.  (*Id.* ¶ 11.)  The offerings had three tranches of notes, which paid quarterly interest of 5% to 10.25%, and promised a return of principal at maturity, in one, three, or five years.  (*Id.*)  Smith was primarily responsible for the Four Funds and their investment decisions.  (*Id.* ¶ 159.)

    The PPMs stated that the net proceeds would be used "to acquire various public and/or private investments."  (Dkt. No. 722 at 15; Dkt. No. 723 at 15; Dkt. No. 724 at 15; Dkt. No. 760, Attach. 1 at 2.)  The PPMs further stated that the Four Funds "may acquire such [i]nvestments directly, or from . . . an affiliate . . . or . . . managing member that has purchased the [i]nvestment," and that, if any of the Four Funds purchases an investment from a managing member or affiliate, the fund will "pay the same price for the [i]nvestment that [it] would have paid if [it] had directly

purchased the [i]nvestment." (Dkt. No. 722 at 15; Dkt. No. 723 at 15; Dkt. No. 724 at 15; Dkt. No. 760, Attach. 1 at 2.)

McGinn and Smith, however, engaged in a course of conduct and dealings that were contrary to the PPMs. First, investor proceeds from the Four Funds were used to purchase contracts from pre-2003 trust offerings, which had begun to fail, for more than their initial cost, or to make loans to pre-2003 trusts for the purpose of redeeming or making interest payments to investors. (Pl.'s SMF ¶¶ 75-97, 172; Dkt. No. 712 ¶¶ 8-29, 32-34, 36.) Second, the Four Funds used investor money to directly invest in, rather than purchase investments from, affiliates. (Pl.'s SMF ¶¶ 98-119.) Indeed, in a November 2007 letter, Smith wrote that:

> One of the more troubling aspects of the [Four Funds] investments has been my willingness to make substantial investments in affiliated entities, both because they were available and in some cases . . . new investments were needed to support past investments. Thus, . . . the pattern was often the same; invest more money to support the original investment.

(Dkt. No. 714, Attach. 1 at 3-4.) Many of the affiliated investments, however, provided no cash flow to the Four Funds, and were ultimately considered worthless. (Dkt. No. 712 ¶¶ 30-35.) Finally, proceeds from the

Four Funds were funneled through MSTF and then used to pay MS & Co.'s payroll.[20]  (Pl.'s SMF ¶¶ 138, 169, 170, 171; Dkt. No. 724, Attach. 16 at 43-44.)

In late 2007, Smith received an email from David Rees—the comptroller at MS & Co., whose responsibilities included preparing and maintaining the firm's financial statements—which showed a $48.8 million deficit in the Four Funds.  (Pl.'s SMF ¶¶ 160, 163.)  Nevertheless, Smith continued to solicit new investments in the Four Funds.  (*Id.* ¶ 164.)  In early 2008, interest payments to junior note holders were first reduced, and then later eliminated, which constituted a default.  (Pl.'s SMF ¶¶ 137, 141; Dkt. No. 727 at 4; Dkt. No. 727, Attach. 1 at 2)  The reduction, and subsequent elimination, of interest payments were attributed to the collapse of various debt and credit markets and the "sub prime mess."  (Dkt. No. 727 at 2; Dkt. No. 727, Attach. 1.)  Certain preferred investors, however, continued to receive interest payments, but those payments

---

[20] Although Smith purports to dispute this fact, he has not complied with this District's Local Rules.  Indeed, in support of his statement that "any Four Funds proceeds that were allocated to payroll was an error on . . . behalf of Mr. Cooper, not at the direction of . . . McGinn or . . . Smith[,]" Smith generally cites to 321 pages of G. Smith's trial testimony.  (Dkt. No. 785 ¶¶ 169, 170.)  This does not, in the court's view, comport with the mandate in L.R. 7.1(a)(3) that an opposing party support each denial with "a specific citation to the record where the factual issue arises."  Smith is represented by sophisticated counsel, and the court declines Smith's invitation to scour voluminous documents for disputed facts.

came from MTSF funds, not proceeds from the Four Funds.[21]  (Pl.'s SMF

¶¶ 168, 170; Dkt. No. 724, Attach. 16 at 41-42.)  Finally, in October 2008,

Smith sent a letter to all note holders in all tranches of the Four Funds,

which outlined a restructuring plan, extended the maturity dates of the

notes, reduced interest payments for all tranches, and forfeited all future

fees due to MS & Co.  (Pl.'s SMF ¶¶ 142-44; Dkt. No. 741, Attach. 3.)

   2.  *The Trust Offerings*[22]

   Beginning in October 2006, MS & Co. was the sales agent for the

Trust Offerings, which sold trust certificates.  (Pl.'s SMF ¶ 12.)  Investors in

the Trust Offerings were promised interest payments ranging from 7.75%

to 13% per year, and a return of principal at maturity, which ranged from

fifteen months to five years.  (*Id.* ¶ 13.)  Investors were advised that the

proceeds raised by the Trust Offerings, minus certain disclosed fees and

deal costs, would be invested in specific streams of receivables, such as

---

   [21] Smith disputes that the interest payments to the Four Funds investors came from MSTF funds, but, again, in support of that proposition cites G. Smith's entire trial testimony. (Dkt. No. 785 ¶¶ 168, 170.)  For the same reasons discussed above, *see supra* note 20, this fact is deemed admitted.

   [22] Again, Smith purports to dispute many of the facts below, but, in support of his denials, he generally cites the full contents of lengthy documents, including the PPMs for eighteen of the Trust Offerings, and the entire trial testimony transcripts of G. Smith, Smith, and Richard Engel.  (*See, e.g.*, Dkt. No. 785 ¶¶ 149-51, 203, 229, 233, 237, 238, 241, 250.)  For the same reasons discussed above, *see supra* note 20, these facts are deemed admitted.

the purchase of contracts for security alarm services, broadband cable services, telephone services, and luxury cruises.  (*Id.* ¶¶ 146, 147.)

For each Trust Offering, however, less than the amount represented in the PPM was actually invested in the identified streams of receivables. Specifically, the PPMs promised that, in aggregate, 85% of money raised from investors would be invested in the disclosed assets, but, in fact, only 58% of the money was invested as promised.  (Dkt. No. 712 ¶ 44, at 40, 62.)  Moreover, the funds raised from the Trust Offerings paid fees to MS & Co. in excess of the fees disclosed in the PPMs.  Indeed, although the PPMs disclosed combined maximum underwriting and other fees payable to MS & Co. of up to $3.2 million, from October 2006 through December 2009, MS & Co. received over $6.4 million in connection with the Trust Offerings, and, further, Smith, McGinn, and Matthew Rogers, a former senior managing director at MS & Co., personally took approximately $4.7 million from funds raised from the Trust Offerings.  (*Id.* ¶¶ 46, 47, at 40, 42-43, 62; Pl.'s SMF ¶¶ 59, 150-51.)

Furthermore, like the Four Funds offerings, the investments that were made by the Trust Offerings did not generate sufficient returns to cover interest and principal payments owed to investors.  Thus, contrary to

the terms of the PPMs, in many instances, McGinn and Smith used

investor funds from one offering—including the various Trust Offerings, the

Four Funds, and MSTF—to cover interest and principal payments in other

Trust Offerings.  (Pl.'s SMF ¶¶ 197, 198, 201, 203; Dkt. No. 712 ¶ 52.)

