**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SECURITIES AND EXCHANGE**
**COMMISSION,**

|  |  |
|---|---|
| **Plaintiff,** | **1:10-cv-457** |
|  | **(GLS/CFH)** |

          **v.**

**MCGINN, SMITH & CO., INC.**
**et al.**,

                  **Defendants,**

**LYNN A. SMITH,** and **NANCY**
**MCGINN,**

               **Relief**
               **Defendants,**
               and

**GEOFFREY R. SMITH,** Trustee of
the David L. and Lynn A. Smith
Irrevocable Trust U/A 8/04/04, and
**U.S. ATTORNEY'S OFFICE FOR**
**ND/NY,**

               **Intervenors.**

_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
U.S Securities and Exchange      DAVID P. STOELTING, ESQ.
Commission                     HAIMAVATHI V. MARLIER, ESQ.
3 World Financial Center        JACK KAUFMAN, ESQ.
New York, NY 10281            JOSHUA M. NEWVILLE, ESQ.

KEVIN P. MCGRATH, ESQ.
LARA S. MEHRABAN, ESQ.

**FOR THE DEFENDANTS/RELIEF
DEFENDANTS AND INTERVENORS:**
*McGinn, Smith & Co.*, *Inc.*; *McGinn,
Smith Advisors, LLC*; *McGinn, Smith
Capital Holdings Corp.*; *First Advisory
Income Notes, LLC*; *First Excelsior
Income Notes, LLC*; *First Independent
Income Notes, LLC*; *and Third Albany
Income Notes, LLC*
Phillips Lytle LLP                                    WILLIAM J. BROWN, ESQ.
One Canalside
125 Main Street
Buffalo, NY 14203

*Timothy M. McGinn*
Office of E. Stewart Jones, Jr.          E. STEWART JONES, JR., ESQ.
28 Second Street
Jones Building
Troy, NY 12180

*David L. Smith*
Dreyer, Boyajian Law Firm                WILLIAM J. DREYER, ESQ.
75 Columbia Street                       BENJAMIN W. HILL, ESQ.
Albany, NY 12210

*Lynn A. Smith*
Featherstonhaugh, Wiley Law Firm         JAMES D.
99 Pine Street                           FEATHERSTONHAUGH, ESQ.
Suite 207
Albany, NY 12207

*Geoffrey R. Smith, Individually and as
Trustee of the David L. and Lynn A.
Smith Irrevocable Trust U/A 8/04/04*,

2

*and Lauren T. Smith*
Linnan, Fallon Law Firm          JAMES D. LINNAN, ESQ.
61 Columbia Street
Suite 300
Albany, NY 12210-2736

*Nancy McGinn*
Pro Se
426-8th Ave.
Troy, NY 12182

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff the United States Securities and Exchange Commission (SEC) commenced this civil enforcement action against defendants David Smith and Timothy McGinn, along with various entities owned and controlled by McGinn and Smith: McGinn, Smith & Co, Inc. ("MS & Co."), McGinn, Smith Advisors, LLC ("MS Advisors"), McGinn, Smith Capital Holdings Corp. ("MS Capital"), First Advisory Income Notes, LLC (FAIN), First Excelsior Income Notes, LLC (FEIN), First Independent Income Notes, LLC (FIIN), Third Albany Income Notes, LLC (TAIN),[1] (collectively, the "MS Entities"), alleging multiple violations of the federal securities laws.

---

[1] FAIN, FEIN, FIIN, and TAIN are collectively referred to as the "Four Funds."

(*See generally* 2d Am. Compl., Dkt. No. 334.)  The SEC additionally asserts claims of fraudulent conveyance in violation of § 276 of the New York Debtor and Creditor Law against McGinn, Smith, defendants Lynn A. Smith[2] ("L. Smith"), Geoffrey R. Smith ("G. Smith"), individually and as Trustee of the David L. and Lynn A. Smith Irrevocable Trust U/A 8/04/04 (the "Smith Trust"), Lauren T. Smith ("L.T. Smith"),[3] and *pro se* defendant Nancy McGinn[4] ("N. McGinn").  (*Id.* ¶¶ 206-11.)  L. Smith and N. McGinn are also named as relief defendants for allegedly receiving and retaining ill-gotten gains, of which the SEC seeks disgorgement.  (*Id.* ¶¶ 203-05.)

Pending are L. Smith's motion for summary judgment, (Dkt. No. 696), G. Smith, L.T. Smith, and the Smith Trust's motion for summary judgment, (Dkt. No. 704), and the remainder of the SEC's motion for summary judgment, upon which the court previously reserved judgment, (Dkt. No. 708; Dkt. No. 708, Attach. 1 at 14-29, 32-40).  For the reasons that follow, the remainder of the SEC's motion is granted, and L. Smith and the Smith Trust's motions are denied.

---

[2] L. Smith is Smith's wife.  (2d. Am. Compl. ¶ 36.)

[3] L.T. Smith and G. Smith are the children of L. Smith and Smith.  (2d Am. Compl. ¶¶ 34, 35.)

[4] N. McGinn is McGinn's wife.  (2d Am. Compl. ¶ 37.)

## II.  **Background**[5]

Before addressing the facts and arguments at issue here, the court first outlines where it has been and where it is going.  In a Memorandum-Decision and Order dated February 17, 2015 (MDO I), the court granted the SEC's motion to the extent that it sought entry of summary judgment on its first, second, third, fourth, and sixth causes of action, all of which alleged violations of the federal securities laws.  (Dkt. No. 807 at 20-37.) Further, the court granted the SEC's requests for an injunction against McGinn and Smith and an order barring McGinn from serving as an officer or director of a publically traded corporation, but denied the SEC's request for civil monetary penalties.  (*Id.* at 46-53.)  Additionally, while the court found that the SEC had demonstrated that disgorgement of profits was an appropriate sanction, the court reserved judgment on the amount to be

---

[5] At the outset, two points must be noted.  First, despite the passage of the due date, (Dkt. No. 776), McGinn and N. McGinn neither filed a response to the SEC's motion, nor notified the court of their intent to forego opposition to the motion, as is required by this District's Local Rules.  *See* N.D.N.Y. L.R. 7.1(b)(3).  As the court has previously noted, (Dkt. No. 807 at 6 n.16), the result of the McGinns' willful failure to respond is that, in accordance with L.R. 7.1(a)(3), and only as against N. McGinn and McGinn, any properly supported facts are deemed admitted, and the SEC "need only show that [its] argument[s] possess facial merit, which has appropriately been characterized as a 'modest' burden."  *Pedroso v. Syracuse Cmty. Health Ctr.*, No. 5:11-CV-1268, 2014 WL 3956570, at *6 (N.D.N.Y. Aug. 13, 2014) (citations omitted).  Second, the court incorporates the facts, procedural history, and any previously defined terms, along with its findings and conclusions, articulated in its Memorandum-Decision and Order dated February 17, 2015, and generally presumes familiarity therewith.

disgorged, pending the SEC's submission of more detailed evidence.  (*Id.* at 37-46.)  The court also noted that the SEC had not moved for summary judgment as against the Four Funds, despite the fact that two claims were asserted against them, and directed the SEC to inform the court what it intended to do with those claims.  (*Id.* at 53-54.)  Finally, the court reserved judgment on the portion of the SEC's motion seeking disgorgement of assets held by L. Smith, N. McGinn, and the Smith Trust. (*Id.* at 56.)

In this Memorandum-Decision and Order, the court again considers the SEC's request for disgorgement of profits, and also addresses the disputes surrounding certain assets that remain frozen.  The relevant assets include the following: (1) assets held in L. Smith's name, including (a) a checking account with Bank of America (the "Checking Account"), (Dkt. No. 86 at 42), (b) a stock account maintained at RMR Wealth Management, LLC (the "Stock Account"), (*id.*), and (c) proceeds from the sale of a vacation home in Vero Beach, Florida ("Smith Vero Beach Home"), (*id.*; Dkt. No. 263 at 10-11,); (2) assets held by the Smith Trust, (Dkt. No. 194 at 23); and (3) assets held by N. McGinn, including proceeds from the sale of the McGinns' property in Niskayuna, New York

6

("Niskayuna Property"), (Dkt. No. 233; Dkt. No. 276; Dkt. No. 426).[6]  The court also considers certain transfers that have been made from the Smith Trust since this action was commenced, which the SEC alleges were fraudulent under New York law.

## A.   <u>Facts</u>[7]

The facts in this case read like a script from a hyperlink cinema—a film genre known for interwoven storylines between multiple characters, plot twists, and a chronology that is not altogether linear.[8]  This case includes a cast of characters comprised of individuals whose audacity knows no bounds, and a recurring theme of insatiable greed.  Below—in little vignettes—the court explains how each defendant ended up here and which of his or her assets the SEC seeks to disgorge.