The Firstline Trust 07, Firstline Sr. Trust 07, Firstline Trust 07 Series B,

and Firstline Sr. Trust 07 Series B offerings (collectively, the "Firstline

Trusts") are good examples.

        The Firstline Trusts raised money from investors, which was then

loaned to Firstline, Inc., an alarm company in Utah.  (Pl.'s SMF ¶ 225.)

The investors were to receive monthly payments from Firstline's revenue

stream.  (Dkt. No. 712 ¶¶ 55, 56.)  Firstline, however, filed for bankruptcy

on January 25, 2008, and, after filing, failed to make its payments on the

loans.  (Pl.'s SMF ¶ 228.)  The Firstline Trusts then used approximately $2

million from MSTF and other Trust Offerings, including TDM Cable Trust

06, TDM Verifier Trust 07R, and Integrated Excellence Jr. Trust 08, to pay

interest to investors.  (Id. ¶¶ 229, 233, 237, 238, 241; Dkt. No. 725, Attach.

4.)  Further, although McGinn and Smith knew about Firstline's bankruptcy

almost immediately, they did not disclose this information to investors, or

to their brokers, who continued to sell Firstline certificates after the

15

bankruptcy, without informing potential investors of Firstline's financial condition.  (Pl.'s SMF ¶¶ 231, 232, 235, 236, 244.)  Investors were not informed about Firstline's bankruptcy until September 2009, and, although they were told that they would continue to receive monthly payments from Firstline receivables, money paid to investors in Firstline, in fact, again came from other Trust Offerings.  (*Id.* ¶¶ 248, 250.)

### 3.  FINRA Proceedings

Eventually, McGinn and Smith's clients complained to authorities about how their investments were being handled, and, in January 2009, the Financial Industry Regulatory Authority (FINRA)[23] undertook an investigation of McGinn, Smith, and MS & Co.  (Pl.'s SMF ¶¶ 4, 63, 64, 551; Dkt. No. 192, Attach. 3 ¶ 9.)  On April 5, 2010, FINRA charged McGinn, Smith, and MS. & Co. with violating § 10(b) of the Exchange Act

---

[23]  FINRA, created in 2007, is a private not-for-profit corporation and a self-regulatory organization that is registered with the SEC as a national securities association pursuant to § 15A of the Exchange Act.  *See* 15 U.S.C. § 78o-3; *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 804 (D.C. Cir. 2005).  "By virtue of its statutory authority, [FINRA] wears two institutional hats: it serves as a professional association, promoting the interests of its members . . . and it serves as a quasi-governmental agency, with express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or [SEC] regulations issued pursuant thereto."  *Nat'l Ass'n of Sec. Dealers*, 431 F.3d at 804 (citations omitted).  In its self-regulatory role, FINRA requires members to arbitrate disputes with clients, and an arbitration may result in an award of damages to a client against a member, and FINRA may investigate the conduct of a member and impose sanctions.  *See Karsner v. Lothian*, 532 F.3d 876, 880 (D.C. Cir. 2008).  FINRA is not a party to this action.

and Rule 10b-5 thereunder, along with various FINRA rules.  (Dkt. No. 712, Attach. 14.)  On September 14, 2011, FINRA issued a default decision, which barred McGinn and Smith from association with any FINRA member firm.  (Dkt. No. 712, Attach. 15.)  In addition to the action initiated by FINRA itself, some of McGinn and Smith's clients commenced arbitrations in FINRA, alleging, among other causes of action, unsuitable investments, negligence, breach of contract, breach of fiduciary duty, fraud, misrepresentations, and omissions, and seeking compensatory damages.  (*See, e.g.*, Dkt. No. 740, Attach. 6 at 16-25.)

## B.    Procedural History

As noted above, on April 20, 2010, the SEC filed its complaint and an order to show cause, and, on the same day, the court entered an order temporarily freezing certain assets, pending a preliminary injunction hearing, and appointing a temporary receiver over the MS Entities' assets. (Dkt. Nos. 1, 4-5.)  McGinn, Smith, and the MS Entities, through the receiver, consented to a preliminary injunction continuing the freeze of their assets.  (Dkt. No. 61; Dkt. No. 87 at 40.)  On July 22, 2010, the court entered a preliminary injunction order, which, among other things, confirmed the appointment of William Brown, Esq. as the Receiver over

the assets of the MS Entities, pending the final disposition of the action. (Dkt. No. 96.)

Also as noted above, this case was stayed pending the completion of the MS Criminal Case.  (Dkt. No. 474.)  On October 11, 2012, a grand jury returned a superseding indictment against McGinn and Smith, which charged them each with one count of conspiracy to commit mail and wire fraud, nine counts of mail fraud, ten counts of wire fraud, six counts of securities fraud, and three counts of filing a false tax return.  (Dkt. No. 712, Attach. 4.)  Among other things, the superseding indictment alleged that McGinn and Smith made material misrepresentations and omissions in connection with the Trust Offerings, the Four Funds, and MSTF.  (*See generally id.*)

On February 6, 2013, the jury returned verdicts.  (Dkt. No. 712, Attachs. 18, 19.)  Both McGinn and Smith were convicted of conspiracy to commit mail and wire fraud, McGinn was convicted of seven counts of mail fraud, all ten counts of wire fraud, all six counts of securities fraud, and all three counts of filing false tax returns, and Smith was convicted of three counts of mail fraud, two counts of wire fraud, all six counts of securities fraud, and all three counts of filing false tax returns.  (Dkt. No. 712,

Attachs. 5, 6, 18, 19.)  On August 7, 2013, Smith was sentenced to ten years imprisonment and was ordered to pay a $50,000 fine, and McGinn was sentenced to fifteen years imprisonment and ordered to pay a $100,000 fine.  (Dkt. No. 712, Attach. 20 at 38-39, 40-41; Dtk. No. 713 at 32-33, 34-35.)  The court also ordered that Smith and McGinn be held jointly and severally liable for a restitution payment of $5,748,722.  (Dkt. No. 712, Attach. 20 at 35; Dkt. No. 713 at 29.)  McGinn and Smith appealed their convictions, and the United States appealed as to the sentences only.  (MS Criminal Case, Dkt. Nos. 237, 238, 249, 250.)

On September 3, 2013, the stay in this civil proceeding was lifted. (Dkt. No. 589.)  Soon thereafter, briefing schedules were set, (Dkt. Nos. 672, 695), and the now-pending motions were filed.

### III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

19

# IV.  Discussion[24]

## A.    First, Second, Third, and Fourth Causes of Action

With respect to its first four causes of action, the SEC first contends that summary judgment is appropriate because McGinn and Smith's convictions in the MS Criminal Case have preclusive effect by virtue of collateral estoppel.  (Dkt. No. 708, Attach. 1 at 2-11.)  Second, the SEC contends that it is entitled to summary judgment because additional evidence demonstrates that there are no genuine issues of material fact.  (Dkt. No. 708, Attach. 1 at 2-11.)  In response, Smith only disputes that collateral estoppel applies; he does not address the SEC's argument that it is also entitled to summary judgment based on undisputed evidence.