### 1.  L. Smith

L. Smith and Smith have been married for over forty years.  (Dkt. No. 23 ¶ 11.)  Together, they have two children and, over the years,

---

[6] All assets held by McGinn, Smith, and the MS Entities also remain frozen, although the parties do not dispute that those assets should be subject to a disgorgement order, if any. (Dkt. No. 61; Dkt. No. 86 at 42.)

[7] Unless otherwise noted, the facts are not in dispute.

[8] An example of such a film is *Crash* (Yuri Film Group 2004)—which is also an apt and succinct description of the fates of the once prominent and now defunct McGinn, Smith empire and the people who profited from it.

amassed great wealth, complete with ski condominiums and beach homes.  (*Id.* ¶¶ 22-23; Pl.'s Statement of Material Facts (SMF) ¶¶ 363, 364, Dkt. No. 711.)  Although the SEC does not ask, nor does the law require, the court to determine the extent to which L. Smith knew of her husband's fraudulent scheme, her actions, described throughout this opinion, carry with them a circumstantial stench.  The assets of hers at issue here include the Stock Account, Checking Account, and Smith Vero Beach Home.

### a.  Stock Account

Throughout their marriage, the Stock Account was used by the Smiths to fund multiple purchases—from mundane household expenses to lavish homes—and to provide short-term cash infusions to struggling MS Entities.  Although L. Smith has always maintained that she inherited the Stock Account, along with property on the Great Sacandaga Lake, from her father after he passed away in 1969, and that they "have always been [her] separate property," (Dkt. No. 23 ¶¶ 13, 17), the SEC has submitted evidence establishing that the Stock Account, in fact, was opened on November 21, 1991 with Bear Stearns, and was funded with cash and securities from a joint account, (Pl.'s SMF ¶¶ 338, 339; Dkt. No.

738, Attach. 8; Dkt. No. 745, Attachs. 2, 3; Dkt. No. 746, Attach. 3).

Further, since at least 1991, Smith made most of the investment decisions

and had full trading authorization over the Stock Account.  (Pl.'s SMF

¶¶ 357-58; Dkt. No. 737, Attach. 10.)  Smith also decided whether the

Stock Account would make investments in any of the MS Entities, and if

such investments were made, L. Smith was unaware of them.  (Dkt. No.

742, Attach. 11 at 20.)

The Stock Account was also used to fund common expenses and

purchase assets that benefited both Smith and L. Smith.  For example, the

Smiths used funds from the Stock Account to purchase their primary

residence in Clifton Park, New York, a ski condominium in Vermont,

another residence in Saratoga Springs, New York, and the Smith Vero

Beach Home.  (Pl.'s SMF ¶¶ 362-64, 370.)  Additionally, the Smiths used

the Stock Account to fund L.T. Smith and G. Smith's college tuition and

various individual retirement accounts (IRAs).  (*Id.* ¶¶ 367-69.)  Other

miscellaneous expenses funded by the Stock Account included golf club

dues, federal and state taxes, car payments, and insurance.  (*Id.* ¶ 373.)

Smith also contributed assets to the Stock Account after it was

opened.  Specifically, Smith obtained a $150,000 loan from MS & Co.,

which was used to partially fund the purchase of 40,688 shares in ALBANK Financial Corporation—later converted to Charter One stock. (*Id.* ¶¶ 375, 378-80.)  Although the shares were issued in April 1992, the stock was not deposited into the Stock Account until September 18, 1992. (*Id.* ¶¶ 379, 381.)  Ultimately, this proved to be an extremely successful and profitable investment, and, by October 2002, the Stock Account held 105,000 shares of Charter One stock, which were worth over $3 million. (*Id.* ¶¶ 385-88.)

The assets held by the Stock Account were also utilized to provide short-term loans to the MS Entities and to make personal loans to McGinn.  Between 1999 and 2010, approximately $17.2 million was transferred from the Stock Account to various MS Entities, but, during the same time period, only $13.7 million was transferred from the MS Entities back to the Stock Account.  (*Id.* ¶¶ 400-01; Dkt. No. 712 at 68-69.[9])  For

---

[9]  L. Smith argues that the Declaration of Kerri Palen, a Staff Accountant in the Enforcement Division of the New York Regional Office of the SEC, (Dkt. No. 712), is inadmissible because Palen is an expert who has not been disclosed pursuant to court order. (Dkt. No. 781 at 20-22.)  The SEC, however, offers this declaration, and the exhibits attached thereto, as "a summary of voluminous bank and brokerage records and other financial documents," pursuant to Fed. R. Evid. 1006.  (Dkt. No. 801 at 14.)  The court agrees with the SEC that this declaration and its exhibits are admissible as a summary exhibit.  L. Smith also attacks certain entries and transactions outlined in the Palen Declaration.  (Dkt. No. at 781 at 20-22.)  Despite arguing that the Palen Declaration "is a complete fabrication and falsehood," (*id.* at 21), L. Smith cites no record evidence to contradict the Palen Declaration, and ignores the fact that, in her response to the SEC's statement of material facts, she either admitted or claimed to lack sufficient knowledge to respond to the majority of the facts regarding transfers

example, during this time period, $7.9 million was transferred from the Stock Account to Capital Center Credit Corporation ("C-4"), which was owned by McGinn and Smith, but only approximately $7.2 million was transferred from C-4 back to the Stock Account.  (Pl.'s SMF ¶¶ 402-03; Dkt. No. 712 at 68.)  Further, also during this time period, $300,000 was transferred from the Stock Account to MS & Co., but only $29,500 was transferred from MS & Co. back to the Stock Account.  (Dkt. No. 712 at 68.)  Additionally, in 2003, a $900,000 loan was made to McGinn, and, later, another $15,000 loan was made to McGinn from the Stock Account. (Pl.'s SMF ¶¶ 466-67; Dkt. No. 742, Attach. 11 at 4-5.)

These transfers from the Stock Account were typically made pursuant to Letters of Authorization (LOAs), which reflected L. Smith's signature.  (Pl.'s SMF ¶¶ 432-33.)  At times, however, Smith directed employees to cut and paste L. Smith's signature onto the LOAs.  (*Id.* ¶¶ 434-45.)  Additionally, L. Smith signed multiple blank LOAs, which contained no information regarding the amount to be transferred or the transferee, and, after signing them, provided the LOAs to Smith to

---

to and from the Stock Account, (Dkt. No. 783 at 389-462).  For substantially the same reasons as articulated in the SEC's reply brief, (Dkt. No. 801 at 14-16), the Palen Declaration is admissible, and to the extent that it summarizes known deposits into and withdrawals from the Stock Account, is reliable.

effectuate transfers from the Stock Account.  (*Id.* ¶ 436; Dkt. No. 745, Attach. 9 at 175-77; Dkt. No. 745, Attach. 10 at 13-15.)  Smith then gave the blank LOAs to an employee, who kept them in his desk drawer until Smith provided him with wiring instructions.  (Pl.'s SMF ¶ 437; Dkt. No. 745, Attach. 9 at 177.)  L. Smith could not explain the business reason behind many of the transfers, at times did not recall certain transfers at all, and, with respect to the loans made to McGinn, never spoke to McGinn regarding the loans, and has not been repaid in full.  (Pl.'s SMF ¶¶ 463-64; Dkt. No. 742, Attach. 11 at 4-5.)

b.  Smith Vero Beach Home

In 2001, the Smiths used money from the Stock Account to purchase the Smith Vero Beach Home.  (Pl.'s SMF ¶ 364.)  The home was purchased in both Smith and L. Smith's names, and they paid approximately $1,389,000.  (*Id.* ¶ 365.)

In December 2008, a statement of claim was filed with the Financial Industry Regulatory Authority (FINRA) by Duckkyu Chang and Kee Chang, customers of McGinn and Smith, seeking compensatory damages in the amount of $2,577,000, punitive damages, commissions, interest, and attorneys' fees.  (*Id.* ¶ 577; Dkt. No. 740, Attach. 6 at 16.)  McGinn

and Smith, along with, among others, MS & Co., MS Advisors, MS Capital, and William Lex, an MS & Co. broker, were named as respondents.  (Pl.'s SMF ¶ 576; Dkt. No. 740, Attach. 6 at 16.)  Additionally, in January 2009, FINRA began investigating McGinn, Smith, and MS & Co. for potential securities laws violations.  (Dkt. No. 192, Attach. 3 ¶ 9.)

Also in January 2009, Smith stated in a letter to Martin Finn, the Smiths' financial planner, "I am interested in reducing my exposure to personal liability as a result of the very litigious business that I am in.  You mentioned transferring my share in the Vero Beach and Saratoga residences to Lynn or a Trust."  (Pl.'s SMF ¶ 555.)  Finn responded that it was more beneficial for the Smiths to continue to own the Smith Vero Beach Home jointly as tenants by the entirety.  (Dkt. No. 729, Attach. 4 at 2.)  Contrary to this advice, in September 2009, the Smiths transferred the vacation home from joint ownership to L. Smith's name alone.  (Pl.'s SMF ¶ 567; Dkt. No. 14 at 1, 6.)