---

[24] The court would be remiss if it did not note, at the outset of its discussion of the parties' respective arguments, its disappointment with the SEC's submissions.  In its November 24, 2014 text order, (Dkt. No. 804), the court first expressed its frustration with the SEC after the court's unsuccessful attempt to make heads or tails of the manner in which the SEC uploaded its nearly 400 exhibits to the docket.  The court further ordered the SEC to submit an appendix that clearly identified the docket number, and, where relevant, attachment number, of each of its exhibits, so that locating a particular document was not a seemingly endless game of Where's Waldo.  Worse than its haphazard filing, however, is the SEC's memorandum of law, which can only be described as carelessly drafted.  Putting aside the SEC's utter failure to provide any specificity with respect to its requests for an order granting $124 million in disgorgement and $124 million in civil penalties, which are discussed below, throughout its submission, the SEC left blank underscores where it clearly intended to cite a paragraph in its statement of material facts, (Dkt. No. 708, Attach. 1 at 12-13), and sporadically misspelled McGinn's surname—and not even consistently, (*id.* at 14 (referring to McGinn as "McMinn" and "McGinnis")).  Of course, the court understands that mistakes happen, and is generally more forgiving of typographical errors and other inconsequential slipups.  But in this instance, it is clear that the SEC did not treat this submission with the type of care, attention, and professionalism that the court expects of a federal agency.

(Dkt. No. 785, Attach. 22 at 3-6.)  For the following reasons, the court

agrees that summary judgment is appropriate based on both collateral

estoppel and the undisputed evidence.

### 1. Collateral Estoppel

"The doctrine of offensive collateral estoppel permits a plaintiff to bar

a defendant from relitigating an issue that was decided in a prior case

against the defendant."  *Roe v. City of Waterbury*, 542 F.3d 31, 41 (2d Cir.

2008).  Collateral estoppel applies when:

> (1) the issues in both proceedings are identical, (2)
> the issue in the prior proceeding was actually
> litigated and actually decided, (3) there was full and
> fair opportunity to litigate in the prior proceeding, and
> (4) the issue previously litigated was necessary to
> support a valid and final judgement on the merits.

*S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) (quoting

*N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999)).  "[T]he

moving party has the burden of demonstrating the identity of the issues

and the opposing party has the burden of showing lack of a full and fair

opportunity to litigate the issue in the prior action."  *S.E.C. v. Tzolov*, No.

08 Civ. 7699, 2011 WL 308274, at *1 (S.D.N.Y. Jan. 26, 2011) (internal

quotation marks and citation omitted).

"It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996) (internal quotation marks and citation omitted).  The rationale behind this rule is as follows:

> The Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. . . .  The criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue.

*S.E.C. v. Shehyn*, No. 04 CV 2003, 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (citations omitted)).  Further, collateral estoppel may apply even during the pendency of an appeal.  *See S.E.C. v. Contorinis*, No. 09 Civ. 1043, 2012 WL 512626, at *3 (S.D.N.Y. Feb. 3, 2012) (citing *Russell-Newman, Inc. v. The Robeworth, Inc.*, No. 00 Civ. 9797, 2002 WL 1918325, at *1 n.1 (S.D.N.Y. Aug.19, 2002)), *aff'd* 743 F.3d 296 (2d Cir. 2014).

a.  The First Four Causes of Action and Their Elements

In its first cause of action, the SEC alleges violations of  § 17(a) of the Securities Act as against MS & Co., MS Advisors, MS Capital, McGinn, and Smith.  (2d. Am. Compl. ¶¶ 176-79.)  In its second cause of action, the SEC alleges violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder as against MS & Co., MS Advisors, MS Capital, McGinn, and Smith.  (*Id.* ¶¶ 180-82.)  In its third cause of action, the SEC alleges that McGinn and Smith aided and abetted violations of § 15(c)(1) of the Exchange Act, and Rule 10b-3 thereunder.  (*Id.* ¶¶ 183-89.)  Finally, in its fourth cause of action, the SEC alleges that MS & Co., MS Advisors, McGinn, and Smith violated §§ 206(1), (2), and (4) of the Advisers Act, and Rule 206(4)-8 thereunder.  (*Id.* ¶¶ 190-93.)

Section 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder are collectively referred to as the antifraud provisions of the federal securities laws.  *See VanCook v. S.E.C.*, 653 F.3d 130, 137 (2d Cir. 2011); *S.E.C. v. Parklane Hosiery Co., Inc.*, 558 F.2d 1083, 1085 n.1 (2d Cir. 1977).  Generally, the antifraud provisions "prohibit the use of fraudulently misleading representations in the purchase or sale of securities."  *Parklane*, 558 F.2d at 1085 n.1.

23

Section 10(b) prohibits, among other things, the use "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).[25] Section 17(a) prohibits the exact same conduct in the offer, purchase, or sale of securities, using the mails or the instruments of interstate commerce. 15 U.S.C. § 77q(a). Similarly, § 15(c) of the Exchange Act prohibits a broker or dealer from using "any manipulative, deceptive, or other fraudulent device or contrivance" "to induce or attempt to induce the purchase or sale of [] any security." 15 U.S.C. § 78o(c)(1); *see SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005).

---

[25] Rule 10b-5, promulgated under Section 10(b), makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The elements necessary to establish violations under § 10(b) and Rule 10b-5 are that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  The standard for establishing violations of § 17(a) of the Securities Act and § 15(c)(1) of the Exchange Act are "[e]ssentially the same."  *Id.*; *see George*, 626 F.3d at 792.

Section 206 of the Advisers Act provides that:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b-6.  Additionally, § 206(4) also prohibits investment advisors from "directly or indirectly . . . engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6(4).[26]  Facts showing a violation of §§ 17(a) or 10(b) by an

---

[26] Section 206(4) is applicable to pooled investment vehicles.  *See* 17 C.F.R. § 275.206(4)-8. Pooled investment vehicles are "any investment company as defined in section 3(a) of the Investment Company Act."  *Id.* § 275.206(4)-8(b).  An investment company,

investment adviser will also support a showing of a § 206 violation. *See*

*Haligiannis*, 470 F. Supp. 2d at 383; *SEC v. Berger*, 244 F. Supp. 2d 180,

188-89 (S.D.N.Y. 2001).

### b. The Civil Elements Are Identical to the Criminal Elements

"Courts have applied collateral estoppel in the securities fraud

context because the elements necessary to establish civil liability under

Section[s] 17(a)[,] 10(b)[, and 206] are identical to those necessary to

establish criminal liability under Section 10(b)." *Haligiannis*, 470 F. Supp.

2d at 382-83 (granting summary judgment on §§ 17(a), 10(b), and 206(1)

and (2) claims after finding defendant was estopped from contesting

liability based on his conviction of one criminal count of a § 10(b)

violation)); *see Tzolov*, 2011 WL 308274, at *2-3.

Further, for collateral estoppel to apply, the civil claims need not

arise under the same statutory provisions under which a party was

convicted; it is enough if "the factual allegations underlying the . . .

convictions are sufficient to establish that [the defendant] also violated the

---

pursuant to the Investment Act, is one which "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3. Liability may be found where an investment adviser makes a false statement of material fact to an investor, realized or prospective, or fails to disclose material facts necessary to make statements made to investors be truthful. *See* 17 C.F.R. § 275.206(4)-8(a).

securities laws provisions at issue."  *SEC v. Dimensional Entm't Corp.*,

493 F. Supp. 1270, 1277 (S.D.N.Y. 1980).  Thus, courts have also applied

collateral estoppel in civil enforcement actions where a defendant

previously pled guilty or was convicted of wire fraud.  *See, e.g.*, *Shehyn*,

2010 WL 3290977, at *2-3 (granting summary judgment on the SEC's

§§ 17(a), 10(b), and Rule 10b-5 claims based on the defendant's prior wire

fraud guilty plea); *see also SEC v. Tandem Mgmt. Inc.*, No. 95 CIV. 8411,

2001 WL 1488218, at *10 (S.D.N.Y. 2001) (applying collateral estoppel to

the SEC's § 206(4) claim where defendant was previously convicted of

wire fraud).