On December 31, 2009, the Chang FINRA arbitration panel held that MS & Co., Lex, and Smith were jointly and severally liable for $805,111 in compensatory damages and other fees.  (Dkt. No. 740, Attach. 6 at 16-25.)  Soon thereafter, in a letter regarding "options to consider in

addressing the Chang award," Smith noted that he was "foolishly compromising the rest of [his] life," and would "be forever burdened with at the very least a lien on [his] wages, and there is some risk that the equity that is not in [his] wife's name or protected by Trusts could be served with a lien to satisfy the judgments." (Dkt. No. 737, Attach. 1 at 1; Pl.'s SMF ¶ 556.) Smith further noted that the "equity is primarily in the form of two properties," including his "home in Florida (transferred to [his] wife solely . . . )." (Dkt. No. 737, Attach. 1 at 1.)

### c. The Checking Account

Since they married in 1968, Smith and L. Smith maintained a joint checking account, into which they deposited their paychecks and from which they paid bills. (Pl.'s SMF ¶ 558.) In the summer of 2009, L. Smith opened a Checking Account at Bank of America in her name only. (*Id.* ¶ 560.) Thereafter, Smith and L. Smith transferred the assets in their joint checking account to L. Smith's Checking Account, and Smith's payroll checks were then deposited into L. Smith's Checking Account. (*Id.* ¶ 561.)

### 2. *The Smith Trust*, *L.T. Smith*, *and G. Smith*

As noted above, in the early 1990s, Smith caused the Stock Account

to purchase 40,688 shares of stock in ALBANK, later to become Charter One, for $406,880.  (Pl.'s SMF ¶¶ 375-76, 380.)  By October 2002, through bank mergers and acquisitions, the number of shares had increased to 105,000 and their value to over $3 million.  (*Id.* ¶¶ 385-88.) On May 4, 2004, Charter One publicly announced that, on August 31, 2004, it would be acquired in an all-cash deal by Citizens Financial Group, which would pay $44.50 per share.  (*Id.* ¶ 479.)  As a result of the buy-out, the Smiths' Charter One stock would be converted to cash.  (*Id.*)

On August 4, 2004, Smith and L. Smith created the Smith Trust pursuant to a Declaration of Trust.  (*Id.* ¶ 481; Dkt. No. 739.)  On September 1, 2004, the Smiths transferred 100,000 shares of Charter One stock from the Stock Account to the Smith Trust, at which time the fair market value of the stock was approximately $4.45 million.  (Pl.'s SMF ¶ 483.)  On the same day, the Charter One acquisition occurred, and the Smith Trust was credited with $4.45 million in cash.  (*Id.* ¶ 484.)  Prior to this transfer, the Smith Trust had no assets.  (*Id.* ¶ 481.)

In return for transferring the Charter One stock, and on the same day that the stock was transferred, the Smiths entered into a Private Annuity Agreement (the "Annuity Agreement") with the Smith Trust.  (Dkt.

15

No. 739, Attach. 1.)  The Annuity Agreement entitled the Smiths to yearly payments of $489,000 from the Smith Trust, beginning in September 2015 and continuing until both Smith and L. Smith were deceased.  (*Id.* at 3.) Under the terms of the Annuity Agreement, the Smiths had a joint life expectancy of approximately twenty years from the date that the payment obligations were scheduled to begin, which would potentially entitle the Smiths to payments of nearly $10 million in total.  (*Id.* at 2-3.)

Thomas Urbelis, a longtime friend of the Smiths and a municipal attorney, was appointed Trustee at Smith's request.  (Pl.'s SMF ¶¶ 510-11; Dkt. No. 746, Attach. 2 at 3.)  Urbelis did not take responsibility for preparing tax returns for the Smith Trust, relied on Smith for all investment decisions, and routinely signed documents regarding the Smith Trust when Smith or other employees of the MS Entities asked him to do so. (Pl.'s SMF ¶¶ 513-16; Dkt. No. 46, Attachs. 7-8; Dkt. No. 746, Attach. 2 at 3-4.)  Urbelis also signed LOAs, which permitted transfers of money from the Smith Trust to Smith or L. Smith.  (Pl.'s SMF ¶ 517.)  Urbelis was under the impression that the money was to pay the Smith Trust's taxes, but did not, in fact, know how the Smiths used the funds.  (*Id.* ¶ 518; Dkt. No. 746, Attach. 2 at 52-53.)  Urbelis resigned as Trustee on April 22,

2010 because of this lawsuit.  (Pl.'s SMF ¶ 514; Dkt. No. 66, Attach. 1 at 51-52.)

L. Smith has repeatedly stated that the Smith Trust was created for the benefit of her children.  (Dkt. No. 742, Attach. 3 ¶ 23; Dkt. No. 742, Attach. 11 at 10-11; Dkt. No. 742, Attach. 13 ¶¶ 4, 6.)  While G. Smith and L.T. Smith learned of the Smith Trust's existence around Thanksgiving 2004, a few months after its creation, neither believed that they had access to the money at that time.  (Pl.'s SMF ¶¶ 520, 533-34, 536-37, 541.)  Even when L.T. Smith "'went through a little bit of a rough period'" between March 2007 and May 2009, L. Smith sent L.T. Smith nineteen checks, totaling $22,100, but L.T. Smith never accessed funds in the Smith Trust.  (Pl.'s SMF ¶¶ 539-41; Dkt. No. 737, Attach. 12.)  In April 2010, however, G. Smith caused $95,000 to be transferred from the Smith Trust to L. Smith's checking account, $75,000 of which was used to pay Smith and L. Smith's state and federal income taxes.  (Pl.'s SMF ¶ 543.)

After this action was commenced, L. Smith failed to disclose the Annuity Agreement to the court and to the SEC when asked to produce documents or respond to questions regarding her assets and liabilities, (Dkt. No. 737, Attach. 7 ¶¶ 12-14; Dkt. No. 742, Attach. 11 at 20-21; Dkt.

17

No. 742, Attach. 18), despite the fact that the Smiths listed assets in the Smith Trust as part of their cash and securities in financial statements, identified Smith as the "beneficiary" of the Smith Trust in a subscription agreement, and occasionally paid the Smith Trust's taxes without reimbursement, (Pl.'s SMF ¶¶ 508, 545; Dkt. No. 732, Attachs. 18, 19; Dkt. No. 745, Attach. 7 at 19; Dkt. No. 745, Attach. 10 at 261).  As discussed more fully below, because the court did not know of the Annuity Agreement, on July 7, 2010, the court decided that the Smith Trust should not be subject to an asset freeze.  (Dkt. No. 86 at 37-41, 42.)

### 3. The McGinns and Their Niskayuna Property

In 2003, McGinn purchased a residence in Niskayuna, New York for approximately $600,000, and, although both McGinn and N. McGinn lived in the home, the property was held in McGinn's name alone.  (Pl.'s SMF ¶¶ 572-73, 580.)  Over the years, McGinn put approximately $235,000 in improvements into the Niskayuna Property.  (*Id.* ¶ 580.)  McGinn and N. McGinn were married in July 2006, and between 2004 and 2010, N. McGinn did not contribute any money to the marriage or for household expenses.  (*Id.* ¶¶ 574-75.)  In 2008, the McGinns purchased another home, in Florida, which was placed in both McGinn and N. McGinn's

names.  (Dkt. No. 745, Attach. 6 at 15.)

On October 13, 2009, McGinn attended MS & Co. broker Lex's testimony at the Chang FINRA arbitration hearing, (Pl.'s SMF ¶ 576), and, shortly thereafter, McGinn sent a text message to N. McGinn stating that "Lex is [a] very poor witness," and indicating that he and Smith would testify later in the week, (*id.* ¶ 578; Dkt. No. 737, Attach. 11).  Six days later, McGinn transferred the title to the Niskayuna residence to N. McGinn in exchange for one dollar.  (Pl.'s SMF ¶¶ 579-80; Dkt. No. 739, Attach. 4.)

## B.   Procedural History

On April 20, 2010, the SEC filed its complaint and a request for an order to show cause, and, on the same day, the court entered an order temporarily freezing defendants' and relief defendants' assets, pending a preliminary injunction hearing, and appointing a temporary receiver over the MS Entities' assets.  (Dkt. Nos. 1, 4-5.)  On May 26, 2010, the Trustee for the Smith Trust—at the time, David Wojeski[10]—intervened in order to challenge the freeze over the Smith Trust's assets.  (Dkt. Nos. 31-35.)

---

[10]  As noted above, Urbelis resigned on April 22, 2010.  (Pl.'s SMF ¶ 514; Dkt. No. 66, Attach. 1 at 51-52.)  Soon thereafter, David M. Wojeski was appointed trustee.  (Dkt. No. 306 ¶¶ 3, 6-7.)  Wojeski then resigned on January 8, 2011, and, on February 14, 2011, G. Smith was substituted as the trustee.  (*Id.* ¶ 28; Dkt. No. 281.)