### c. Collateral Estoppel Applies Here

The SEC contends that collateral estoppel compels the entry of

summary judgment on its first four causes of action.  (Dkt. No. 708, Attach.

1 at 2-11.)  Specifically, the SEC argues that the superseding indictment

and the second amended complaint allege the same conduct and

violations, and, further, the elements necessary to prove its first four

causes of action are the same as those elements that were proven to

convict McGinn and Smith of conspiracy to commit mail and wire fraud,

mail fraud, wire fraud, and securities fraud.  (*Id.* at 4-11.)  Smith, however,

disputes that collateral estoppel applies.  (Dkt. No. 785, Attach. 22 at 4-5.) Specifically, he contends that the issues related to the convictions and the claims in the second amended complaint are not identical.[27]  (*Id.*)  The court agrees with the SEC.[28]

In order to determine whether the issues are identical for collateral estoppel purposes, courts routinely compare the criminal indictment with the civil complaint.  *See Tzolov*, 2011 WL 308274, at *2-4 (comparing conduct alleged in the complaint with conduct alleged in the indictment and concluding that, due to the overlapping factual allegations, there was identity of issue for collateral estoppel purposes); *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 394-95 (S.D.N.Y. 2010) (same).  Here, contrary to Smith's assertions, the issues in this civil case and the MS Criminal Case are identical.  A comparison of the second amended complaint and

---

[27] Smith also argues that the issues related to the conspiracy conviction are ambiguous because, based on the jury instructions, it is unclear whether the jury's verdict related to investors and FINRA or to FINRA only.  (Dkt. No. 785, Attach. 22 at 5-6.)  Because Smith's convictions for mail fraud, wire fraud, and securities fraud are sufficient for collateral estoppel purposes, the court need not consider whether the conspiracy conviction also establishes the securities fraud claims here.

[28] The parties do not dispute that the issues in the MS Criminal Case were actually litigated and decided, that McGinn and Smith had a full and fair opportunity to litigate in the MS Criminal Case, or that the issues previously litigated were necessary to support a valid and final judgment.  Indeed, it is clear from the record that those elements of collateral estoppel are met.  Thus, the court only discusses the first and only disputed element—whether the issues in both proceedings are identical.

the superseding indictment demonstrates that both instruments concern

the same defendants—McGinn and Smith—allege the same scheme to

defraud in connection with the same offerings—the Four Funds, Trust

Offerings, and MSTF—and describe substantially the same conduct.

(*Compare* 2d Am. Compl. *with* Dkt. No. 712, Attach. 4.)

For example, both the superseding indictment and second amended

complaint allege that McGinn and Smith misrepresented and omitted

material information concerning Firstline's financial condition to investors.

(2d Am. Compl. ¶¶ 100-101; Dkt. No. 712, Attach. 4 ¶¶ 21-40.)  Both

McGinn and Smith were convicted of mail fraud, and McGinn was also

convicted of wire fraud, specifically in connection with the Firstline Trusts.

(Dkt. No. 712, Attach. 4; Dkt. No. 712, Attach. 18 at 5; Dkt. No. 712,

Attach. 19 at 3, 5-6.)  Additionally, both the second amended complaint

and the superseding indictment allege that, contrary to what was disclosed

in the PPMs, McGinn and Smith improperly diverted millions of dollars

from the Trust Offerings, including Integrated Excellence Sr. Trust 08 and

TDMM Cable Jr. Trust 09, for their own personal benefit or for the benefit

of other MS Entities.  (2d Am. Compl. ¶¶ 68, 72-76, 81-87; Dkt. No. 712,

Attach. 4 ¶¶ 55-58.)  Further, both the second amended complaint and the

superseding indictment allege that McGinn and Smith misrepresented, and omitted material information concerning, the true purpose of TDM Verifier Trust 08 and Fortress Trust 08 to investors and potential investors. (2d Am. Compl. ¶¶ 68, 72-76, 88-92; Dkt. No. 712, Attach. 4 ¶ 108.)  Both McGinn and Smith were then convicted of six counts of securities fraud specifically in connection to TDM Verifier Trust 08 and Fortress Trust 08. (Dkt. No. 712, Attach. 4 ¶ 108; Dkt. No. 712, Attach. 18 at 8-10; Dkt. No. 712, Attach. 19 at 8-10.)

Smith, however, contends that the SEC has failed to meet its burden in proving identity of issues because his acquittals on twenty of the counts charged in the indictment "are sufficient to raise a material issue of fact." (Dkt. No. 785, Attach. 22 at 4-5.)  Smith's acquittals, however, are of no moment.  *See SEC v. Bravata*, 3 F. Supp. 3d 638, 657 (E.D. Mich. 2014) (noting that an acquittal on one substantive fraud count was "irrelevant" for collateral estoppel purposes).  Convictions are what matter for collateral estoppel purposes, and, as discussed above, Smith was convicted of mail, wire, and securities fraud based on the same conduct alleged in the second amended complaint.

Smith also contends that summary judgment is inappropriate

30

because "there are numerous differences" between the second amended complaint and the superseding indictment, as the second amended complaint only engages an in-depth discussion of four of the Trust Offerings, while the superseding indictment primarily related to conduct involving other Trust Offerings.  (Dkt. No. 785, Attach. 22 at 4-5.)  Smith's comparison of the second amended complaint and the superseding indictment, however, is too pedantic; it ignores the overarching similarities between the two instruments, and instead focuses on immaterial differences.

Indeed, the second amended complaint specifically identifies each of the Trust Offerings, generally discusses what McGinn and Smith promised investors in the PPMs, and then explains that the true purpose of the Trust Offerings, contrary to the PPMs, was "to structure a series of transactions that would allow various McGinn Smith Entities to siphon off millions of dollars in transaction fees and commissions and to serve the interest of McGinn Smith Entities, not the Trust investors."  (2d Am. Compl. ¶¶ 68-76.)  Further, like the superseding indictment, the second amended complaint also explains how McGinn and Smith "fraudulently maintained the illusion of success by funding interest payments with principal raised in

31

other Trust [O]fferings." (*Id.* ¶¶ 74-76; Dkt. No. 712, Attach. 4 ¶¶ 41-50.)

The second amended complaint then offered more detailed examples of

how the Trust Offerings were improperly used through a specific

discussion of the TDMM Benchmark 09, TDMM Cable Trust 09, TDM

Verifier Trust 08, Cruise Charter Venture Trust 08, and Firstline Trust

offerings. (2d Am. Compl. ¶¶ 77-101.) Thus, both the superseding

indictment and the second amended complaint allege the same scheme to

defraud in connection with the same offerings, and, therefore, there is

identity of issue for collateral estoppel purposes.