The Trust's motion was granted, and it was permitted to intervene to oppose the SEC's motion for a preliminary injunction.  (Dkt. No. 39.)  L. Smith also opposed the SEC's motion for a preliminary injunction with respect to certain assets held in her name, including the Stock Account, the Checking Account, the Smith Vero Beach Home, and the Great Sacandaga Lake property.  (Dkt. Nos. 23-24.)

### 1. July 7, 2010 Decision and Subsequent Transfers from the Smith Trust

On July 7, 2010, following a three-day hearing, the court ruled that the Stock Account should remain frozen because the SEC showed a substantial likelihood of success on the merits and in proving that Smith was a joint owner of the Stock Account, as the record demonstrated that "Smith had access and control over the account for decades, . . . a personal and professional interest in the Stock Account and . . . [had] commingled funds between the Stock Account and his business and personal accounts."[11]  (Dkt. No. 86 at 34-36.)  For "essentially the same" reasons, the court also continued the asset freeze with respect to the

---

[11] Alternatively, the court also found that the Stock Account should remain frozen because the SEC demonstrated a likelihood of success on the merits in proving that L. Smith was a proper relief defendant and that the "Stock Account includes ill-gotten gains to which [L. Smith] has no legitimate claim of or ownership."  (Dkt. No. 86 at 31-33.)  For the reasons discussed below, however, the court need not concern itself with this aspect of the analysis.

Checking Account and the Smith Vero Beach Home.  (*Id.* at 36-37.)  With respect to the Great Sacandaga Lake property and the Smith Trust, however, the court vacated the freeze because the SEC failed to show a likelihood that it could prove that Smith was a joint owner.  (*Id.* at 37-41.)  Specifically regarding the Smith Trust, the court noted that continuing the freeze was inappropriate because "the Trust's benefits did not flow to . . . Smith and he did not exercise control over them such that he treated the corpus as his own."  (*Id.* at 40-41.)  Instead, the court concluded, the Smith Trust was created for the benefit of Smith's children, L.T. Smith and G. Smith.  (*Id.* at 3, 40-41.)

Finally, in its July 7, 2010 decision, the court held that the McGinn residence in Niskayuna, New York should not be subject to the asset freeze.  (*Id.* at 41-42.)  The court reasoned that, because title to the home was transferred to N. McGinn in 2009, and because N. McGinn was not a party to the action in any capacity, the court lacked jurisdiction to restrain her actions with respect to any property titled to her alone.  (*Id.*)  The court did note, however, that "the SEC would appear to have demonstrated sufficient cause to include the residence in the asset freeze," had N. Smith been a party in the action.  (*Id.*)  On July 22, 2010, the court entered a

21

preliminary injunction order consistent with its July 7, 2010 decision, and which, among other things, confirmed the appointment of William Brown as the Receiver over the MS Entities' assets, pending the final disposition of the action.  (Dkt. No. 96.)

Following the court's July 7, 2010 decision, nearly one million dollars were transferred out of the Smith Trust, including almost $600,000 in exchange for the Great Sacandaga Lake property.  First, on July 9, 2010, $95,741 was wired from the Smith Trust to the Dunn Law Firm, the firm that formerly represented the Trust.  (Pl.'s SMF ¶ 591.)  On July 12, 2010, $96,500 was wired from the Smith Trust to G. Smith, $75,000 of which was provided to L. Smith as a partial down payment for the Great Sacandaga Lake property, and the remainder of which was used for G. Smith's personal expenses.  (*Id.* ¶¶ 592-93; Dkt. No. 739, Attach. 2 at 1; Dkt. No. 742, Attach. 7 at 39-40.)  On the same day, the Smith Trust wired L.T. Smith another $75,000, also to be used as a partial down payment to L. Smith for the Great Sacandaga Lake property, along with $1,800 to use for rent and $6,200 to pay off credit card debt.  (Pl.'s SMF ¶¶ 586, 588; Dkt. No. 739, Attach. 2 at 1; Dkt. No. 742, Attach. 15 at 14.)  Further, on July 16, 2010, $200,000 was transferred from the Smith Trust to G. Smith

to be used as an investment in G. Smith's new business venture.  (Pl.'s SMF ¶ 594; Dkt. No. 742, Attach. 7 at 40; Dkt. No. 739, Attach. 2 at 1.) Finally, on July 22, 2010, L. Smith executed an indenture releasing all rights to the Great Sacandaga Lake property to the Smith Trust, and, the following day, the Smith Trust wired $449,878 to L. Smith as the remainder of the payment for the Great Sacandaga Lake property.  (Pl.'s SMF ¶¶ 601, 603; Dkt. No. 739, Attach. 2 at 1; Dkt. No. 742, Attach. 1.)

>    2.  *November 22, 2010 Decision and Subsequent Sanctions*

On August 2 and 3, 2010, the SEC filed an amended complaint—this time, naming N. McGinn as both a defendant and relief defendant—(Dkt. No. 100), a motion for reconsideration of the July 7, 2010 decision, and an application for emergency relief, requesting, among other things, that the court again freeze the Smith Trust's assets and N. McGinn's assets, including the Niskayuna property, (Dkt. No. 103).  The thrust of the SEC's motion and application was that, after the July 7, 2010 decision, it discovered new, previously undisclosed evidence: the Annuity Agreement, which entitled L. Smith and Smith to payments of $489,000 per year from the Smith Trust beginning in September 2015.  (Dkt. No. 103, Attach. 1 at 3-19.)

On November 22, 2010, and following another hearing, the court granted the SEC's motion for reconsideration, and vacated the portion of its July 7, 2010 decision that lifted the asset freeze as to the Smith Trust. (Dkt. No. 194 at 23.)  The court found that, in light of the newly discovered Annuity Agreement, the SEC demonstrated a likelihood of success in proving that Smith was an equitable owner of the Smith Trust based, in part, on evidence that "Smith maintained control of [Smith] Trust assets after the Trust was created . . . to insure that the annuity payments required by the Annuity Agreement could be made beginning in 2015." (*Id.* at 22-23.)  The court also granted the SEC's request to freeze the assets of N. McGinn, including the Niskayuna residence.  (Dkt. No. 233.)

Also in its November 22, 2010 decision, the court found evidence of "fraud, misrepresentation, and misconduct" by L. Smith, along with then-trustee Wojeski and then-attorney for the Smith Trust, Jill Dunn, in concealing the existence of the Annuity Agreement, (Dkt. No. 194 at 20 n.17), and, in a later decision, granted the SEC's motion for sanctions against L. Smith, Wojeski, and Dunn, (Dkt. No. 342).  In granting sanctions against L. Smith, the court noted that, in the four weeks between the court's July 7, 2010 decision releasing the Smith Trust's assets from the

asset freeze and the entry of the order re-freezing the Smith Trust's assets on August 3, 2010, the Trust was depleted of a total of $944,848, $600,000 of which was distributed to L. Smith for the sale of the Great Sacandaga Lake property to the Trust.  (*Id.* at 40-41.)  "But for L[.] Smith's concealment of the Annuity Agreement," the court reasoned, "none of the[] disbursements could or would have occurred," and, among other sanctions, L. Smith was ordered to disgorge the full $944,848 to the receiver.  (*Id.*)

### 3.  Second Circuit Decisions

In three separate opinions, the Second Circuit affirmed all of the court's decisions.  First, the Second Circuit affirmed the orders freezing L. Smith's Stock Account and the Smith Trust's assets.  *See Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011).  Second, the Second Circuit affirmed an order permitting the receiver to sell the Smith Vero Beach Home.  *See Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011).  Third, the Second Circuit affirmed the sanctions imposed on L. Smith.  *See SEC v. Smith*, 710 F.3d 87 (2d Cir. 2013).

### 4.  Current Status of Assets

Since the inception of this action, the receiver has liquidated several

assets in order to preserve their value.  As relevant to the pending

motions, the Great Sacandaga Lake property, the Smith Vero Beach

Home, and the McGinns' Niskayuna Property have all been sold.  (Dkt.

Nos. 263, 647, 693); *see* McGinn, Smith & Co. Inc., et al., Website of the

Receiver, William J. Brown, Esq., http://mcginnsmithreceiver.com/ (last

visited Mar. 24, 2015).

### III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well

established and will not be repeated here.  For a full discussion of the

standard, the court refers the parties to its decision in *Wagner v. Swarts*,

827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v.*

*Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV.  Discussion

Below, the court first revisits the SEC's request for a disgorgement

order.  Then, the court goes on to discuss which assets may be applied to

the disgorgement order, and whether the SEC has established liability

under the New York Debtor and Creditor Law.