Because all of the elements of collateral estoppel have been met,

the SEC is entitled to summary judgment on its first four causes of action,

which, as discussed above, all require that the SEC establish essentially

the same elements that were already proven in the MS Criminal Case by

virtue of McGinn and Smith's convictions of wire fraud, mail fraud, and

securities fraud. Accordingly, the SEC is entitled to summary judgment on

its claims alleging (1) violations of § 17(a) of the Securities Act, as against

MS & Co., MS Advisors, MS Capital, McGinn, and Smith; (2) violations of

§ 10(b) of the Exchange Act, and Rule 10b-5 thereunder, as against MS &

Co., MS Advisors, MS Capital, McGinn, and Smith; (3) violations of

§ 15(c)(1) of the Exchange Act as against MS & Co., and aiding and abetting violations of § 15(c)(1)[29] as against McGinn and Smith; and (4) violations of §§ 206(1), (2), and (4) violations of the Advisors Act[30] as against MS & Co., MS Advisors, McGinn, and Smith.

### 2.  Additional Evidence of Securities Laws Violations

The SEC also contends that summary judgment is warranted on its first four causes of action based on additional, undisputed evidence.  (Dkt. No. 708, Attach. 1 at 11.)  In his response, Smith does not address this point at all.  The court agrees that there remain no outstanding questions of material fact with respect to whether McGinn and Smith violated the securities laws.  For example, with respect to the Four Funds, the SEC

---

[29] The court notes that, in order to establish aider and abettor liability, in addition to proving a primary violation of the Exchange Act, the SEC must establish that the aider-abettor had knowledge of the primary violation and knowingly and substantially participated in the wrongdoing.  *SEC v. Ehrenkrantz King Nussbaum, Inc.*, No. 05 CV 4643, 2012 WL 893917, at *14 (E.D.N.Y. Mar. 15, 2012).  There is no dispute that McGinn and Smith had knowledge of the primary violations and knowingly and substantially participated in the wrongdoing.

[30] The court notes that, in addition to the requirements discussed above, in order to establish violations of §§ 206(1), (2), and (4) of the Advisors Act, the SEC must also prove that the violation was committed by an "investment adviser."  15 U.S.C. § 80b-2(a)(11) (defining "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities"); *see Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977) (holding that "persons who manage[ ] the funds of others for compensation are 'investment advisers' within the meaning of the statute.")  There is no dispute that MS Advisors and MS & Co. are investment advisors under the act.

has demonstrated that, beginning with the first issuance in 2003, investor proceeds were used to redeem or pay interest to investors of pre-2003 MS & Co. offerings and to make loans to entities controlled by McGinn and Smith.  (Pl.'s SMF ¶¶ 75-97; Dkt. No. 712 ¶¶ 8-29, at 45.)  This was not disclosed in the PPMs, and operated to the great detriment of Four Funds investors.  Accordingly, the SEC is entitled to summary judgment on its first four causes of action.

## B.    Sale of Unregistered Securities

The SEC also seeks summary judgment on its sixth cause of action, which alleges that MS & Co., MS Capital, the Four Funds, McGinn, and Smith violated § 5(a) and (c) of the Securities Act when they sold unregistered securities through means of interstate commerce.[31]  (2d. Am. Compl. ¶¶ 198-202; Dkt. No. 708, Attach. 1 at 12-14.)  Smith argues that genuine issues of material fact exist as to whether the securities sold required registration.  (Dkt. No. 785, Attach. 22 at 9-10.)  The court agrees with the SEC.

Sections 5(a) and (c) of the Securities Act make it unlawful for any

---

[31] The court notes that the SEC has not moved for summary judgment as against the Four Funds.  (Dkt. No. 708 at 2.)  Thus, although the court grants the SEC's motion with respect to this claim, it nevertheless remains outstanding with respect to the Four Funds.

person to offer or sell any security through interstate commerce when no registration statement has been filed.  *See* 15 U.S.C. § 77e(a) and (c); *SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  To prove a violation of § 5, the SEC must establishing three prima facie elements: (1) the defendant directly or indirectly sold or offered to sell securities; (2) use of the interstate transportation or communication and the mails in connection with the offer or sale; and (3) "lack of a registration statement as to the subject securities."  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).  "Scienter is not an element of a Section 5 violation."  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997) (citing *Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976)), *aff'd* 159 F.3d 1348 (2d Cir. 1998).  A defendant  may rebut this *prima facie* case by showing that the securities involved were not required to be registered. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Here, the SEC's claims relate to the notes sold in the Four Funds. (Dkt. No. 708, Attach. 1 at 12-14.)  There is no dispute as to whether defendants offered and sold "securities" as that term has been broadly defined.  *See Reves v. Ernst & Young*, 494 U.S. 56, 65-66 (1990) ("[I]f the seller's purpose is to raise money for the general use of a business

enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'").  There is also no dispute as to whether the notes sold were registered; they were not.  (*See, e.g.*, Dkt. No. 722 at 11 (stating that the notes will not be registered under the Securities Act).)  In addition, Smith does not dispute that interstate communication and the mails were used to offer and sell the notes.  Thus, the SEC has established a *prima facie* § 5 violation.  Summary judgment, therefore, is appropriate, unless Smith can prove that the securities were exempt from registration.

Smith has failed to meet his burden.  First, rather than point to a specific exemption or cite any authority, Smith argues that the Four Funds "were not investment companies but specialty finance companies designed to provide financing, primarily in the form of debt, to emerging growth companies and did not require registration."  (Dkt. No. 785, Attach. 22 at 9.)  Second, Smith appears to invoke the registration exemptions found in Rule 506 of Regulation D, *see* 17 C.F.R. § 230.506, but utterly fails to explain how this exemption applies and where facts exist in the record which support its application.  (Dkt. No. 785, Attach. 22 at 9-10.)  Thus, Smith has failed to demonstrate that the securities were exempt

36

from registration, and summary judgment on the SEC's sixth cause of

action as against MS & Co., MS Capital, McGinn, and Smith is also

appropriate.

**C.**  **Sanctions**

The SEC seeks sanctions in the form of disgorgement of profits, an

injunction prohibiting McGinn and Smith from committing future securities

laws violations, an order barring McGinn from serving as an officer or

director, and civil penalties.  (Dkt. No. 708, Attach. 1 at 14-31.)  The court

addresses each requested sanction below.

*1. Disgorgement*

First, the SEC seeks an order holding McGinn and Smith jointly and

severally liable for disgorgement of $124 million, plus pre-judgment

interest.  (Dkt. No. 708, Attach. 1 at 14-17.)  In response, Smith contends

that the collateral estoppel doctrine limits the civil damages to Judge

Hurd's $5.7 million restitution order related to investor losses, and,

alternatively, that the SEC's motion for disgorgement is moot.  (Dkt. No.

785, Attach. 22 at 6-9.)  The SEC is correct that disgorgement is

warranted, but, given the evidence now before the court, it is impossible

for the court to make an informed decision as to the appropriate dollar

amount to be disgorged.

A district court has broad discretion to order disgorgement of profits obtained through violation of federal securities laws and, if ordered, in calculating the disgorgement amount. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.* at 1474. "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court." *Cavanagh*, 445 F.3d at 117. "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his [violation]." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009), *aff'd* 438 F. App'x 23 (2d Cir. 2011).