### A.    Disgorgement

In MDO I, the court held that disgorgement was an appropriate

sanction, but was unable, without further explanation from the SEC, to determine the appropriate dollar amount to be disgorged.  (Dkt. No. 807 at 37-46.)  The SEC has since provided the court with additional documentation and briefing, in which it requests that the court hold McGinn and Smith jointly and severally liable for the payment of $87,433,218 in disgorgement, plus prejudgment interest in the amount of $11,668,132.  (Dkt. No. 809; Dkt. No. 809, Attachs. 1-10.)  After thoroughly reviewing the SEC's submissions, and considering Smith's response thereto, (Dkt. No. 815), the court is satisfied that the SEC has demonstrated that $87,433,218 in disgorgement, plus prejudgment interest in the amount of $11,668,132 is appropriate.

Although the court incorporates its discussion of the legal standards governing disgorgement outlined in MDO I, (Dkt. No. 807 at 38-42), the court highlights here that, "[d]istrict courts are given broad discretion in tailoring appropriate and reasonable sanctions."  *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990); *see* Wright & Miller, Federal Practice & Procedure § 1336.3 (3d ed. 2014) ("[F]ederal courts retain broad discretionary power to fashion novel and unique sanctions to fit the particular case.").  The court is also free to hold joint tortfeasors

jointly and severally liable for the ultimate amount to be disgorged.  *See*

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475-76 (2d Cir. 1996).

Despite the broad discretion afforded to the district court, however, the

amount of disgorgement ordered must be "a reasonable approximation of

profits causally connected to the violation."  *Id.* (internal quotation marks

and citations omitted).

Here, the SEC has met its burden.  In arriving at its request for

$87,433,218 in disgorgement, the SEC subtracted the amount returned to

investors—$29,172,312, (Dkt. No. 809, Attach. 1 ¶ 13; Dkt. No. 809,

Attach. 2)—from the total amount raised through the fraudulent

offerings—$126,932,000, (Dkt. No. 809 at 13).  (*See* Dkt. No. 807 at 41-42

(noting "that the proper metric for calculating disgorgement in [Ponzi

scheme cases] is subtracting the amount returned to investors from the

total amount raised through the fraudulent offerings," and citing cases in

support of that proposition).)  The total amount raised through the

fraudulent offerings—the Four Funds, Trust, and MSTF offerings—

> was determined through an analysis of records for
> hundreds of bank accounts for the [MS Entities,],
> issuers and offerings, including monthly account
> statements, account opening documents, transfer
> records, deposit, check and withdrawal records;

28

> financial, accounting, and other records of MS & Co.;
> accounting workpapers and tax returns; and Quicken
> accounting files maintained by MS & Co.[, along with]
> "a large electronic database maintained by MS & Co.
> referred to as the Investor Database.

(Dkt. No. 809 at 2.)  The amount returned to investors was determined

through a detailed analysis of MS & Co. records by Brown, the receiver.

(Dkt. No. 809, Attach. 1 ¶¶ 6-13; Dkt. No. 809, Attachs. 2, 6.)

In response, Smith contends that the SEC's "methodology is flawed

in that the proposal does not comply with the [c]ourt's order and fails to

establish the requisite nexus between wrongdoing and profit."  (Dkt. No.

815 at 2.)  Principally, Smith argues that, because liability here was

premised on the collateral estoppel effect of McGinn and Smith's

convictions in the MS Criminal Case, and the MS Criminal Case "was

limited to the [T]rusts and MSTF," the SEC, therefore, is not entitled to

seek disgorgement of profits raised through the Four Funds.  (*Id.* at 3-6.)

Smith's arguments are unavailing.  First, in MDO I, separate and apart

from its discussion of collateral estoppel, the court held that McGinn and

Smith violated the federal securities laws in connection with the Four

Funds offerings based upon undisputed evidence submitted by the SEC in

this civil case.  (Dkt. No. 807 at 33-34.)  This independent liability finding is

enough to warrant inclusion of Four Funds' profits in a disgorgement order, rendering Smith's arguments academic.

Further, and similarly, in attacking the SEC's "methodology," Smith relies entirely on the evidence submitted at trial in the MS Criminal Case, and totally ignores the proof that the SEC has submitted here.  In fact, Smith has in no way attacked the SEC's submissions detailing how it arrived at its request for $87,433,218 in disgorgement, other than to say that profits from the Four Funds should be excluded.  Accordingly, the SEC has demonstrated "a reasonable approximation of profits causally connected to the violation[s]," *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014), and McGinn and Smith have not met their burden in response "to show that [their] gains were unaffected by [their] offenses," *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (internal quotation marks and citations omitted), or that "the . . . measure [of disgorgement] is inaccurate," *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994)).  Therefore, McGinn and Smith are jointly and severally liable for disgorgement of $87,433,218.

The SEC has also requested prejudgment interest in the amount of $11,668,132.  (Dkt. No. 809 at 5-6.)  Smith has not objected either to the

SEC's request for prejudgment interest, or to the amount of prejudgment interest that the SEC seeks.  (*See generally* Dkt. No. 815.)  The district court has discretion to award prejudgment interest, a decision which "is governed by the equities, reflecting 'considerations of fairness' rather than 'a rigid theory of compensation.'"  *Contorinis*, 743 F.3d at 307-08 (quoting *Blau v. Lehman*, 368 U.S. 403, 414 (1962)).  Further, "the failure of securities law violators to enjoy a profit does not, standing alone, make it inequitable to compel them to pay interest."  *Id.* at 308 (internal quotation marks and citations omitted).  Here, prejudgment interest is appropriate, particularly in light of the fact that neither McGinn nor Smith have objected to the imposition of prejudgment interest.  *See SEC v. Contorinis*, No. 09 Civ. 1043, 2012 WL 512626, at *4 n.8 (S.D.N.Y. Feb. 3, 2012), *aff'd* 743 F.3d 296 (2d Cir. 2014).  Given that prejudgment interest on the entire disgorgement amount is warranted, *see Contorinis*, 743 F.3d at 308, the court orders prejudgment interest in the amount of $11,668,132.

Finally, the SEC seeks to return the disgorged profits to defrauded investors.  (Dkt. No. 708, Attach. 1 at 14.)  The court agrees that this is the appropriate course of action, even though the measure of disgorgement is distinct from restitution, and need not be tied to investor losses.  "'[O]nce

the primary purpose of disgorgement has been served by depriving the wrongdoer of illegal profits, the equitable result is to return the money to the victims of the violation.'"  *SEC v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 407 (S.D.N.Y. 2009) (quoting *SEC v. Drexel Burnham Lambert, Inc.*, 956 F. Supp. 503, 507 (S.D.N.Y. 1997)); *see SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) (noting that "disgorged funds may often go to compensate securities fraud victims for their losses").

The court now turns to a discussion of which assets may be applied to satisfy the disgorgement order.

## B.    L. Smith's Relief Defendant Status and The Stock Account

First, the SEC argues that the Stock Account should be applied to satisfy the judgment against Smith.  (Dkt. No. 708, Attach. 1 at 18-23.) Specifically, based on preliminary findings and additional undisputed evidence, the SEC contends that Smith was the joint owner of the Stock Account.  (*Id.*)  L. Smith responds that issues of fact regarding Smith's ownership and control over the Stock Account preclude summary judgment.  (Dkt. No. 781 at 5-18.)  Additionally, in her own motion for partial summary judgment, L. Smith argues that the SEC has not met its

burden in proving that she is a proper relief defendant.  (Dkt. No. 696, Attach. 1 at 8-20.)  For the reasons that follow, the court agrees with the SEC that the Stock Account should be applied to the disgorgement order on the basis that Smith was a joint owner, and, therefore, L. Smith's motion is rendered moot.

A "nominal" or "relief" defendant is "a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because [s]he has no ownership interest in the property which is the subject of [the] litigation."  *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991); *see SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("[T]he SEC may name a non-party depository as a nominal defendant to effect full relief in the marshalling of assets that are the fruit of [an] underlying fraud.").  Generally, federal courts have jurisdiction over and "may order equitable relief against" a relief defendant in a securities enforcement action if she: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.*"  SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (citation omitted).