"[B]ecause of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013). Under Second Circuit law, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of

profits causally connected to the violation.'"  *Contorinis*, 743 F.3d at 305

(quoting *First Jersey*, 101 F.3d at 1474-75).  Once the SEC has met its

burden, "the burden shifts to the defendant to show that his gains 'were

unaffected by his offenses.'"  *Razmilovic*, 738 F.3d at 31 (quoting *SEC v.*

*Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).  Defendants are "entitled to prove

that the . . . measure is inaccurate,"  *SEC v. Warde*, 151 F.3d 42, 50 (2d

Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994)), but

the "'risk of uncertainty in calculating disgorgement should fall upon the

wrongdoer whose illegal conduct created that uncertainty.'"  *Contorinis*,

743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).  Ultimately,

however, the final decision as to the amount of disgorgement rests with

the district court.  *See First Jersey*, 101 F.3d at 1474-75.

The court also has discretion to order payment of prejudgment

interest on any disgorged gains.  Requiring the payment of interest

prevents a defendant from obtaining the benefit of "what amounts to an

interest free loan procured as a result of illegal activity."  *SEC v. Credit*

*Bancorp, Ltd.*, No. 99 Civ. 11395, 2011 WL 666158, at *3 (S.D.N.Y. Feb.

14, 2011) (internal quotation marks and citation omitted), *aff'd sub nom.*

*SEC v. Blech*, 501 F. App'x 74 (2d Cir. 2012).  "In deciding whether an

award of prejudgment interest is warranted, a court should [take into account] . . . considerations of fairness and the relative equities of the award[,] . . . the remedial purpose of the statute involved, and/or . . . such other general principles as are deemed relevant by the court." *First Jersey*, 101 F.3d at 1476 (internal quotation marks and citations omitted).

Finally, the court may hold joint tortfeasors jointly and severally liable. "Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement." *Universal Express*, 646 F. Supp. 2d at 563 (citing *First Jersey*, 101 F.3d at 1475). The SEC is neither "required to trace every dollar of proceeds" nor "identify misappropriated monies which have been commingled." *SEC v. Anticevic*, No. 05 CV 6991, 2009 WL 4250508, at *4 (S.D.N.Y. Nov. 30, 2009) (internal quotation marks and citations omitted). It is understood that "[g]enerally . . . 'apportionment is difficult or even practically impossible because [the] defendants have engaged in complex and heavily disguised transactions.'" *Universal Express*, 646 F. Supp. 2d at 563 (quoting *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997)), *aff'd* 438 F. App'x 23 (2d Cir. 2011).

The joint-violators bear the burden of demonstrating that their liability can be reasonably apportioned. *Id.*

Here, as discussed above, McGinn and Smith committed pervasive and egregious securities laws violations that spanned several years and resulted in significant pecuniary gain for McGinn, Smith, and the MS Entities. Thus, based on this finding, the court's equitable powers are invoked, and it has no trouble concluding that the SEC is entitled to a disgorgement order. Indeed, Smith himself does not argue that a disgorgement order is inappropriate. Rather, he merely disputes the amount to be disgorged. (Dkt. No. 785, Attach. 22 at 6-9.)

Thus, having concluded that a disgorgement order is appropriate, the next step is to determine the amount to be disgorged. In this regard, the court further agrees with the SEC that the proper metric for calculating disgorgement in actions such as this is subtracting the amount returned to investors from the total amount raised through the fraudulent offerings. *See, e.g.*, *SEC v. Pittsford Capital Income Partners, LLC*, No. 06 Civ 6353, 2007 WL 2455124, at *16 (W.D.N.Y. Aug. 23, 2007) (calculating disgorgement by subtracting the total amount paid back to investors as redemptions from the total amount rased through the fraudulent offerings),

*aff'd* 305 F. App'x 694 (2d Cir. 2008); *Haligiannis*, 470 F. Supp. 2d at 384-85 ("The Court finds a proper estimation of defendant's ill-gotten gains to be the total difference between contributions and distributions after the fraud began."); *SEC* v. *Invest Better 2001*, No. 01 Civ. 11427, 2005 WL 2385452, at *9 (S.D.N.Y. May 4, 2005) (calculating disgorgement in Ponzi scheme by subtracting total distributions from total contributions).

Therefore, the SEC need only demonstrate "a reasonable approximation of profits causally connected to the violation."  *Contorinis*, 743 F.3d at 305 (internal quotation marks and citation omitted).  As Smith argues, however, this is where the SEC's submissions fall short.  (Dkt. No. 785, Attach. 22 at 8 ("The SEC fails to meet its burden with respect to [the disgorgement amount] it seeks and advances no evidence that supports its calculation.").)  The SEC seeks disgorgement "of at least $124 million, the proceeds of [defendants'] fraud still owed to investors."  (Dkt. No. 708, Attach. 1 at 14-17.)  In support of its assertion that $124 million is a reasonable approximation of "all proceeds of the offering fraud remaining unpaid to investors," (*id.* at 15), the SEC cites one paragraph of the Receiver's declaration, which in turn cites no additional evidence supporting that calculation, (*id.* at 14 (citing Dkt. No. 712, Attach. 2 ¶ 3)).

42

The court cannot and will not rely on one sentence from the Receiver's declaration and, willy-nilly, order $124 million to be disgorged; more explanation is necessary.  *See SEC v. Bass*, No. 1:10-CV-00606, 2012 WL 5334743, at *3 (N.D.N.Y. Oct. 26, 2012) (granting the SEC's request for disgorgement in full and, in doing so, relying on exhibits submitted by the SEC, including "a comprehensive listing of [d]efendants' bank account activity involving investor funds and the [d]eclaration of . . . an SEC attorney, in which she explains the origin of this information and how the [SEC] used it to calculate the disgorgement amount" and further noting that "[e]ach individual payment—from investors to [d]efendants, as well as from [d]efendants back to investors—is catalogued in the SEC's exhibits"); *Pittsford Capital Income Partners*, 2007 WL 2455124, at *16 (granting the SEC's request for disgorgement in full where "the SEC . . . proffered evidence, through issuer records, bank records and investor checks" to establish the principal raised through fraudulent offerings and the total amount redeemed).

Equally unpersuasive are Smith's main arguments regarding the appropriate amount of a disgorgement order, and little discussion of them is warranted.  In essence, and citing not a single authority that supports

43

his contentions, Smith argues that any disgorgement order issued by the court should be limited to Judge Hurd's $5.7 million restitution order related to investor losses, and, alternatively, that the restitution order renders the SEC's request for disgorgement moot.  (Dkt. No. 785, Attach. 22 at 6-9.)  Restitution and disgorgement, however, are distinct.  *See SEC v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 507 (S.D.N.Y. 1997) ("While some cases have equated [restitution and disgorgment], they are distinct in that restitution aims to make the damaged persons whole, while disgorgement aims to deprive the wrongdoer of ill-gotten gains." (citations omitted)).  Smith has not cited, nor has the court found, a single case in which restitution in a criminal case limited or governed the disgorgement amount in a parallel civil case, and his arguments, therefore, are rejected.