Alternatively, "[i]f an asset belonging to a relief defendant is, in reality, also an asset of a defendant," then application of the two-part

*Cavanagh* test is inappropriate.  *SEC v. Heden*, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999); *see SEC v. McGinn, Smith & Co., Inc.*, 752 F. Supp. 2d 194, 215-16 (N.D.N.Y. 2010), *aff'd sub nom. Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011). In determining whether a defendant and relief defendant jointly own an asset, "the central inquiry concerns 'the element of control [implicating] . . . the concept of equitable ownership."  *McGinn, Smith & Co.*, 752 F. Supp. 2d at 207 (quoting *In re Vebeliunas*, 332 F.3d 85, 92 (2d Cir. 2003)).  Equitable or joint ownership is established when "an individual . . . exercise[s] considerable authority over [the asset] . . . acting as though [its] assets [are] his alone to manage and distribute." *Vebeliunas*, 332 F.3d at 92 (internal quotation marks and citations omitted).  In addition to the element of control, courts also consider the following factors in determining joint ownership: (1) the length of time the asset had been held; (2) whether the defendant had an interest in and benefitted from the asset; (3) whether the defendant had transferred assets from his name into the asset; (4) whether the defendant contributed to acquire the asset initially; and (5) whether the defendant ever withdrew any funds from the asset.  *See Heden*, 51 F. Supp. 2d at 301; *see also McGinn, Smith & Co.*, 752 F. Supp. 2d at 207-08.        Here, the SEC

relies entirely on the joint or equitable ownership theory.  (Dkt. No. 708, Attach. 1 at 18-23.)  First, the SEC points to the court's findings, after a three-day preliminary injunction hearing, that Smith was the joint owner of the Stock Account.  (*Id.* at 18-19.)  In response, L. Smith argues that the preliminary injunction findings are not conclusive evidence that Smith is a joint owner of the Stock Account.  (Dkt. No. 781 at 6-7.)  Indeed, the court agrees with L. Smith that it is not bound by the preliminary injunction findings, and that they are in no way dispositive, but also notes that it is free to consider those findings here.  *See, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 133 (D. Conn. 2010) (collecting cases).  Further, it does not appear to be the SEC's position that it is entitled to summary judgment by virtue of any collateral estoppel effect or even the law of the case doctrine; rather, the SEC's argument is that the underlying evidence that supported those earlier findings is undisputed and sufficient, by itself, to render summary judgment appropriate here.  In any event, the court need not dwell on this issue, as it is satisfied that there are no outstanding questions of material fact regarding Smith's ownership and control over the Stock Account.

The court begins with the origins of the Stock Account, including when it was opened and with what assets it was initially funded. The SEC has submitted evidence demonstrating that the Stock Account was opened in L. Smith's name in 1991, with Bear, Stearns & Co., and funded with assets jointly held by Smith and L. Smith. (Dkt. No. 738, Attach. 8; Dkt. No. 745, Attachs. 2, 3; Dkt. No. 746, Attach. 3.) L. Smith, however, argues that the Stock Account was bequeathed to her around 1969, at which time it held $60,000. (Dkt. No. 783 at 8-12; Dkt. No. 23 ¶¶ 13-14; Dkt. No. 34 ¶ 2.) However, L. Smith relies primarily on her own self-serving affidavits, (Dkt. No. 23 ¶¶ 13-14; Dkt. No. 34 ¶ 2), which, standing alone, "are insufficient to create a triable issue of fact [to] defeat a motion for summary judgment." *Kobrand Corp. v. Abadia Retuerta S.A.*, No. 12 Civ. 154, 2012 WL 5851139, at *4 (S.D.N.Y. Nov. 19, 2012) (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996)). While L. Smith also purports to have submitted additional documentary evidence, including stock certificates in her name from 1970, letters discussing certain stocks she had inherited, and a letter to her father referencing a stock that he owned, (Dkt. No. 783, Attachs. 1-3), these documents do not establish, or even suggest, that the Stock

36

Account at issue here was created prior to November 1991.  Thus, there are no genuine questions of fact with respect to how long the Stock Account has existed—since November 1991, (Dkt. No. 745, Attach. 2)—and with what assets it was initially funded—"all cash and securities" from a joint account, (Dkt. No. 746, Attach. 3).[12]  These facts weigh in favor of a finding that Smith was a joint owner of the Stock Account.

The SEC has also established that Smith contributed assets to the Stock Account after it was created.  Most notably, the 40,688 shares of Charter One stock, one of the Stock Account's most valuable and successful investments, was purchased, in part, with a $150,000 loan that Smith secured from MS & Co.  (Pl.'s SMF ¶ 378; Dkt. No. 739, Attach. 10.) L. Smith's only response is that she "funded the vast majority of the transaction," and that Smith's contribution "was . . . a gift."  (Dkt. No. 781 at 16.)  Even if this is true, however, it simply does not change the fact that Smith contributed assets to the Stock Account—another factor that

_____

[12] Even if the court were to find questions of fact on this point, it would make no difference in the court's ultimate conclusion that Smith was a joint owner of the Stock Account. Indeed, in making its initial determination that the Stock Account should remain frozen because Smith was a joint owner, the court accepted as true that the Stock Account was created by L. Smith's father and bequeathed to her after he passed away.  (Dkt. No. 86 at 7-8.)  The origin of the Stock Account is but one factor to consider of many.

militates in favor of finding that Smith is a joint owner.

Next, although L. Smith contends that Smith was merely acting as an "agent" for his "customer," and "did not 'control'" the Stock Account, (*id.* at 12-13), the SEC has set forth undisputed facts and evidence demonstrating that Smith exercised virtually unfettered control over the Stock Account, and benefited from it in both his personal and professional life.  For example, L. Smith signed stacks of blank LOAs so that Smith could transfer money from the Stock Account at his own whim, and without L. Smith's full knowledge or understanding of the transactions. (Pl.'s SMF ¶¶ 432-33, 436-37; Dkt. No. 745, Attach. 9 at 175-77; Dkt. No. 745, Attach. 10 at 13-15.)  This demonstrates not only Smith's control over the Stock Account, but also his beneficial interest in it, as many of the transfers out of the Stock Account went to struggling MS Entities.  Indeed, between 1999 and 2010, bank records show that there were withdrawals of approximately $17.2 million from the Stock Account to various MS Entities.  (Pl.'s SMF ¶¶ 400-01; Dkt. No. 712 at 68-69.)

Smith also benefitted from the Stock Account personally.  To illustrate, as noted above, funds from the Stock Account were used to purchase real property, including residences in Clifton Park and Saratoga

Springs, New York, the Smith Vero Beach Home, and a ski condominium in Vermont. (Pl.'s SMF ¶¶ 362-64, 370, 373.) The Stock Account also contributed money to miscellaneous personal expenses, including IRAs, golf club dues, and car payments. (*Id.* ¶¶ 367, 373.) L. Smith's contention that it is irrelevant whether Smith benefitted from the Stock Account, (Dkt. No. 783 at 14-15), is without merit. *See Heden*, 51 F. Supp. 2d at 301 (noting that, in considering whether a defendant jointly owns an asset, courts should consider whether the defendant benefitted from the asset).

In short, the undisputed evidence overwhelmingly establishes that Smith was a joint owner of the Stock Account, and the fundamental flaw with L. Smith's entire opposition is that, in her memorandum of law, she attempts to dispute facts that she previously admitted, or lacked knowledge regarding, in her response to the SEC's statement of material facts. Accordingly, it is on the basis that Smith was a joint owner of the Stock Account that the court grants the SEC's request to apply the Stock Account to the disgorgement order. Thus, because the Stock Account will be treated as an asset of Smith, L. Smith's motion, which seeks entry of partial summary judgment on the ground that she is an improper relief defendant with respect to her ownership of the Stock Account, is rendered

moot.  *See id.* at 299 (noting that application of the two-part *Cavanagh* test for relief defendants is inappropriate if the court determines that the asset at issue is a joint asset).

## C.    The Smith Trust

Next, the SEC asks the court to apply the Smith Trust's assets to the disgorgement order.  (Dkt. No. 708, Attach. 1 at 24-29.)  Principally, the SEC contends that Smith was an equitable owner of, and had a beneficial interest in, the Smith Trust because: (1) the Annuity Agreement, and the fact that the Smiths hid the Annuity Agreement from the court, proves that the Smith Trust was created solely to benefit Smith and L. Smith in the future, not their children; (2) prior to the court's July 7, 2010 decision to unfreeze the Smith Trust's assets, the Smith Trust, in fact, only benefitted Smith and L. Smith; (3) the Smiths reported the Smith Trust as their asset in various financial documents; and (4) Smith, not the trustee, paid the Smith Trust's taxes and made all investment decisions involving the Smith Trust.  (*Id.*)  The Smith Trust opposes the SEC's request, arguing, primarily, that the Smith Trust was created to benefit G. Smith and L.T. Smith, and the facts that the Smiths hid the Annuity Agreement and reported the Smith Trust in financial documents are irrelevant.  (Dkt. No.

40

778, Attach. 2 at 4-11.)  The court again agrees with the SEC.

With respect to piercing the veil of a trust, the Second Circuit has "assumed that New York courts would allow the veil of a trust to be pierced in situations where the complete domination of a trust has been shown." *Smith*, 432 F. App'x at 13 (citing *In re Vebeliunas*, 332 F.3d at 91-92).  To make such a showing, "the SEC must establish that (1) the owner of the Trust exercised such control that the Trust had become a mere instrumentality of the owner; (2) the owner used this control to commit a fraud or 'other wrong'; and (3) the fraud or wrong resulted in injury or loss."  *Id.*; *see Transition Invs., Inc. v. Allen O. Dragge, Jr. Family Trust*, No. 11 Civ. 4775, 2011 WL 5865149, at *5 (S.D.N.Y. Nov. 21, 2011) ("Courts have assumed that the veil of a trust can be pierced where complete domination of the trust has been shown.")  With respect to the first element, control, it is sufficient to show that the defendant "could be considered the equitable owner of the Trust, such that he acted as though the Trust assets were 'his alone to manage and distribute.'"  *Smith*, 432 F. App'x at 13 (quoting *In re Vebeliunas*, 332 F.3d at 92).