Accordingly, without more explanation and evidence from the SEC, not only is the court unable to grant the SEC's request for disgorgement of $124 million,[32] but it is also incapable of using its broad equitable powers to fashion appropriate relief on its own.  Indeed, while the court can

---

[32] To further confound matters, in its reply brief, the SEC states, on the same page, both that "investor losses exceed[] $80 million" and that "investor losses . . . are approximately $100 million."  (Dkt. No. 801 at 7.)  How investor losses dropped by millions of dollars between the time the SEC submitted its opening brief and the time that it submitted its reply brief also remains unexplained.

roughly approximate the total amount of money raised in the Trust Offerings, Four Funds, and MSTF offerings, (*see* Pl.'s SMF ¶¶ 11, 12, 14), it has no concept of what amount, if any, has been returned to investors. It very well may be that all of the evidence necessary to make an informed decision regarding the appropriate amount to be disgorged is buried somewhere within the SEC's nearly 400 exhibits, but it is not the court's duty to find and rely on those documents without the SEC's direction or invitation.

However, in light of the fact that the SEC has demonstrated that a disgorgement order of some amount is appropriate, and because "[t]he deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits," the court reserves judgment on the amount to be disgorged at this juncture. *SEC v. Wyly*, No. 10-cv-5760, 2014 WL 3739415, at *7 (S.D.N.Y. July 29, 2014) (internal quotation marks and citations omitted). Thus, the SEC is entitled to one final opportunity to propose a reasonable approximation of profits causally connected to the violations, with greater explanation and in reliance on documentary evidence. Accordingly, if it wishes to pursue this theory, the SEC must provide a reasonable

45

approximation of McGinn and Smith's profits causally connected to the violation*s* within fourteen days from the issuance of this Memorandum-Decision and Order.  Smith may respond, if he so chooses, within seven days after the SEC files its submission, and the SEC may file a reply within seven days after Smith files his response, if any.

### 2. Civil Monetary Penalties

The SEC also seeks civil penalties pursuant to § 20(d) of the Securities Act,[33] § 21(d)(3) of the Exchange Act,[34] and § 209(e) of the Advisers Act.[35]  Specifically, the SEC seeks penalties in the amount of "the defendant[s]' gross pecuniary gain," or $124 million.  (Dkt. No. 708, Attach. 1 at 31.)  For similar reasons as discussed above, the SEC's request is denied.

The Securities Act, the Exchange Act, and the Advisers Act provide that, when any person has violated any provision of these statutes, the SEC may bring an action to seek a civil penalty and a district court "shall have jurisdiction to impose, upon a proper showing, a civil penalty to be

---

[33] *See* 15 U.S.C. § 77t(d).

[34] *See* 15 U.S.C. § 78u(d)(3).

[35] *See* 15 U.S.C. § 80b-9(e).

paid by the person who committed such violation."  15 U.S.C. §§ 77t(d)(1),

78u(d)(3)(A), 80b-9(e)(1).  Under each statute, a penalty may be imposed

for each violation as follows: (i) a first-tier penalty for any violation; (ii) a

second-tier penalty if the violation "involved fraud, deceit, manipulation, or

deliberate or reckless disregard of a regulatory requirement"; and (iii) a

third-tier penalty if the violation "involved fraud, deceit, manipulation, or

deliberate or reckless disregard of a regulatory requirement" and "such

violation directly or indirectly resulted in substantial losses or created a

significant risk of substantial losses to other persons."  *Id.* §§ 77t(d)(2),

78u(d)(3)(B), 80b-9(e)(2).

Each statute provides that, for each violation, the amount of penalty

"shall not exceed the greater of": (i) the specified maximum amount for a

natural person or any other person "[f]or each violation", or (ii) "the gross

amount of pecuniary gain to such defendant as a result of the violation."

*Id.* §§ 77t(d)(2), 78u(d)(3)(B), 80b-9(e)(2).  The maximum amounts

specified for a natural person and for any other person respectively are: a

first-tier penalty of $5,000 and $50,000, a second-tier penalty of $50,000

and $250,000, and a third-tier penalty of $100,000 and $500,000.  *See* 15

U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B), 80b-9(e)(2).[36]  Further, while a

disgorgement award may be imposed jointly and severally and need not

be "measured as to each individual defendant," a civil penalty is required

by statute to be so measured.  *SEC v. Pentagon Capital Mgmt. PLC*, 725

F.3d 279, 288 (2d Cir. 2013).  "[T]he actual amount of the penalty [is] left

up to the discretion of the district court."  *Kern*, 425 F.3d at 153.

Here, the SEC requests only that the court follow the "gross

pecuniary gain" method of calculation and impose a penalty equal to "at

least $124 million."  (Dkt. No. 708, Attach. 1 at 31.)  The SEC does not at

all address what the civil penalty would be under the "per violation"

method of calculation, because "[w]hile there are multiple ways to

calculate what constitutes a violation, it is unlikely that any 'per violation'

calculation of the penalty would result in a higher penalty than the $124

million in gross proceeds."  (*Id.*)

There are two main problems with the SEC's suggestion.  First, as

discussed above, the SEC has not demonstrated that $124 million is even

---

[36] As required by the Debt Collection Improvement Act, the maximum amounts of all civil penalties are adjusted for inflation for violations occurring after: (a) December 9, 1996 and before February 2, 2001, see 17 C.F.R. § 201.1001, pt. 201 subpt. E, tbl. 1; (b) February 2, 2001, see 17 C.F.R. § 201.1002, pt. 201 subpt. E, tbl. II; (c) February 14, 2005, see 17 C.F.R. § 201.1003, pt. 201, subpt. E, tbl. III; and (d) March 3, 2009, *see* 17 C.F.R. § 201.1004, pt. 201, subpt. E, tbl. IV.

a "reasonable approximation" of McGinn and Smith's profits for disgorgement purposes.  The SEC's claim that $124 million accurately reflects McGinn and Smith's gross pecuniary gain for civil penalty purposes is equally unsubstantiated.  Second, the Second Circuit has made clear that a finding of joint and several liability for civil penalties is contrary to the securities statutes providing for a civil penalty.  *See Pentagon Capital*, 725 F.3d at 287 (noting that "[t]he statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain *to such defendant*'" (quoting 15 U.S.C. § 77t(d)(2)).  Here, the SEC has made no attempt to identify either the per violation penalty or gross pecuniary gain penalty for each individual defendant, but rather seeks a lump sum of $124 million.  The court will not endeavor to make these calculations on its own.  *See SEC v. GTF Enters., Inc.*, No. 10 Civ. 4258, 2014 WL 1877080, at *8 (S.D.N.Y. May 6, 2014) (recommending that no amount of civil penalties be awarded because the SEC provided no evidence of the gross amount of pecuniary gain to each individual defendant).  Accordingly, the SEC's request for civil penalties is denied.

    *3. Permanent Injunctions*

Next, the SEC seeks an order enjoining McGinn and Smith from future securities laws violations.  (Dkt. No. 708, Attach. 1 at 29-30.)  The court agrees that an injunction is warranted.

The Securities Act, Exchange Act, and Advisers Act provide for injunctive relief when their provisions have been violated.  *See* 15 U.S.C. §§ 77t(b), 78u(d), 80b-9(d).  Pursuant to those provisions, a defendant may be permanently enjoined from further violations of the acts.  *Id.* Injunctive relief should be granted when there is a "realistic likelihood of recurrence" of the violations, and may be appropriate even on summary judgment.  *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978). The following factors are considered when determining the likelihood of recurrence: "(1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations."  *Softpoint*, 958 F. Supp. at 867 (citing *Commonwealth Chem. Sec.*, 574 F.2d at 100).