Here, as the SEC has pointed out, (Dkt. No. 801 at 18, 22-24), the Smith Trust has admitted to nearly all of the material facts set forth by the

41

SEC,  (Dkt. No. 778, Attach. 3), and the court is satisfied that these facts

establish that Smith was an equitable owner of the Trust.  First, contrary to

the Smith Trust's assertions, (Dkt. No. 778, Attach. 2 at 7-10), the mere

existence of the Annuity Agreement, which entitled Smith and L. Smith to

receive monthly payments of nearly $500,000 beginning in September

2015, belies any claim that the Smith Trust was created for the benefit of

G. Smith and L.T. Smith.  Indeed, the Annuity Agreement states that

Smith and L. Smith "desire to sell the [stock] to the [Smith Trust] to be

relieved of the burden and risk associated with owning and managing the

[stock] *in order to receive investment income and a portion of the principal*

*on a regular basis*."  (Dkt. No. 739, Attach. 1 at 3 (emphasis added).)  The

Annuity Agreement further states that the Smith Trust is to "hold full title to

the [stock], free and clear of all liens and encumbrances, and there shall

be no collateral liens of any kind on the [stock] or any other assets of the

[Smith Trust] to secure payment of the obligations to [Smith and L.

Smith]."  (*Id.*)

      The above language, coupled with the fact that the Annuity

Agreement was entered into on the same day that the Charter One stock

was transferred to the Trust, which was previously devoid of any other

42

assets, make clear that the Trust was created for the benefit of Smith and L. Smith.  Further, the fact that L. Smith continuously and systematically failed to disclose the Annuity Agreement in response to discovery requests, (Dkt. No. 103, Attach. 2 ¶¶ 12-14), on a court-ordered Statement of Net Assets as of March 31, 2010, (Dkt. No. 742, Attach. 18), during her May 27, 2010 deposition—at which she was specifically asked questions concerning her assets, the Smith Trust, and why the Smith Trust was listed as an asset of Smith and L. Smith in financial statements, (Dkt. No. 742, Attach. 11 at 20-22)—or during her testimony at the preliminary injunction hearing, (Dkt. No. 745, Attach. 10), indicates that the Smiths hid this agreement from the court to preserve their beneficial interest in the Trust.[13]

Lastly, additional facts also support the conclusion that the Smiths treated the Smith Trust as their own.  For example, Smith listed the Trust as an asset on various financial documents, (Dkt. No. 732, Attachs. 18, 19), identified himself as the beneficiary of the Trust on a subscription agreement, (Dkt. No. 745, Attach. 7 at 19), paid the Trust's taxes without

---

[13] The Smith Trust also claims that the Smiths never actually benefitted from the Trust. (Dkt. No. 778, Attach. 2 at 9-10.)  However, the Trust admits that the only transfer from the Trust prior to the court's July 7, 2010 decision was a $95,000 transfer to Smith, which was used, in part, to pay the Smiths' taxes.  (Pl.'s SMF ¶ 543; Dkt. No. 778, Attach. 3 ¶ 543.)

reimbursement, (Dkt. No. at 745, Attach. 10 at 261), and made all of the investment decisions concerning the Trust, (Dkt. No. 746, Attach. 2 at 3-4).  Indeed, Urbelis, the former trustee, testified that he routinely signed documents regarding the Trust when Smith or other employees asked him to do so.  (Dkt. No. 46, Attachs. 7-8; Dkt. No. 746, Attach. 2 at 3-4.)  While the Smith Trust claims that many of these undisputed facts are "irrelevant," they, in fact, add insult to injury.

The remainder of the Smith Trust's arguments against applying the Trust to the disgorgement order require little discussion.  First, the Smith Trust's contention that this is the first time that the SEC has raised this theory is simply incorrect.  (Dkt. No. 86 at 37 ("The SEC contends that . . . Smith was a beneficial owner of the [T]rust over which he asserted dominion and control.").)  Next, the Smith Trust asserts that, because the Trust is a spendthrift trust, it cannot be invaded by the Smiths' creditors, including the SEC, and that, because the trustee has discretion to make distributions to beneficiaries and to terminate the Trust, the Trust should not be subject to disgorgement.  (Dkt. No. 704, Attach. 4 at 10-11; Dkt. No. 778, Attach. 2 at 5-6.)  However, aside from general references to the New York State Estates, Powers, and Trusts Law, these arguments are

44

unsupported by any authority, and they are, therefore, rejected.

Accordingly, the court is satisfied that Smith was a beneficial owner of the Trust and the Smith Trust should be applied to satisfy the disgorgement order.

## D.   Fraudulent Conveyances

Finally, the SEC seeks summary judgment on its eighth cause of action, which alleges that defendants engaged in various fraudulent transfers in violation of § 276 of the New York Debtor and Creditor law. (2d Am. Compl. ¶¶ 142, 206-11; Dkt. No. 708, Attach. 1 at 32-40.) Specifically, the SEC claims that the following transfers were fraudulent under New York law: (1) McGinn's transfer of the Niskayuna Property to N. McGinn; (2) Smith's transfer of the Vero Beach Home to L. Smith; (3) Smith's transfer of all assets held in a joint checking account into the Checking Account in L. Smith's name; and (4) the post-July 7, 2010 transfers from the Stock Account to L. Smith, G. Smith, and L.T. Smith.[14]

---

[14] As an alternative to its equitable ownership theory, the SEC also seeks entry of summary judgment on its claim that the 2004 transfer of the Charter One stock to the Smith Trust violated § 276.  (Dkt. No. 708, Attach. 1 at 36-38.)  The SEC notes, however, that, if the court found that Smith is an equitable owner of the Smith Trust, it would render its § 276 claim moot.  (*Id.* at 32 n.9, 36.)  Accordingly, because the court has ordered that the Smith Trust be disgorged on the SEC's theory of equitable ownership, the court need not reach the SEC's § 276 claim.

(Dkt. No. 708, Attach. 1 at 32-36, 38-40.)  Neither the McGinns nor the Smiths have set forth any arguments opposing the SEC's motion with respect to its eighth cause of action.  Only the Smith Trust, G. Smith, and L.T. Smith have contested the SEC's arguments, and they have done so primarily through their own motion for summary judgment.  (Dkt. No. 704.) For the reasons discussed below, the court agrees with the SEC.

Under § 276 of the New York Debtor and Creditor Law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276.  "Where a conveyance . . . is fraudulent as to a creditor, such creditor . . . may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, . . . [h]ave the conveyance set aside . . . to the extent necessary to satisfy his claim.  *Id.* § 278(1)(a).  In order to make out a claim under § 276 for fraudulent conveyance, a party must meet Fed. R. Civ. P. 9(b)'s heightened standard by pleading with particularity an actual intent to defraud, *see Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987), which "may be inferred

46

from circumstantial evidence, or 'badges of fraud,'" including:

> (1) the inadequacy of consideration received in the allegedly fraudulent conveyance; (2) the close relationship between parties to the transfer; (3) information that the transferor was rendered insolvent by the conveyance; (4) suspicious timing of transactions or existence of a pattern after the debt had been incurred or a legal action against the debtor had been threatened; or (5) the use of fictitious parties.

*Eclaire Advisor Ltd. as Tr. to Daewoo Int'l (Am.) Corp. Creditor Trust v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268-69 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).  For example, "[t]he transfer of property by the debtor to his spouse . . . while retaining the use and enjoyment of the property, is a classic badge of fraud."  *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) (citation omitted).

### 1.  *McGinn Niskayuna Property*[15]

Here, McGinn's 2009 conveyance of the Niskayuna residence to N. McGinn has nearly all of the "badges of fraud" evidencing a fraudulent intent.  First, McGinn received inadequate consideration for the transfer.  Indeed, although the home was purchased for $600,000 in 2003, and,

---

[15] The court notes that, because McGinn, N. McGinn, Smith, and L. Smith failed to respond to this portion of the SEC's motion, they are "deemed to have 'consented' to the legal arguments contained in [the SEC's] memorandum of law," and, the SEC need only "show that [its] argument[s] possess facial merit."  *Pedroso*, 2014 WL 3956570, at *6 (citations omitted).

over the years, received approximately $235,000 in improvements, (Pl.'s

SMF ¶ 580), N. McGinn paid only one dollar in consideration, (*id.* ¶¶ 579-

80).  Second, the transfer was effectuated between parties who share a

close relationship—husband and wife—and after McGinn transferred the

property to N. McGinn, he continued to live in the home.  (Dkt. No. 745,

Attach. 6 at 11.)  Finally, the circumstances surrounding the transfer are

suspicious, as it was completed only six days after McGinn expressed

concern to N. McGinn over Lex's testimony in the pending FINRA

arbitration in which McGinn was named as a respondent.  (Pl.'s SMF

¶¶ 578-79.)  Accordingly, the SEC is entitled to summary judgment on its

eighth cause of action with respect to McGinn's transfer of the Niskayuna

residence to N. McGinn.