Here, the SEC has submitted evidence that demonstrates a high

degree of scienter.[37]  Further, McGinn and Smith's fraudulent behavior was not limited to an isolated incident but, rather, was a scheme that involved multiple debt offerings, spanned several years, and defrauded hundreds of investors.  Thus, McGinn and Smith are permanently enjoined from committing future violations of §§ 5(a), 5(c), and 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder, § 15(c)(1) of the Exchange Act, and Rule 10b-3 thereunder, and §§ 206(1), 206(2), and 206(4) of the Investment Advisers Act and Rule 206(4)-8 thereunder.

### 4. Officer or Director Bar Against McGinn

Finally, the SEC seeks an order barring McGinn, who served as

---

[37] For example, the SEC submitted an undated, handwritten letter from Smith to McGinn, which stated the following:

> While you have previously rejected my characterization of these acts as similar to a "Ponzi scheme," . . . we are now in the possession of indisputable empirical evidence that the new investments have no chance of ever being repaid in full . . . .  For us not to allow for these deficits by setting up adequate reserves is, in my judgment, bordering on fraud.  Certainly, by not disclosing in the prospectus our poor history of collections, we are not providing the prospective investors an accurate picture of this risk.  We both know why we don't make that disclosure—because such disclosure would cause our salesm[e]n to cease selling and investors to cease buying.  Thus, we are misleading both our own employees and customers. . . .  This is wrong.  I strongly believe that in civil or criminal litigation we would lose badly on this point.

(Dkt. No. 715 at 8-10.)

chief executive officer of Integrated Alarm Services Group, Inc., a

publically traded company, (Pl.'s SMF ¶ 2), from serving as an officer or

director of a publicly traded corporation.  (Dkt. No. 708, Attach. 1 at 30.)

The SEC's request is granted.

The Exchange Act and the Securities Act authorize the court to

"prohibit, conditionally or unconditionally, and permanently . . . any person

who violated [the applicable provisions] from acting as an officer or

director [of a public company] if the person's conduct demonstrates

unfitness to serve as an officer or director.  15 U.S.C. §§ 77t(e), 78u(d)(2).

The Second Circuit has identified six non-exclusive factors that are "'useful

in making the unfitness assessment'":

> (1) the egregiousness of the underlying securities law
> violation; (2) the defendant's repeat offender status;
> (3) the defendant's role or position when he engaged
> in the fraud; (4) the defendant's degree of scienter;
> (5) the defendant's economic stake in the violation;
> and (6) the likelihood that misconduct will recur.

*SEC v. Bankosky*, 716 F.3d 45, 48 (2d Cir. 2013) (quoting *SEC v. Patel*,

61 F.3d 137, 141 (2d Cir. 1995)).

Again, McGinn has failed to respond to the SEC's motion.  Based on

the evidence submitted by the SEC, the court is satisfied that McGinn's

past conduct—namely, unrepentantly orchestrating and prolonging an intricate Ponzi scheme—demonstrate that he is unfit to serve as an officer or director.  Thus, the SEC's request is granted.

**E.    Outstanding Claims and Issues**

Before concluding, it is prudent to outline the claims and issues that remain outstanding.  First, and most obviously, at this juncture the court has reserved judgment on L. Smith's motion for summary judgment, (Dkt. No. 696), L.T. Smith, G. Smith, and the Smith Trust's motion for summary judgment, (Dkt. No. 704), and the portion of the SEC's motion regarding the assets held solely by L. Smith, N. McGinn, and the Smith Trust, (Dkt. No. 708, Attach. 1 at 18-29, 32-40).  The court will address those motions in due course.

Second, as noted above, the SEC has not moved for summary judgment on its fifth cause of action, which alleges that the Four Funds violated § 7(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-7, (2d Am. Compl. ¶¶ 194-97).  Thus, this claim remains outstanding.  The SEC also has not moved for summary judgment as against the Four Funds, (Dkt. No. 708 at 2), and, therefore, the SEC's sixth cause of action as it relates to the Four Funds also remains outstanding, (2d Am. Compl.

¶¶ 194-97).  Accordingly, the SEC is ordered to inform the court whether it has abandoned and/or withdrawn these claims, or whether it seeks a trial.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the SEC's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to the SEC's first cause of action alleging violations of § 17(a) of the Securities Act, as against MS & Co., MS Advisors, MS Capital, McGinn, and Smith;

**GRANTED** with respect to the SEC's second cause of action alleging violations of § 10(b) of the Exchange Act, and Rule 10b-5 thereunder, as against MS & Co., MS Advisors, MS Capital, McGinn, and Smith;

**GRANTED** with respect to the SEC's third cause of action alleging violations of § 15(c)(1) of the Exchange Act as against MS & Co., and aiding and abetting violations of § 15(c)(1) as against McGinn and Smith;

**GRANTED** with respect to the SEC's fourth cause of action alleging violations of the Advisors Act as against MS & Co.,

54

MS Advisors, McGinn, and Smith;

**GRANTED** with respect to the SEC's sixth cause of action

alleging violations of §§ 5(a) and 5(c) of the Securities Act as

against MS & Co., MS Capital, McGinn, and Smith;

**GRANTED** with respect to the SEC's request for a permanent

injunction barring McGinn and Smith from committing future

violations of §§ 5(a), 5(c), and 17(a) of the Securities Act,

§ 10(b) of the Exchange Act, and Rule 10b-5 thereunder,

§ 15(c)(1) of the Exchange Act, and Rule 10b-3 thereunder,

and §§ 206(1), 206(2), and 206(4) of the Investment Advisers

Act, and Rule 206(4)-8 thereunder; and

**GRANTED** with respect to the SEC's request for an order

barring McGinn from serving as an officer or director of a

public company; and

**DENIED** with respect to the SEC's request for civil penalties;

and it is further;

**ORDERED** that the court reserves judgment on the SEC's request

for disgorgement of profits, only as to the appropriate amount.  If the SEC

wishes to pursue this theory, consistent with this Memorandum-Decision

and Order, the SEC must provide a reasonable approximation of the profits causally connected to the violations within **SEVEN (7) DAYS** from the issuance of this Memorandum-Decision and Order.  Smith may respond within **SEVEN (7) DAYS** after the SEC files its submission; and it is further;

**ORDERED** that the court reserves judgment on the remainder of the SEC's motion; and it is further

**ORDERED** that, within **SEVEN (7) DAYS** of this Memorandum-Decision and Order, the SEC inform the court whether it has abandoned and/or withdrawn its fifth cause of action and sixth cause of action insofar as it is alleged against the Four Funds, or whether it seeks a trial on those claims; and it is further

**ORDERED** that McGinn and Smith are enjoined from committing future violations of §§ 5(a), 5(c), and 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder, § 15(c)(1) of the Exchange Act, and Rule 10b-3 thereunder, and §§ 206(1), 206(2), and 206(4) of the Investment Advisers Act, and Rule 206(4)-8 thereunder; and it is further

**ORDERED** that McGinn is permanently and unconditionally barred from acting as an officer or director of any issuer that has a class of

securities registered pursuant to 15 U.S.C. § 78*l* or that is required to file

reports pursuant to 15 U.S.C. § 78o(d); and it is further

**ORDERED** that the Clerk of the Court provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

February 17, 2015
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court

57