### 2.  *Smith Vero Beach Home and L. Smith Checking Account*

The court also finds that the Smiths' 2009 transfer of the Smith Vero

Beach Home to L. Smith and their 2009 transfer of assets from a joint

checking account into the Checking Account opened only in L. Smith's

name were fraudulent.  These transfers, too, bear nearly all of the "badges

of fraud."  Again, Smith and L. Smith shared a close relationship, as they

are husband and wife.  (2d. Am. Compl. ¶ 36.)  Additionally, despite the

fact that the Smiths purchased the Smith Vero Beach Home for

$1,389,000, the court is unaware of any consideration that L. Smith

provided in exchange for the transfer.  (Pl.'s SMF ¶ 365.)  And finally, the

circumstances surrounding the transfers are highly suspicious; these

transfers were effectuated at the peak of the FINRA investigation and

amidst FINRA arbitrations commenced by customers seeking

compensatory and punitive damages.  (*Id.* ¶ 577; Dkt. No. 192, Attach. 3

¶ 9; Dkt. No. 740, Attach. 6 at 16.)   Moreover, Smith made several

statements in letters regarding his desire to transfer assets, including the

Smith Vero Beach Home, to L. Smith in order to shield them from "the very

litigious business that [he is] in," (Pl.'s SMF ¶ 555; Dkt. No. 733, Attach. 5

at 1; Dkt. No. 737, Attach. 1 at 1), and, in a January 14, 2009 email to

McGinn, stated that, "Lynn and I have to shift money arround [sic]

between us," (Dkt. No. 740, Attach. 5).

Accordingly, the SEC's motion for summary judgment with respect to

its eighth cause of action as it relates to the transfers of the Smith Vero

Beach Home and the Checking Account is granted.

### 3.  *Post-July 7, 2010 Transfers from the Smith Trust*

The SEC has identified five fraudulent transfers from the Smith Trust

following the court's July 7, 2010 decision, which, among other things, vacated the asset freeze as to the Smith Trust.  (Dkt. No. 708, Attach. 1 at 38-40.)  These transfers include: (1) the July 9, 2010 transfer to the Dunn Law Firm in the amount of $95,741; (2) the July 12, 2010 transfer to G. Smith in the amount of $96,500; (3) the July 12, 2010 transfers to L.T. Smith in the total amount of $83,000; (4) the July 16, 2010 transfer to G. Smith in the amount of $200,000; and (5) the July 23, 2010 transfer to L. Smith in the amount of $449,878.  (*Id.*)  The Smith Trust, along with G. Smith and L.T. Smith, oppose the SEC's motion, (Dkt. No. 778), and have filed their own motion seeking summary judgment dismissing the SEC's fraudulent conveyance claims asserted against them, (Dkt. No. 704).  For the reasons that follow, the SEC's motion is granted, and the Smith Trust's motion is denied.

The Smith Trust primarily contends that, in relation to these post-July 7, 2010 transfers, G. Smith and L.T. Smith did not have an actual intent to defraud.[16]  (Dkt. No. 704, Attach. 4 at 3-9.)  As the SEC notes, (Dkt. No. 788 at 5-15), however, it is the transferor's intent that is relevant

---

[16] The Smith Trust also contends that, because the Smith Trust is an irrevocable spendthrift trust, it cannot be invaded by creditors.  (Dkt. No. 704, Attach. 4 at 10-11.)  The court again rejects this argument.

for the purpose of the § 276 inquiry.  *See In Re Dreier LLP*, 452 B.R. 391, 432-33 (Bankr. S.D.N.Y. 2011) ("The text of [New York Debtor and Creditor Law] § 276 juxtaposed against other sections . . . compel the conclusion that it is the transferor's intent alone, and not the intent of the transferee, that is relevant under . . . § 276.").  Thus, L.T. Smith and G. Smith's intents are wholly irrelevant, as they were not the transferors for any of the post-July 7, 2010 transfers.

The question, then, is who was the transferor with respect to each of these five transactions?  The SEC argues, (Dkt. No. 788 at 5-7), and the court is persuaded, that Smith and L. Smith were the true transferors.  The court has already determined that Smith was an equitable owner of, and exercised control over, the Smith Trust, and, in its June 8, 2011 decision granting the SEC's request for sanctions against L. Smith, noted that, "[b]ut for L[.] Smith's concealment of the Annuity Agreement, none of the[] disbursements could or would have occurred."  (Dkt. No. 342 at 41.) Accordingly, the only parties whose intent matters are Smith and L. Smith, and the court is more than satisfied that the above transfers were made with the intent to defraud creditors, namely the SEC.

First, and most obviously, there is no dispute that L. Smith and

Smith knew that the Annuity Agreement existed when the Smith Trust was released from the asset freeze, and, thus, perpetrated a fraud on the court.  Further, the timing of these transfers could not be more suspicious. Indeed, the nearly one million dollars transferred out of the Smith Trust occurred within two weeks of the court's July 7, 2010 decision releasing the Smith Trust from the asset freeze.  Moreover, despite being the titular beneficiaries of the Trust, prior to these post-July 7, 2010 transfers, L.T. Smith and G. Smith had never received a single distribution from the Smith Trust since its creation in 2004, even during L.T. Smith's "rough period."  (Pl.'s SMF ¶ 540.)  Yet, after the Trust was unfrozen, they received a collective total of $379,500.  Further, the fact that $599,878, in total, was transferred to L. Smith in exchange for the Great Sacandaga Lake property—the only other asset of value not subject to the asset freeze—smacks of deceit.

Accordingly, the post-July 7, 2010 transfers were made in violation of § 276 of the New York Debtor and Creditor Law.  Thus, the SEC's motion for summary judgment is granted, and the Smith Trust's motion is denied.

**E.    Final Considerations**

First, consistent with this court's directive in MDO I, the SEC has requested that the receiver be permitted to consent to entry of judgment on behalf of the Four Funds, which are receivership entities.  (Dkt. No. 809 at 1, 6-7.)  The court is satisfied that the receiver has such authority under both the case law cited in the SEC's supplemental submissions, (*id.* at 7), and under the preliminary injunction order, (Dkt. No. 96 at 7).  Accordingly, the SEC's request is granted, and the receiver may consent to entry of judgment on the SEC's fifth and sixth causes of action on behalf of the Four Funds.

Second, the SEC has requested that the court defer entering judgment for the receivership defendants—MS & Co., MS Advisors, MS Capital, and the Four Funds—until the bulk of the funds held for investors have been distributed and the receivership is preparing to close.  (Dkt. No. 809 at 8.)  The purpose of this request is to prevent the "creat[ion of] any impediments to ongoing collection and recovery efforts for the benefit of investors because of an outstanding judgment against the entities for which [Brown] act[s] as Receiver."  (Dkt. No. 809, Attach. 1 ¶ 15.)  Given that no party has objected to this request, it is granted.  Brown is directed to inform the court, in writing, once the funds have been distributed and he

is ready to close the receivership, so that the court may enter judgment.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the remainder of the SEC's motion for summary judgment (Dkt. No. 708; Dkt. No. 708, Attach. 1 at 14-29, 32-40) is **GRANTED**; and it is further

**ORDERED** that the SEC's requests for disgorgement of profits in the amount of $87,433,218 and prejudgment interest in the amount of $11,668,132 are **GRANTED**; and it is further

**ORDERED** that $99,101,350—the total amount of disgorged profits plus prejudgment interest—be returned to defrauded investors; and it is further

**ORDERED** that the following assets may be applied in order to satisfy the disgorgement order: (1) the Stock Account; (2) the Smith Vero Beach Home; (3) the Checking Account; and (4) the Smith Trust; and it is further

**ORDERED** that the Clerk defer entering judgment as against the Four Funds, MS & Co., MS Advisors, and MS Capital pending further direction from the court; and it is further

**ORDERED** that Brown, on behalf of the Four Funds, may consent to entry of judgment on the SEC's fifth and sixth causes of action, and is directed to file his consent with the court within fourteen (14) days of this Memorandum-Decision and Order; and it is further

**ORDERED** that Brown is further directed to inform the court, in writing, once the funds have been distributed to investors and he is ready to close the receivership, so that the court may enter judgment; and it is further

**ORDERED** that L. Smith's motion for summary judgment (Dkt. No. 696) is **DENIED** as moot; and it is further

**ORDERED** that the Smith Trust, L.T. Smith, and G. Smith's motion for summary judgment (Dkt. No. 704) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 30, 2015
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court